# 23-60513

*In The*

# United States Court Of Appeals
## For The Fifth Circuit

**CAPSTONE LOGISTICS, L.L.C.,**
*Petitioner/Cross-Respondent*,

**v.**

**NATIONAL LABOR RELATIONS BOARD,**
*Respondent/Cross-Petitioner.*

ON PETITION FOR REVIEW AND CROSS-APPLICATION FOR
ENFORCEMENT OF A DECISION AND ORDER OF THE
NATIONAL LABOR RELATIONS BOARD

_____

**RECORD EXCERPTS OF PETITIONER/CROSS-RESPONDENT**

_____

| | |
|---|---|
| **Edward F. Harold, Esq.** | **Reyburn W. Lominack, III, Esq.** |
| **La. Bar No.: 21672** | **S.C. Bar No.: 72833** |
| **FISHER & PHILLIPS LLP** | **FISHER & PHILLIPS LLP** |
| **201 St. Charles Avenue, Suite 3710** | **1320 Main Street, Suite 750** |
| **New Orleans, Louisiana 70170** | **Columbia, South Carolina 29201** |
| **(504) 522-3303** | **(803) 255-0000** |
| **eharold@fisherphillips.com** | **rlominack@fisherphillips.com** |
| | |
| *Counsel for Petitioner/* | *Counsel for Petitioner/* |
| *Cross-Respondent* | *Cross-Respondent* |

*Gibson*MOORE APPELLATE SERVICES, LLC
206 East Cary Street ♦ P.O. Box 1460 (23218) ♦ Richmond, VA 23219
804-249-7770 ♦ www.gibsonmoore.net

# TABLE OF CONTENTS

| Tab | Document | Record Citation |
|---|---|---|

**1.**      Decision
                   filed May 10, 2022. . . . . . . . . . . . . . . . . . . . . . .  ROA.1093

**CERTIFICATE OF FILING AND SERVICE**

# TAB 1

NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

**Capstone Logistics LLC and Associated Wholesale Grocers, Inc. as Joint Employers *and* Joyce Henson and Peggy Cooper.** Cases 15–CA–257443 and 15–CA–259712

August 22, 2023

DECISION AND ORDER

BY CHAIRMAN MCFERRAN AND MEMBERS WILCOX AND PROUTY

On May 10, 2022, Administrative Law Judge Arthur J. Amchan issued the attached decision. The General Counsel and the Charging Parties filed exceptions and supporting briefs. The Respondents filed cross-exceptions and supporting briefs. The General Counsel and Respondents also filed answering briefs and reply briefs.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board has considered the decision and the record in light of the exceptions and briefs and has decided to affirm the judge's rulings, findings,[1] and conclusions only to the extent consistent with this Decision and Order.[2]

The judge dismissed the complaint in its entirety. We agree with the judge, for the reasons set forth in his decision, that neither Respondent violated Section 8(a)(1) of the Act by discharging Peggy Cooper. However, for the reasons explained below, we reverse the judge's conclusion that Respondent Capstone Logistics LLC ("Capstone") did not violate Section 8(a)(1) by discharging Joyce Henson. We also reverse the judge's conclusion that Respondent Capstone did not violate Section 8(a)(1) of the Act when it informed Henson of the reason for her discharge. Finally, we find it unnecessary to pass on the complaint allegation that Respondent Associated Wholesale Grocers, Inc. ("AWG") is a joint employer and whether AWG's actions with respect to Henson violated Section 8(a)(1) because any finding in that regard would not materially affect the remedy in light of the Section 8(a)(1) discharge violation we find with respect to Respondent Capstone.

I. FACTS

In the fall of 2019, Capstone began supplying personnel to AWG to work as auditors at AWG's food distribution warehouse in Pearl River, Louisiana.[3] The auditors were charged with insuring that AWG accurately fulfilled customer orders. Using a scan gun, the auditors checked the customers' orders stacked about 6 feet high on pallets on AWG's various docks, including the cold dock for perishables. For at least the month of October, the Capstone auditors were also required to locate items missing from the customers' orders (including items stored in the freezer). Accordingly, the number of items or cases that an auditor could scan in a given time period would be adversely affected if the items did not scan properly or if items that a customer had ordered were not on the pallet. After verifying that the customers' orders were correctly filled, the auditors then rewrapped the orders and rebuilt the pallet.

Capstone told the auditors that they would be paid hourly during their training and would receive production pay—at 16 cents per case scanned—after their training. During her short (approximately 1 month) tenure, Charging Party Joyce Henson, whom Capstone hired with the intent to make her the lead auditor, spoke to the other Capstone auditors—and Capstone and AWG personnel—about a variety of work-related matters, including concerns about their safety and training, the need for warm clothing to withstand the cold temperatures, and their pay. Henson also spoke separately with AWG and Capstone officials about her own pay as the lead auditor.

On about October 17 or 18, Capstone Trainer Prince Wilson brought the auditors to a meeting with AWG Director of Distribution Chris Griffin and AWG Senior Manager Ryan Carroll. At the meeting, Henson raised the auditors' concerns about their unsafe work location, their need for freezer suits to deal with the cold temperatures, and their production pay. As Henson spoke, the other auditors nodded their heads in agreement. Griffin

---

[1] The parties have excepted to some of the judge's credibility findings. The judge presiding over the hearing resigned before rendering a decision. The parties agreed to let another judge decide the case based on the existing record, which meant that credibility findings could not be based on demeanor. It is well established that the Board's policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect. *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951). Where, as here, credibility resolutions are not based on demeanor, the Board may make an independent evaluation of credibility, based on the weight of evidence, established facts, inherent probabilities, and reasonable inferences drawn from the record as a whole. *Storer Communications*, 297 NLRB 296, 296 fn. 2 (1989). We have carefully examined the record, independently evaluating credibility with a view to the above considerations, and we find no basis for overturning Judge Amchan's credibility resolutions.

[2] We have amended the judge's conclusions of law and recommended remedy consistent with our findings herein. We have also modified the judge's recommended Order to conform to our findings and the Board's standard remedial language. We have substituted a new notice to conform to the Order as modified.

[3] All dates are in 2019.

372 NLRB No. 124

23-60513.1093

told her that he would discuss those matters with Capstone.[4]

At the end of the meeting, Henson asked to speak to Griffin and Carroll privately. When the other auditors left, Henson raised concerns about her own pay. Henson also mentioned that she had contacted Donnie Rouse, a major customer of AWG (and a personal friend of Henson's stepfather), about her pay. Griffin expressed surprise that Henson knew Rouse and told her to contact Capstone Vice President of Operations Tim Casey and Capstone Director of Operations Mike Ruder.

Thereafter, Griffin told Casey about his meeting with the Capstone auditors. He expressed annoyance that the auditors came to him instead of their own managers about Capstone-related matters. Griffin also complained that Henson did not know who to report to, and he also told Casey about Henson's relationship with Donnie Rouse. Casey assured Griffin that he would take care of it.

At about noon on October 22, Henson, Cooper, and the other auditors met with Capstone officials Casey and Ruder, along with Andrew Powell, who was slated to succeed Ruder as director of operations. During the meeting, Henson raised concerns about the safety of the area in which the auditors were being trained. Powell indicated that this was a problem at another AWG location and that he had been able to rectify the issue. Henson also claimed that Wilson, the individual who had been training the auditors, was unqualified to do so, but Casey disagreed. Other auditors, including Cooper, raised concerns about their training and safety. When Henson asked about freezer suits for the auditors, Casey responded that Capstone was only required to provide employees with gloves and vests. Henson also raised the issue of compensation, stating that the auditors had been told that they would make 16 cents per case and arguing that the production pay system was flawed. Casey remarked that the auditors would be paid 8 or 9 cents per case.

At a private meeting that same day—either right before or right after the group meeting—Henson complained to Casey, Ruder, and Powell that she had been told that she would make $200 per day. Casey indicated that Capstone would investigate it and that she would get what she was due. During this private meeting, Casey told Henson that if she had any concerns, she should bring them only to him or Ruder, and specifically asked her not to go to the partner, AWG, with any Capstone-related issues or concerns.[5]

Despite the directive to bring her concerns only to Capstone officials, Henson sent a LinkedIn message that same day to AWG customer Donnie Rouse. The message concerned her pay and the pay of her fellow auditors, and it implicitly asked him to intervene with AWG officials Chris Griffin and Ryan Carroll on their behalf.[6] The LinkedIn message read as follows:

> This is by far the worst company I have ever worked for. Do you ever come to slidell? Would you like to have lunch with me and we talk about everything and I'll treat you!!! I really need your opinion and feed back. I'm really trying to stick it out. Today at 12:00 pm we had a meeting with capstone management. They told my auditors that they was misinformed and they will only make $0.09 per case not $0.16. I have not been given a amount that I will make. As of right now I'm only making 10.00 hr and This is week 3.
>
> I would love to talk anytime 985-290-8532 and answer any questions you might have. The guy that runs things for AWG is Chris griffin and Ryan Carroll their number is 985-863-1500.[7]

---

[4] The judge specifically credited Henson's testimony that she "raised concerted concerns regarding the production or piecework rate at which the new auditors were to be paid after completing their training." Having adopted the judge's credibility determinations, we find that Wilson's uncorroborated testimony that Henson only asked about her own pay during the group meeting with Griffin is not credible.

[5] Capstone refers to its customers, such as AWG, as its "partners."

[6] As Capstone notes in its answering brief, the judge repeatedly referred to Henson's LinkedIn message as a text. These inadvertent errors have not affected our disposition of this case.

[7] Although the judge found that Henson engaged in protected concerted activity in the October 22 group meeting with Capstone supervisors and, elsewhere in his decision, that Henson raised concerted concerns regarding the production or piecework rate at which the new auditors were to be paid, the judge, in the course of discussing Capstone's knowledge of Henson's protected concerted activity, merely pointed to Prince Wilson's having knowledge of same, even though Wilson was not at the October 22 meeting. We find that Henson's LinkedIn message supports Henson's testimony, which we credit, that she mentioned the pay issue for the auditors at the October 22 group meeting with Casey, Ruder, and Powell. In addition to the concerns about her own pay, Henson's LinkedIn message also raises the concern that the auditors had learned at the noon meeting that they would be making substantially less than the 16 cents per case they had been promised. Henson's testimony is additionally supported by an internal Capstone email indicating that Henson claimed, after being fired, that there had been a discussion with Casey about a pay issue that Casey was apparently working on for "them" (i.e., for the "employees" as a group).

There is no contrary testimony on this point from Ruder and Powell. And although Casey testified that he could not remember Henson saying anything specifically during the meeting, he admitted that concerns were raised during the meeting about production pay and about how they (the employees as a group) would not be able to make money. Given that Henson's LinkedIn message to AWG's customer mentioned a specific reduction in the production rate, we do not find credible

Shortly thereafter, Griffin learned about Henson's LinkedIn message. Griffin then approached Henson[8] and, later that afternoon, had a short conversation with Casey about Henson.[9]

The following day, Casey told Ruder that he (Casey) had decided to fire Henson because she "had gone to the partner [AWG] with some concerns" after being told not to voice concerns to the partner, thereby "violat[ing] proper communication." Casey then telephoned Henson and informed her that Capstone was terminating her because of what had transpired the day before and for disrupting Capstone's relationship with its business partner, AWG. Casey did not ask Henson what had transpired between her and Griffin on October 22.

Henson subsequently contacted Capstone's HR department several times about her discharge. On November 6, Casey left the following voice mail message for Henson:

> My apologies nobody's gotten back to you yet on, uh, reason for termination but, uh, I think it's pretty clear [unintelligible] at the end of the day it was disruption of business. Even after we had spoke, uh, day before, um, and had an agreement with how we were going to go forward, you came in questioning the partner and…and, uh, which basically disrupted business on things we already talked about and I had told you that if you had any questions or issues, to come to me so I thought it best to separate ways.[10]

Casey testified that AWG personnel never asked or instructed Capstone to terminate Henson and had no input into his decision to fire Henson, and that he alone made the decision to fire Henson.

By the time of the unfair labor practice hearing, Capstone was no longer providing auditing services for AWG.

## II. ANALYSIS

### A. The Discharge of Henson

Applying *Wright Line*,[11] the judge dismissed the complaint allegation that Capstone unlawfully discharged Henson. The judge concluded that the General Counsel failed to satisfy her initial burden of showing that Capstone's opposition to Henson's protected concerted activity was a motivating factor in its decision to discharge Henson, notwithstanding his findings that Capstone knew Henson had engaged in protected concerted activity, that the timing of Henson's October 23 discharge—so soon after she raised group concerns to Capstone on October 22—was suspicious, and that the record contained evidence of pretext ("lack of investigation, departure from normal practices, disparate treatment, etc.").

Noting that Griffin contacted Casey almost immediately after Griffin's October 22 interaction with Henson, the judge found that "more likely than not, whatever occurred [during Henson's interaction with Griffin] led to Henson's termination by Capstone the next day." However, the judge found that there was no reliable evidence as to what transpired between Griffin and Henson during that interaction and concluded there was no evidence that Henson engaged in protected concerted activity during the interaction that led to the discharge. The judge further found no evidence of animus by Capstone towards Henson prior to October 22, even though Capstone knew that she had engaged in protected concerted activity before then. Although the judge found that Capstone's directive not to bring Capstone-related issues or concerns to AWG evinced animus, the judge found that this directive did not show animus toward Henson's protected activities because she was also engaged in an unprotected effort to secure better compensation for herself.[12]

We disagree with the judge's analysis and find the discharge unlawful. As discussed below, we find that the record supports two rationales for finding that Henson's discharge violated Section 8(a)(1)—that she was discharged for sending a LinkedIn message to a customer to enlist support for an employee compensation matter, and that she was discharged because Capstone believed she engaged in a protected concerted conversation with Griffin.

---

Casey's testimony that he did not make any statement about a specific production rate at the group meeting.

[8] We note that the judge inferred this fact, and there are no exceptions to the judge's inference. We further note that the judge found that there was "no reliable evidence in this record as to what transpired between Griffin and Henson on the afternoon of October 22." Although Griffin did not testify, Henson testified that Griffin asked her about her meeting with Casey, Ruder, and Powell. She replied that the meeting had gone well, and then she and Griffin returned to work.

[9] Once again, the judge found that there "is no reliable evidence as to what was said by either one." The judge reasoned that Casey's account of what Griffin said to him "is too self-serving in the context of this record to be credible."

[10] The text of Casey's voice mail message, set forth above, slightly differs from that set forth in the judge's decision. We have conformed it to a clarification made at the hearing by AWG's counsel, and agreed to by Casey, after listening to the message. The General Counsel also appeared to agree to the clarification, though the exhibit transcription does not reflect the entire clarification. The conformance does not affect our decision on the merits of this case.

[11] 251 NLRB 1083 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982).

[12] Similarly, in a separate section of his decision dealing with the legality of Casey's statements about the discharge, the judge stated that, in a private meeting with Capstone officials on October 22, Henson engaged in unprotected conduct by raising concerns about her own pay.

### 1. Capstone discharged Henson because of her protected concerted activity of sending a LinkedIn message to AWG's customer to enlist the support of AWG regarding the auditors' pay

In assessing the legality of the discharge, the judge focused on Henson's interaction with Griffin on the afternoon of October 22, noting that Griffin contacted Casey almost immediately thereafter and that Casey fired Henson the very next day. However, as the judge found, that interaction occurred after Griffin had learned of Henson's LinkedIn Message to AWG's customer Donnie Rouse. Having carefully examined the record, we find that Capstone fired Henson because she sent the LinkedIn message to Rouse, and for this reason the discharge was unlawful.

Section 7 grants employees the right to engage in concerted activities for mutual aid or protection. As the Supreme Court has recognized, employees do "not lose their protection under the 'mutual aid or protection' clause when they seek to improve terms and conditions of employment or otherwise improve their lot as employees through channels outside the immediate employee-employer relationship." *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565 (1978). Thus, it is well settled that employees have a Section 7 right to communicate with their employer's customers about their terms and conditions of employment for their mutual aid or protection. See *CleanPower, Inc.*, 316 NLRB 496, 497–498 (1995) (janitorial service employee engaged in protected concerted activity by threatening to bring group complaints about working conditions to his employer's customer—the manager of an office building—in an attempt to enlist the customer's support for the employees' cause, and employer unlawfully threatened to discipline the employee for doing so); *Allied Aviation Service Co. of New Jersey, Inc.*, 248 NLRB 229, 229–231 (1980) (employer unlawfully suspended and discharged employee for sending letters to his employer's customers about safety issues), enfd. 636 F.2d 1210 (3d Cir. 1980).

Here, we find that Henson engaged in protected concerted activity by sending the LinkedIn message to the customer (Donnie Rouse) of Capstone's partner (AWG) in an effort to enlist Rouse's support in asking AWG to intervene with Capstone on the employees' behalf concerning their pay. Clearly, Henson's LinkedIn message was a logical outgrowth of the employees' prior protected concerted activity. See *NLRB v. Mike Yurosek & Son, Inc.*, 53 F.3d 261, 265 (9th Cir. 1995) ("The lone act of a single employee is concerted if it 'stems from' or 'logically grew' out of prior concerted activity."), enfg. 306 NLRB 1037, 1038 (1992).[13] The message specifically complained about her fellow auditors' pay (and not just her own pay), just as Henson had in the noon meeting earlier that day with Casey, and in the group meeting with AWG's Chris Griffin the previous week. Significantly, the message also provided the customer with the telephone number of AWG Officials Griffin and Carroll for the customer to call.[14]

Although there is no direct evidence that Capstone Vice President Casey knew about Henson's LinkedIn message to AWG Customer Donnie Rouse when he decided to fire her, we find that the record warrants an inference of such knowledge. It is well-settled that knowledge of an employee's protected activity may be proven by circumstantial evidence from which a reasonable inference may be drawn. Such circumstances may include the employer's general knowledge of protected activity, animus towards that activity, evidence of prior reports to the employer about the protected activity, and the timing of the adverse action in relation to the employee's protected activity. *Waste Management de Puerto Rico*, 339 NLRB 262, 266, 271 (2003), enfd. sub. nom. *E.C. Waste, Inc. v. NLRB*, 359 F.3d 36, 42-43 (1st Cir. 2004); *Kajima Engineering & Construction*, 331 NLRB 1604, 1604-1605 (2000).

Applying those principles, we find that Casey knew of Henson's LinkedIn message when he decided to fire her. To begin, there is no dispute that Casey knew that Henson had engaged in protected concerted activity before discharging her. Indeed, there are no exceptions to the judge's finding that "Henson engaged in protected concerted activity in the group meeting with Capstone supervisors" on October 22, at which Casey was present. We further note that Griffin had previously complained to Casey that the auditors came to him (Griffin) instead of their own managers about Capstone-related issues, remarked to Casey that Henson did not know whom to report to, and told Casey about Henson's relationship with Donnie Rouse. As shown, Casey then assured the annoyed Griffin that he would take care of it. Yet, despite Casey's assurance, Griffin subsequently learned that Henson had asked Rouse (in the LinkedIn message) to contact him (Griffin) about the employees' pay issues

---

[13] See also *Salisbury Hotel*, 283 NLRB 685, 686-687 (1987) (employee's call to the Department of Labor was concerted, notwithstanding there was no evidence that any employee knew in advance that she would call the department or that they authorized her to call on their behalf, because her call logically grew out of the employees' concerted efforts regarding the employer's new lunch policy).

[14] Indeed, Capstone's attorney admitted at the hearing that "Ms. Henson, in her LinkedIn message to Mr. Rouse, . . . . told him . . . to call AWG's managers."

with Capstone.[15] And shortly thereafter, Griffin spoke to Casey about Henson, whereupon Casey immediately decided to discharge Henson.[16] Griffin's prior reporting to Casey along with the sequence of events constitutes compelling circumstantial evidence that Griffin told Casey about Henson's October 22 LinkedIn message prior to Casey's decision to discharge Henson. See generally *NLRB v. RELCO Locomotives, In*c., 734 F.3d 764, 770, 781, 783 (8th Cir. 2013) (Board was entitled to infer employer's knowledge of discriminatees' protected activity where record showed that another employee had been informing management about the union campaign); *Kajima Engineering & Construction*, 331 NLRB at 1604-1605 (employer's general knowledge of protected activity, its demonstrated animus, and the timing of the adverse action support inference of knowledge).

We further find that, because Capstone essentially admitted that it discharged Henson because of the conduct found to be protected concerted activity, a *Wright Line* analysis is not necessary in these circumstances. See *Valley Hospital Medical Center*, 351 NLRB 1250, 1251-1252 fn. 5 (2007) (*Wright Line* inapplicable where the motive for the challenged action is not in dispute), enfd. 358 Fed. Appx. 783 (9th Cir. 2009); *Neff-Perkins Co.*, 315 NLRB 1229, 1229 fn. 2 (1994) (judge need not apply *Wright Line* analysis where conduct for which employer claims to have discharged employee was protected concerted activity). Significantly, just before firing Henson on October 23, Casey told Director Ruder that he had decided to fire Henson because she had gone to the partner after being told not to do so. Casey then told Henson she was fired for what had transpired the day before and for disrupting Capstone's relationship with its business partner—statements that link her discharge to her protected concerted activity in sending the LinkedIn message.

Even assuming a *Wright Line* analysis were applicable, our finding that Capstone unlawfully discharged Henson would nonetheless be warranted. First, the evidence establishes that Henson's protected concerted activity was a motivating factor in the discharge. As shown, Henson engaged in protected concerted activity by sending the LinkedIn message, and Casey knew it before firing her. Animus is demonstrated by Capstone's hostility towards Henson's raising the auditors' Capstone-related issues to AWG. Additionally, Casey's statements to Director Ruder immediately before the discharge, and his explanation to Henson for her discharge, amplify its motivation.[17] Further, the timing of Casey's decision to fire Henson, immediately after learning of her LinkedIn message, also makes the motivation "stunningly obvious." *NLRB v. S.E. Nichols, Inc.,* 862 F.2d 952, 959 (2d Cir. 1988), enfg. 284 NLRB 556 (1987). Accord *Matson Terminals, Inc., v. NLRB*, 114 F.3d 300, 303 (D.C. Cir. 1997) (proximity between protected activity and employer's action, by itself, is substantial circumstantial evidence of unlawful motivation), enfg. 321 NLRB 879 (1996); *Parkview Lounge, LLC d/b/a Ascent Lounge*, 366 NLRB No. 71, slip op. at 2 (2018) (suspicious timing of discharge, just 2 days after employee engaged in protected concerted activity, was evidence of animus), enfd. 790 Fed. Appx. 256 (2d Cir. 2019).

We find unavailing Capstone's reliance on the fact that the General Counsel did not allege as unlawful (and the judge did not find unlawful) Casey's directive not to bring Capstone-related issues or concerns to the partner. Put simply, the absence of such an allegation cannot immunize Capstone's decision to discharge her for engaging in protected concerted activity in sending the LinkedIn message. See *NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 17 (1962) (rejecting employer's contention that its established rule forbidding employees to leave work without permission of the foreman entitled it to discharge employees who exercised their Section 7 rights to walk off the job in protest of cold working conditions); *Valley Hospital Medical Center*, 351 NLRB at 1254 ("[S]o long as protected concerted activity is not unlawful, violent, in breach of contract, or disloyal, employees engaged in such activity generally do not lose the protection of the Act simply because their activity contravenes an employer's rule or policies.").

Relying on the judge's finding that Henson was "primarily concerned with her own pay and not that of others," Capstone also argues that "any animus Capstone . . . had was to Henson's unprotected conduct" of seeking AWG's assistance in securing better compensation for herself. We disagree. Whatever Henson was "primarily" concerned about, the fact remains that the LinkedIn message raised concerted concerns about the pay of her fellow auditors and not just concerns about her own pay. Casey's broad directive not to bring Capstone-related issues or concerns to AWG certainly was not limited to Henson's individual concerns. In short, it would strain

---

[15] As noted, no party excepts to the judge's inference that Griffin learned of Henson's LinkedIn message before he approached Henson.

[16] Indeed, Casey testified that he decided to fire Henson "immediately after" his call with Griffin.

[17] See *Bowling Transportation, Inc.*, 336 NLRB 393, 394, 398 (2001) (protected concerted activity found to be a motivating factor in employee discharges where employer told employees it was removing them from the property because of their discussion with their employer's customer about working conditions), enfd. 352 F.3d 274 (6th Cir. 2003); *NLRB v. L. C. Ferguson*, 257 F.2d 88, 92 (5th Cir. 1958) (employer's statement constituted "outright confession" of unlawful motivation).

credulity to conclude that Casey was only angry with Henson for raising concerns about her own pay in the LinkedIn message.

In sum, we find that the record strongly supports a finding that Henson's protected LinkedIn message to Rouse was a motivating factor in her discharge. Accordingly, under *Wright Line* the burden shifts to Capstone to prove that it would have fired Henson even absent that protected concerted activity. We note that the only other explanation Casey offered for discharging Henson was his claim that she had been rude, disruptive, and difficult to control during her October 22 interaction with Griffin. The judge essentially rejected this contention in his finding that there was no reliable evidence about what had happened during Henson's interaction with Griffin. Casey did not witness the interaction between Henson and Griffin, and Griffin did not testify.

We agree that the record fails to show that Henson engaged in misconduct in her interaction with Griffin. First, we find without merit Capstone's claim that Casey was entitled to rely on Griffin's purported report of Henson's October 22 misconduct simply because he had known Griffin for years and believed him to be credible. There is no credited evidence that anyone told Casey, the individual who decided to fire Henson, that Henson had been rude, disruptive, and difficult to control. And Griffin, the person who supposedly told Casey about Henson's misconduct, did not testify. As noted above, the judge found Casey's account of Griffin's call with him "too self-serving in the context of this record to be credible." Further, the phone/text records between Griffin and Casey do not reveal the content of their conversation, and there are no written communications from Griffin stating that Henson was rude, disruptive, or difficult to control on October 22. Indeed, there is no evidence that Henson had ever been rude, disruptive, or difficult to control at all.

In any event, even assuming Casey reasonably believed Henson was rude, disruptive, and difficult to control during her interaction with Griffin on October 22, the record fails to show that it would have fired her for that reason in the absence of the protected activity. Capstone relies on sections of its Associate Handbook providing that failure to conform to its policies can be grounds for discharge without prior warning or discipline, and that abusive or offensive language and disorderly or coercive conduct "may" or "could" result in immediate termination. And Casey testified that he considered insubordination to be encompassed in the type of serious misconduct that could result in immediate termination. However, "[u]nder *Wright Line*, an employer cannot carry its burden of persuasion by merely showing that it had a legitimate reason for [its action], but must show by a preponderance of the evidence that the action would have taken place even without the protected conduct." *Hicks Oils & Hicksgas*, 293 NLRB 84, 85 (1989), enfd. 942 F.2d 1140 (7th Cir. 1991). Significantly, the record shows that in some instances Capstone imposed lesser forms of discipline on employees who had been rude, disruptive, insubordinate, and difficult to control. For example, Capstone suspended for two days an employee who had violated workplace rules prohibiting "creating or causing a disturbance, which is disruptive to the workplace and . . . insubordination; refusal to perform a job duty."[18] In another instance, Capstone merely warned an employee for violating company policies and engaging in inappropriate behavior ("disrespectful and cursing to his direct supervisor").[19]

Finally, we note that Casey admitted that although Capstone typically issues a written notice of termination to the employees it fires, it did not do so for Henson. This departure from its normal practice casts further doubt on Capstone's claim that it would have fired Henson even absent her protected concerted activity. *Kajima Engineering & Construction*, 331 NLRB at 1605.

In sum, we find the record demonstrates that Capstone unlawfully discharged Henson in retaliation for her protected LinkedIn message. In addition, and as explained below, we further find that even assuming Capstone did not actually know that Henson had sent that protected message, it unlawfully discharged her based on its belief that she engaged in other protected concerted activity.

2. Capstone discharged Henson because it believed she had engaged in protected concerted activity during her October 22 interaction with AWG's Chris Griffin

In dismissing the discharge allegation, the judge found that there was no showing that Henson had engaged in protected concerted activity during the October 22 interaction with AWG's Chris Griffin that the judge found "more likely than not" had led to her discharge. However, it is well settled that even if an employee has not actually engaged in protected concerted activity, an employer violates the Act if it discharges the employee because it believes that the employee engaged in protected concerted activity. See, e.g., *JCR Hotel, Inc. v. NLRB*, 342 F.3d 837, 839 (8th Cir. 2003) (employer's erroneous belief that an employee has engaged in protected concerted activity "can be the basis of a § 8(a)(1) viola-

---

[18] GC Exh. 13 p. 2.
[19] R Exh. 36 p. 2. Although these incidents occurred in different time frames and at different locations, Capstone Director Powell admitted that Capstone's rules apply equally regardless of the partner or facility location and that Capstone's policies had not changed between 2018 and 2020.

tion."), enfg. 338 NLRB 250 (2002); *Metropolitan Orthopedic Associates, P.C.*, 237 NLRB 427, 427 fn. 3 (1978) (the "discharge of 4 employees . . . because of Respondent's belief, albeit mistaken, that the[y] had engaged in protected concerted activities is an unfair labor practice . . . ."); see also *Monarch Water Systems*, 271 NLRB 558, 558 & fn. 3 (1984).

Contrary to the judge, the record supports a finding that a motivating factor for Capstone's discharge of Henson was its belief that she had raised group employment complaints to Griffin on October 22. Indeed, if Casey did not believe that Henson had brought complaints to AWG's Chris Griffin on October 22, there would have been no reason for Casey to claim—when explaining the reason for her discharge—that Henson had violated his directive not to bring Capstone-related issues or concerns to AWG.[20] To be sure, Casey had good reason to believe that Henson had raised group complaints to Griffin, because Henson had raised group complaints earlier that day during the meeting the auditors had with Casey, Ruder, and Powell.[21] The evidentiary admissions, the timing of the discharge, and Capstone's hostility toward Henson's act of raising the auditors' issues to AWG, persuade us that Henson's discharge was motivated by Capstone's belief that she had engaged in protected concerted activity during her October 22 interaction with Griffin.[22]

For the reasons previously discussed, we reject Capstone's contention that it would have fired Henson even absent its belief that she engaged in protected concerted activity for being rude, disruptive, and difficult to control during her October 22 interaction with Griffin. We therefore conclude that the record shows that Capstone violated Section 8(a)(1) by discharging Henson because it believed she engaged in protected concerted activity.

*B. Capstone VP Casey Violated Section 8(a)(1) by Telling Henson She Was Fired for an Unlawful Reason.*

The judge dismissed the allegation that Casey violated the Act by telling Henson—in the October 23 discharge call and in the November 6 voice mail message--that she was fired for her protected concerted activity. Relying on his findings that there is no evidence that Henson had engaged in protected concerted activity during her October 22 interaction with Griffin and that Henson engaged in both protected and unprotected activity in her October 22 interactions with Casey, the judge found that Casey's statements of termination did "not mean" she was terminated for her protected concerted activity.

However, having found, contrary to the judge, that Henson's discharge was unlawful, we also find that Casey violated the Act by telling Henson that she was fired for the protected concerted activity that formed the basis for the discharge. Indeed, there can be no doubt that an employee in Henson's position would reasonably conclude from Casey's explanations (in both the discharge call and in the subsequent voice mail message) that Capstone terminated her for engaging in protected concerted activity. As the judge found, Casey specifically told Henson in the discharge call that she was fired for what had happened the day before (i.e., on October 22) and for disrupting Capstone's relationship with its business partner, AWG. Similarly, Casey's November 6 voice mail message explained that Casey thought it best to go their separate ways because Henson had questioned the partner (AWG) after being told not to bring Capstone-related issues to AWG. See generally *Bowling Transportation*, 336 NLRB at 393–394, 398 (employer violated Section 8(a)(1) by telling employees they were being removed from the property because of their protected discussion about a safety bonus and, with respect to one employee, because of suspected union activity).

AMENDED CONCLUSIONS OF LAW

1. Capstone Logistics LLC (Respondent Capstone) is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

2. Respondent Capstone violated Section 8(a)(1) of the Act by discharging employee Joyce Henson because she engaged in protected concerted activity and/or because Respondent Capstone believed she engaged in protected concerted activity.

---

[20] The record amply supports the fact that Casey made this claim. Ruder testified that Casey told him that he (Casey) had decided to fire Henson because she "had gone to the partner [AWG] with some concerns" after being told not to voice concerns to the partner, thereby "violat[ing] proper communication." Additionally, the voice mail message that Casey left for Henson a couple of weeks after her discharge also stated this as the reason for the discharge. Moreover, Capstone's oral motion to dismiss the case conceded this point, stating among other things that "[t]he only evidence about what Mr. Casey was upset about was when Ms. Henson came back in, questioning Capstone's partner and that disrupted its business relationship with AWG" and that "[t]he evidence is that Ms. Henson disregarded his instructions immediately afterwards and went back to Capstone's partner and that was the reason."

[21] As noted, Capstone does not except to the judge's finding that Henson engaged in protected concerted activity in the group meeting with Capstone supervisors on October 22, shortly before her interaction with Griffin.

[22] See generally *Bowling Transportation*, 336 NLRB at 393, 394, 398 (discharge of employee violated Sec. 8(a)(3) where employer told employee he was being removed from the property because employer believed he was trying to start a union based on his conversation with the employer's customer); *Matson Terminals, Inc., v. NLRB*, 114 F.3d at 303 (proximity between protected activity and employer's action is substantial circumstantial evidence of unlawful motivation); *Parkview Lounge, LLC d/b/a Ascent Lounge*, 366 NLRB No. 71, slip op. at 2 (suspicious timing of the discharge supports finding of unlawful motivation).

3. Respondent Capstone violated Section 8(a)(1) of the Act by informing Henson that she was discharged for engaging in protected concerted activity.

4. The above unfair labor practices affect commerce within the meaning of Section 2(6) and (7) of the Act.

REMEDY

Having found that Respondent Capstone has engaged in certain unfair labor practices, we shall order it to cease and desist and to take certain affirmative action designed to effectuate the policies of the Act. Specifically, having found that Respondent Capstone violated Section 8(a)(1) by discharging Joyce Henson, we shall order that Respondent Capstone offer Joyce Henson immediate and full reinstatement to her former job, or, if that job no longer exists, to a substantially equivalent position, without prejudice to her seniority or other rights. Respondent Capstone shall also make Joyce Henson whole for any loss of earnings and other benefits she may have suffered by reason of its unlawful discrimination. Backpay shall be computed in the manner set forth in *F.W. Woolworth Co.*, 90 NLRB 289 (1950), with interest to be computed in the manner set forth in *New Horizons*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center*, 356 NLRB 6 (2010). In accordance with our decision in *Thryv, Inc.*, 372 NLRB No. 22 (2022), Respondent Capstone shall also compensate Joyce Henson for any other direct or foreseeable pecuniary harms incurred as a result of the unlawful discharge, including reasonable search-for-work and interim employment expenses, if any, regardless of whether these expenses exceed interim earnings. Compensation for these harms shall be calculated separately from taxable net backpay, with interest at the rate prescribed in *New Horizons,* supra, compounded daily as prescribed in *Kentucky River Medical Center*, supra. In addition, Respondent Capstone shall compensate Joyce Henson for the adverse tax consequences, if any, of receiving a lump-sum backpay award and file a report with the Social Security Administration allocating the backpay awards to the appropriate calendar quarters. In accordance with *Cascades Containerboard Packaging—Niagara*, 370 NLRB No. 76 (2021), as modified in 371 NLRB No. 25 (2021), we shall also order Respondent Capstone to file with the Regional Director a copy of Henson's W-2 form(s) reflecting the backpay award. Respondent Capstone shall also be ordered to expunge from its files any reference to Henson's loss of employment and to notify her in writing that this has been done and that the loss of employment will not be used against her in any way. We shall also order Respondent Capstone to post an appropriate notice in accord with *J. Picini Flooring*, 356 NLRB 11 (2010), and *Paragon Systems, Inc.*, 371 NLRB No. 104 (2022).

ORDER

The National Labor Relations Board orders that the Respondent, Capstone Logistics LLC, Pearl River, Louisiana, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Discharging employees because they engage in protected concerted activities or because of its belief that they have engaged in protected concerted activities.

(b) Telling employees that they were discharged because they engaged in protected concerted activities.

(c) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Within 14 days from the date of this Order, offer Joyce Henson full reinstatement to her former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to her seniority or any other rights or privileges previously enjoyed.

(b) Make Joyce Henson whole for any loss of earnings and other benefits, and for any other direct or foreseeable pecuniary harms, suffered as a result of her unlawful termination, in the manner set forth in the remedy section of this decision.

(c) Compensate Joyce Henson for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and file with the Regional Director for Region 15, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay awards to the appropriate calendar year(s).

(d) File with the Regional Director for Region 15, within 21 days of the date the amount of backpay is fixed either by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of Joyce Henson's corresponding W-2 form(s) reflecting the backpay award.

(e) Within 14 days from the date of this Order, remove from its files any reference to the unlawful discharge, and within 3 days thereafter, notify Joyce Henson in writing that this has been done and that the discharge will not be used against her in any way.

(f) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an elec-

tronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(g)  Post at its offices in AWG's Pearl River, Louisiana facility, copies of the attached notice marked "Appendix."²³  Copies of the notice, on forms provided by the Regional Director for Region 15, after being signed by Respondent Capstone's authorized representative, shall be posted by Respondent Capstone and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted.  In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if Respondent Capstone customarily communicates with its employees by such means.  Reasonable steps shall be taken by Respondent Capstone to ensure that the notice is not altered, defaced, or covered by any other material.  If Respondent Capstone has gone out of business or no longer has offices at the AWG's Pear River facility involved in these proceedings, Respondent Capstone shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by Respondent Capstone at the AWG Pearl River facility at any time since October 23, 2019.

(h)  Within 21 days after service by the Region, file with the Regional Director for Region 15 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

IT IS FURTHER ORDERED that the complaint is dismissed insofar as it alleges violations of the Act not specifically found.

Dated, Washington, D.C.  August 22, 2023

_____
Lauren McFerran,                Chairman

_____
Gwynne A. Wilcox,                Member

_____
David M. Prouty,                Member

(SEAL)        NATIONAL LABOR RELATIONS BOARD

## APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT discharge or otherwise discriminate against any of you for engaging in protected concerted activities or because we believe you to have engaged in protected concerted activities.

WE WILL NOT tell you that you were discharged because you engaged in protected concerted activities.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL, within 14 days from the date of this Order, offer Joyce Henson full reinstatement to her former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to her seniority or any other rights or privileges previously enjoyed.

WE WILL make Joyce Henson whole for any loss of earnings and other benefits resulting from the unlawful

---

[23]  If the facility involved in these proceedings is open and staffed by a substantial complement of employees, the notices must be posted within 14 days after service by the Region.  If the facility involved in these proceedings is closed or not staffed by a substantial complement of employees due to the Coronavirus Disease 2019 (COVID-19) pandemic, the notices must be posted within 14 days after the facility reopens and a substantial complement of employees has returned to work, and the notices may not be posted until a substantial complement of employees has returned to work.  If, while closed or not staffed by a substantial complement of employees due to the pandemic, the Respondent is communicating with its employees by electronic means, the notice must also be posted by such electronic means within 14 days after service by the Region.  If the notice to be physically posted was posted electronically more than 60 days before physical posting of the notice, the notice shall state at the bottom that "This is the same notice previously [sent or posted] electronically on [date]."  If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

termination, less any net interim earnings, plus interest, and WE WILL also make Joyce Henson whole for any other direct or foreseeable pecuniary harms suffered as a result of the unlawful termination, including reasonable search-for-work and interim employment expenses, plus interest.

WE WILL compensate Joyce Henson for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and WE WILL file with the Regional Director for Region 15, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar year(s).

WE WILL file with the Regional Director for Region 15, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of Joyce Henson's corresponding W-2 form(s) reflecting the backpay award.

WE WILL, within 14 days from the date of the Board's Order, remove from our files any reference to the unlawful discharge of Joyce Henson and WE WILL, within 3 days thereafter, notify Joyce Henson in writing that this has been done and that the discharge will not be used against her in any way.

CAPSTONE LOGISTICS LLC

The Board's decision can be found at www.nlrb.gov/case/15-CA-257443 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



*William T. Hearne, Esq.*, for the General Counsel.
*David I. Klass* and *Benjamin S. Morris Esqs. (Fisher and Phillips, LLP)*, of Charlotte, North Carolina, for the Respondent Capstone Logistics.
*Martin J. Regimbal* and *Bart N. Sisk, Esqs. (The Kullman Firm)*, of Memphis, Tennessee, for Respondent Associated Wholesale Grocers.
*Casey R. Denson* and *Justine Daniel, Esqs. (Casey Denson Law)*, of New Orleans, Louisiana, for the Charging Party.

## DECISION

### STATEMENT OF THE CASE

ARTHUR J. AMCHAN, Administrative Law Judge. This case was tried via Zoom technology from May 10–13, 2021, before Administrative Law Judge Elizabeth M. Tafe. Posttrial briefs were filed by the parties on July 1, 2021. Effective April 25, 2022, Judge Tafe transferred to a non-judicial position at the NLRB. On that date I reassigned this case to myself. The parties have agreed to my issuing a decision on the record made before Judge Tafe.

Joyce Henson filed the initial charge in Case 15–CA–257443 on March 3, 2020. Peggy Cooper filed the initial charge in Case 15–CA–259712 on April 27, 2020. The General Counsel issued a consolidated complaint in these cases on October 5, 2020.

The General Counsel alleges that Respondents, Capstone Logistics and Associated Wholesale Grocers (AWG) violated Section 8(a)(1) of the Act by discharging Joyce Henson on about October 23, 2019, and by discharging Peggy Cooper on about November 1, 2019, because they engaged in protected concerted activity.[1]

The General Counsel alleges further that Capstone and AWG were joint employers of the Capstone auditor employees working at AWG's Pearl River, Louisiana facility in 2019 and 2020.

On the entire record, but not including observation of the demeanor of the witnesses,[2] and after considering the briefs filed by the General Counsel and separately by Respondents Capstone Logistics and Associated Wholesale Grocers, I make the following

### FINDINGS OF FACT

#### I. JURISDICTION

Capstone Logistics is a nationwide company that provides labor to other businesses,[3] including Associated Wholesale Grocers at its facilities, including one in Pearl River, Louisiana. Associated Wholesale Grocers (AWG) is also a nationwide company, which distributes groceries. Capstone annually performs services valued in excess of $50,000 in States other than Louisiana. AWG annually purchases and receives goods valued in excess of $50,000 directly from points outside of Louisiana. Respondents admit, and I find, that they are employers engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

#### II. ALLEGED UNFAIR LABOR PRACTICES

Capstone Logistics provides labor to AWG at many sites, including its distribution center in Pearl River, Louisiana, which is also known as AWG's Gulf Coast facility. In late September

---

[1] The General Counsel also alleges that Tim Casey, Capstone's vice president of operations, made certain statements that violated Section 8(a)(1).
[2] I have credited conflicting testimony based upon the weight of the evidence, established or admitted facts, inherent probabilities, and reasonable inferences drawn from the record as a whole. *Panelrama Centers,* 296 NLRB 711 fn. 1 (1989).
[3] Capstone provides labor to companies other than AWG, such as Family Dollar.

2019 Capstone began providing auditors to AWG at Pearl River. Auditors worked a day shift.

Capstone had been providing unloaders and sanitation employees to AWG at Pearl River since 2014.[4] Unloaders worked exclusively at night, starting at about 1 a.m. Unloaders were paid according to their production (piecework) but sanitation workers, whose main job was to scrape ice off a freezer floor were paid an hourly wage. While sanitation workers also worked mainly at night, some worked a day shift (Tr. 386).

The auditors' job is to check groceries that have been loaded on pallets with a scan gun to insure that the items on the pallet match the customer's order. The customers are usually grocery chains. AWG employees instruct the Capstone auditors as to which pallets they must audit.

The auditor's job requires the employee to lift items weighing up to 80 pounds while transferring items from one pallet to another. They are generally paid an hourly wage during training and then earn production pay (i.e., piecework) after training. The Capstone auditors hired at Pearl River were told they would switch to production pay after training. However, in the 9 months or so that Capstone provided auditors to AWG at Pearl River, its auditors were paid an hourly wage throughout their employment.

In late September or early October 2019, Capstone hired the Charging Parties, Joyce Henson and Peggy Cooper as audit employees at Pearl River. At about the same time, it hired Valerie Marcel to be an auditor. Afterwards, possibly about October 14, 2019, Capstone hired Kiki Garcia to be an auditor. The new auditors trained together.

When these employees were hired, Capstone's site manager was Shadi Krishnan, who left shortly after they arrived. Prince Wilson, a Capstone manager from Albany, New York, arrived at Pearl River to train the new auditors on about October 5, 2019. During his 2 weeks at Pearl River Wilson trained the new auditors in how to operate the double pallet jack, a type of forklift truck. He did not train them in how to perform the auditing job.

For 1 week or 2, Brady Bordelon, a AWG warehouse lead, at the direction of his supervisor, Robert Kelly, trained the Capstone auditors by having them "shadow" auditors who worked for AWG.[5] On about October 25, Shayne Mora, a lead auditor working for Capstone in Kansas City, arrived at Pearl River to conduct training of the new employees in the auditing function. Prior to Mora's arrival, the Capstone auditors were managed by AWG personnel (GC Exh. 16).

### Joyce Henson

Capstone hired Joyce Henson on or about September 30, 2019. She had worked for Capstone at AWG's Pearl River facility several years earlier. Capstone hired Henson with the intention of making her the lead auditor. As such she would have been compensated via an hourly wage plus being paid per her production. The other auditors were to be paid only per production after completing their training.

On Henson's first day she attended an orientation with several other newly hired auditors, Peggy Cooper and Valerie Marcel. The Capstone site manager sent the new employees' home after orientation because they were not certified to operate the jacks (forklifts). When Prince Wilson arrived; he began their forklift training. This training took place in a room where the facility's equipment was charged and stored. Henson complained to Wilson in front of the other new auditors that the area was dangerous and asked if the training could take place elsewhere at the facility.[6]

On or about October 9 or 10, Henson had a conversation with Glenn Batiste, the warehouse trainer supervisor for AWG, in the presence of Prince Wilson and auditors Peggy Cooper and Valerie Marcel. Batiste told the new auditors that the equipment at Pearl River was very dangerous and gave them tips on how to avoid injury. Henson questioned why Capstone was doing its training in the equipment room. Batiste replied that he did not understand why they were training there; he trained AWG employees in open areas on the loading dock.[7]

On October 11, 2019, Henson filled out an evaluation form, giving Wilson perfect marks as an equipment trainer (GC Exh. 4). At trial, she testified that was not her actual opinion of Wilson's training. A few days later, Henson asked Wilson if she could be designated as Capstone's lead auditor. Wilson introduced her as such to AWG personnel. On October 17, 2019, Capstone certified Henson to train other employees in the operation of a forklift, and to certify them (GC Exh. 3).

The auditors' duties required them to spend some time inside the AWG freezers. AWG employees were provided freezer suits; Capstone auditors were not. Henson asked Wilson for freezer suits. Wilson said there were none for Capstone employees. Capstone submits that the duties of the auditors at Pearl River required them to work only in cold storage areas in which the temperature did not go below 40 degrees Fahrenheit and thus they did not need freezer suits. However, this contention is predicated on the testimony of vice-president Tim Casey, who did not have personal knowledge regarding what the Capstone auditors did at Pearl River. Henson testified that she had to drive into areas in which it was much colder several times per shift (Tr. 96–97). Cooper also testified that she had to work in areas that were very cold (Tr. 247). I credit Henson

---

[4] Capstone was then called LMS Intellibound, Inc.

[5] Capstone's supervisors at Pearl River worked the night shift with the Capstone unloaders. Between the time Wilson left and Shayne Mora arrived, Capstone had nobody with authority supervising or training the day shift.

[6] I credit Henson because although Wilson denied that Henson made safety complaints to him, he did so in a very general way. His testimony is not credible in that new auditor Valerie Marcel ran into an electrical box or charging station, during training, which Wilson had to document and report. Henson credibly testified that she and Marcel were required to fill out reports of this event. Wilson initially denied there were any safety issues during the training of the auditors, Tr. 656, until confronted by the Charging Party's counsel about this accident. Peggy Cooper testified that on another occasion she accidently bumped into an employee with her forklift.

I do not credit Mike Ruder's testimony that he met in person with Henson prior to October 22, 2019. He was not at Pearl River on October 17, when he spoke to Henson over the phone. There is no credible evidence that he was at the facility while Henson was employed before that.

[7] Henson's testimony about her conversation with Batiste is uncontroverted and thus credited.

and Cooper on this point.

On October 16, Henson contacted Donnie Rouse a major customer of AWG:

> Q  Where you upset that you were going to be making 11.75 an hour?
> A  Yes.
> Q  And you told Mr. Rouse that you can't continue this job for $11.75 an hour, correct?
> A  That's correct.
> Q  So you asked Mr. Rouse -- Rouse for help, for him to put in a call, correct?
> A  Yes.
> Q  And you -- you asked him to do that on October 16, 2019?
> A  Yes.
> Q  You wanted Mr. Rouse to call AWG to see if your rate of pay could be changed, correct?

Tr. 192-93.

On or about October 17 or 18, 2019, Henson and the other new auditors accompanied Wilson to a meeting with Chris Griffin, AWG's Director of Distribution at Pearl River (Warehouse Manager) and Ryan Carroll, another AWG senior manager.[8] According to Wilson, Henson asked Griffin about her pay, not anyone else's. Wilson also testified that she did not complain about safety or anything else. Henson testified that she asked Griffin for freezer suits, and also complained about the safety of the location in which auditors would be working and being paid according to production. Henson testified that the other auditors nodded their heads in agreement. Griffin told her that he would discuss these issues with Capstone.

Then Henson asked to speak to Griffin and Carroll privately. She complained about her pay and mentioned that she had already contacted Donnie Rouse, the owner of a grocery chain which was a major customer of the AWG Pearl River warehouse (Tr. 109).

> Q  Okay. Why did you want to meet with Mr. Griffin and—and Mr. Carroll privately?
> A  Because I wanted to talk about my pay rate, what I was going to be paid, what I was going to be making. And I didn't want to discuss that in front of the other coworkers, because I knew they wasn't going to make what I was going to make.
> Q  Okay. And why do you—why do you say that?
> A  Because I accepted the position as the lead auditor.
> Q  Okay. What did you—I guess, once—once you were—once you were alone with Mr. Griffin and Mr. Carroll, how did that meeting get served?
> A  I told them that I had concerns about my pay. I let Mr. Chris Griffin know that I already contacted Mr. Rouse and that's when Chris's eyes got so big, he looked at me and put his hands on the table. He's, like, you know Donnie Rouse?

Rouse is a personal friend of Henson's stepfather. Griffin gave Henson a piece of paper which had the phone numbers of Tim Casey, Capstone's vice president of operations and Mike Ruder, Capstone's director of operations. Griffin told Henson to call them.

After this meeting Henson went to Capstone's office at the warehouse. Prince Wilson was talking on a speaker phone to Mike Ruder. Rudder spoke to Henson on the speakerphone and told her he would be at Pearl River in a few days and would be discussing her pay privately.

At about noon on October 22, 2019, Henson and the other three new auditors met with Ruder, Vice President Tim Casey and Andrew Powell, who at the time was Capstone's site manager in Kansas City and was going to succeed Ruder as director of operations for Pearl River. When the auditors raised concerns about the terms of their employment, Casey responded. He generally dismissed their concerns,

In this meeting, which lasted about 10 minutes, Henson raised concerns about the area in which the Capstone auditors were being trained. She stated the training should take place inside the safety corrals, which prevented entry by mobile equipment. Andrew Powell responded that this was a problem at another AWG location and that he had been able to rectify the issue. Henson understood that Powell was offering to do the same at Pearl River (Tr. 154).

Henson also told Casey that Prince Wilson was not qualified to train the auditors. Casey disagreed. Henson also testified that she asked that the auditors be provided freezer suits when they had to work in the freezer. She testified that Casey responded that Capstone was only required to provide employees with gloves and vests.

Further Henson testified that she asked about the auditors' compensation. She testified that she told Casey that the auditors were told that they would be paid 16 cents for every case they scanned. Casey told her they would be paid 8 or 9 cents per case. According to Henson, Valerie Marcel mentioned her accident and Peggy Cooper complained about Prince Wilson's training.

In a private meeting with Casey, Ruder and Powell, that occurred just before or just after the meeting with all the new auditors, Henson told them that Shadi Krishan had told her she would be making $200 a day (Tr. 116–118, 155–156, 443). Casey told Ruder to find out what a lead auditor is paid by Capstone and that Henson would get that rate + production pay.

Casey told Henson that if she had any concerns she should bring them to himself or Mike Ruder. He specifically asked her not to go to AWG with any Capstone related issues or concerns (Tr. 444–445.)

At 2:43 p.m. on October 22, Henson sent the following text message to AWG's customer Donnie Rouse:

> This is by far the worse company I have ever worked for. Do you ever come to Slidell? Would you like to have lunch with me, and we talk about everything, and I'll treat you!! I really need your opinion and feedback. I'm trying to stick it out. Today at 12:00 pm we had a meeting with Capstone management. They told my auditors that they was misinformed and they will only make $0.09 per case not $0.16. I have not

---

[8] See AWG's answer to the complaint, par. 5(b). Ryan Carroll was AWG's party representative at this hearing.

been given a amount that I will make. As of right now I'm making 10.00 hr and This is week 3.

I would love to talk anytime [phone number] and answer any questions you might have. The guy that runs things for AWG is Chris Griffin and Ryan Carroll their number is……………

R. Exh. 55.

I infer that after learning of this text and getting a call from Rouse, AWG's Chris Griffin approached Henson on the loading dock. (Tr. 187–188.)[9] According to Henson, Griffin asked Henson how her meeting with Casey, Ruder and Powell went. She replied that the meeting went well and then both returned to their workstations. Henson testified she did not make any complaints about wages or other working conditions to Griffin. I find there is no reliable evidence in this record as to what transpired between Griffin and Henson on the afternoon of October 22. However, I conclude that more likely than not, whatever occurred led to Henson's termination by Capstone the next day.

I also infer that Chris Griffin almost immediately texted Casey after talking to Henson. He asked Casey to call him (R. Exh. 38).[10] A few minutes later Griffin and Casey had a one-minute telephone conversation. There is no reliable evidence as to what was said by either one. Griffin did not testify in this proceeding. The testimony regarding what transpired between Griffin and Henson that day is hearsay and I decline to credit it. While Casey's account of what Griffin said is not hearsay as to what he heard Griffin say, it is too self-serving in the context of this record to be credible. Casey testified that after talking to Griffin, he decided to terminate Henson. I credit Casey insofar as he testified that he decided to terminate Henson after talking to Griffin on the afternoon of October 22 and/or the morning of October 23.

The next day, October 23, 2019, VP Tim Casey called Henson at home. In a brief conversation Casey informed Henson that Capstone was terminating her employment. Casey told Henson she was being terminated due to what transpired the day before and for disrupting Capstone's relationship with its business partner AWG (Tr. 120, 201, 475).[11] He did not ask Henson for her explanation of what transpired before terminating her. Henson was completely surprised by her termination (Tr. 120).

On October 24, Henson went to the Pearl River facility and was able to enter because her badge had not been deactivated. She tried to talk to Tim Casey, but he had left the facility. On November 6, 2019, Casey provided Henson the following explanation for her termination in a voice mail message:

My apologies nobody's gotten back to you yet on, uh, reason for termination but, uh, I think it's pretty clear [unintelligible] at the end of the day it was disruption of business. Even after we had spoke, uh, day before, um, and had an agreement with how we were going to go forward, you came in questioning the partner and…and, uh, which was disrupted business on things we already talked about and I had told you that if you had any questions or issues, to come to me so I thought it best to separate ways.

GC Exh. 8(b) (transcript of a voice mail left by Casey on Henson's phone).

Capstone did not provide Henson with any documentation regarding her termination nor any other explanation than the ones set forth above.

Peggy Cooper

Capstone also hired Peggy Cooper as an auditor on or about September 30, 2019. During her training in the AWG equipment or maintenance area, Cooper was concerned that the area was not big enough to train on the operation of forklifts. She discussed her concerns with her fellow auditors, Henson, Kiki Garcia and Valerie Marcel and with Prince Wilson. She was also part of a conversation in front of Wilson with AWG supervisor Glenn Batiste. As a result of that conversation the Capstone auditors began to train on forklifts on the dry goods side of the loading dock. Cooper remained concerned with the safety of training in this area and shared those concerns with Wilson.

For about 4 days, an AWG employee trained Cooper on how to audit the products on the pallets. At some point the auditors began to work in the cold side of the loading dock. Cooper asked Brady Bordelon of AWG whether the Capstone auditors could get freezer suits. Bordelon told her that she would have to ask Capstone.

After Capstone trainer Shayne Mora arrived at Pearl River on October 25, Cooper was told that she would eventually be switched to production pay. This meant that what she earned depended on how fast she worked. Cooper testified to concerns she raised to Mora about the manner in which Mora was conducting the training. I find she did so but also find that the record does not establish that these concerns were concerted, as opposed to Cooper's concerns as to whether she could do the job in the manner Mora was telling her it was to be done.[12] Moreover, the record does not establish a connection between Cooper's complaints to Mora and her termination.

A few days later, on or about October 31, 2019, Cooper was called into a meeting with Capstone Vice President Casey.

---

[9] In her affidavit to the Board, Henson stated she spoke to Griffin several hours after her meeting with Casey, Ruder and Powell. At trial, she testified that the encounter occurred almost immediately after that meeting.

[10] Griffin apparently texted Casey at 2:58 Central time (3:58 Eastern time) asking Casey to call him. Casey called Griffin at 2:59 and spoke to him for one minute at 3:01, shortly after Henson's text to Rouse, Tr. 453-62, R. Exhs. 38, 47.

[11] Henson testified that Casey told her she was being terminated due to what occurred at the October 22 meeting with Capstone management. Casey testified that if he was specific about anything it was the October 22 interaction between Henson and Griffin that caused him to terminate Henson. I do not credit Henson's testimony that Casey said her termination was related to her meeting with Capstone managers on October 22. According to Henson's testimony nothing occurred at that meeting that would have led Capstone to fire her.

[12] Even if Cooper's complaints were concerted, there is no evidence that Mora knew they were concerted. This is an element in proving a PCA discharge, *Amelio's,* 301 NLRB 182 (1991)

Casey told her that Capstone did not think she could work fast enough to perform the auditor's job successfully. Cooper acknowledged to Casey that the auditing job might be too much for her (Tr. 291–292). Casey told her that he would see if he could find her another job with AWG.[13] Then he told her she could go home. Cooper complained to Casey that the auditors' training was inconsistent.

The next day, Cooper reported for work. Casey told her that he checked with AWG and that AWG did not have a job for her. Cooper did not tell Casey she wanted to return to work as an auditor. Cooper left and did not hear from Capstone again. Casey decided to terminate Cooper's employment on about November 1, 2019 (GC Exh. 15).

ANALYSIS

Section 8(a)(1) of the National Labor Relations Act provides that it is an unfair labor practice to interfere with, restrain or coerce employees in the exercise of the rights guaranteed in Section 7. Discharging or otherwise discriminating against employees because they engaged in activity protected by Section 7 is a violation of Section 8(a)(1).

Section 7 provides that, "employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, *and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . .* (Emphasis added)."

In *Myers Industries (Myers 1)*, 268 NLRB 493 (1984), and in *Myers Industries (Myers II)* 281 NLRB 882 (1986), the Board held that "concerted activities" protected by Section 7 are those "engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself."

To establish an 8(a)(1) violation based on an adverse employment action where the motive for the action is disputed, the General Counsel has the initial burden of showing that protected activity was a motivating factor for the action, *Wright Line,* 251 NLRB 1083 (1980). The General Counsel satisfies that burden by proving the existence of protected activity, the employer's knowledge of the activity, and animus against the activity that is sufficient to create an inference that the employee's protected activity was a motivating factor in his or her discharge. If the General Counsel meets his burden, the burden shifts to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct.[14]

*The legal principles applied to this case*

*Joyce Henson*

*Protected Activity*

Joyce Henson engaged in protected concerted activity. She concertedly complained about the safety of the area in which new auditors were trained. I credit her testimony that she raised concerted concerns regarding the production or piecework rate at which the new auditors were to be paid after completing their training.

*Employer Knowledge of Henson's protected activity*

Capstone, by Prince Wilson, was aware of Henson's safety and compensation complaints.

*Animus*

There is no evidence of animus towards Henson's protected activities prior to October 22 and 23. Moreover, while there is evidence of animus towards Henson on October 22 and 23 by Capstone and AWG, I find that the General Counsel has not established that this animus was due to her protected activities.[15] The record is equally consistent with animus confined to her unprotected activities. Those activities being her efforts to secure better compensation merely for herself, not other employees. That Henson was primarily concerned with her own pay and not that of others is established by her testimony at Tr. 109 quoted earlier and her October 22 text message to Donnie Rouse, a major customer of AWG.

It is clear that something transpired between Henson and AWG's Chris Griffin on October 22, that led Griffin to call Tim Casey to tell him Henson was not to be allowed back in the Pearl River facility. Since Griffin did not testify, the record does not fully establish what was said by either. Also, Griffin may have been reacting to a communication from Donnie Rouse. Henson's text of October 22, suggests that she was seeking his support in getting better wages at Pearl River.[16]

The record also does not establish any animus towards Henson's protected activities prior to October 22. Up until that date, the record establishes that Capstone had continued to designate Henson as the lead auditor with greater compensation than the other newly hired auditors.[17] Henson's surprise at her termination also indicates it was the result of something to

---

[13] On the evening of October 31, Mora sent Casey a text. R. Exh. 39 & 40, which reads in pertinent part:" But Ms. Peggy says she doesn't want to come in if she's not gonna stay in audit. When would she be moved to another positions?" I infer that the word not in this message is an inadvertent error. The message only makes sense if Mora was communicating that Cooper wanted to continue working ONLY if she was given a non-auditing position. This reading is consistent with Cooper's behavior on November 1. When Casey told her he did not have another job for her, she did not ask him to resume working as an auditor. This reading is also consistent with Mora's testimony at Tr. 662, 664.

[14] In cases in which the employer's motive for allegedly discriminatory discipline is at issue, the *Wright Line* test applies regardless of whether the employee was engaged in union activity or other protected concerted activity, *Hoodview Vending Co.,* 362 NLRB 690 (2015); 359 NLRB 355 (2012).

[15] With regard to Henson's complaints about the safety of Capstone training in the maintenance area, the fact that Capstone moved the auditor training to the loading dock without significant delay, suggests it did not bear animus towards Henson (or Cooper) due to these complaints.

[16] Casey testified that on at least one occasion, Griffin discussed Henson's relationship with Rouse with him, Tr. 438.

[17] If the record established that Henson went to Griffin about protected matters, that Griffin excluded her from the property and that Capstone fired her as a result, I may well have found that both AWG and Capstone violated the Act and that they were joint employers. Concerted complaints to third parties about working conditions are protected, *Eastex v. NLRB*, 437 U.S. 556 (1978). Beyond this, AWG was clearly a joint employer while its employees trained and supervised the Capstone auditors, but not necessarily afterwards.

which she was not privy, i.e., the conversation between Griffin and Casey the day before.

*Causal Connection between Henson's protected activities and her discharge*

The General Counsel has not established a sufficient causal connection between Henson's protected activities and her discharge. While her discharge is clearly connected to her interaction with Chris Griffin on October 22, the General Counsel has not established that this communication concerned her protected activities as opposed to her desire to put pressure on both Respondents to increase her own compensation. The timing between Henson's meeting with Capstone and Henson's discharge might otherwise suggest discriminatory motivation. However, it does not do so necessarily in this case given the lack of evidence of animus towards Henson's protected activity, and the intervening event, i.e., Henson's interaction with Griffin.

*Peggy Cooper*

The record establishes that Peggy Cooper engaged in protected concerted activity by complaining about safety issues and the compensation of all the new auditors. The record also establishes that Capstone knew of those complaints and their protected nature. However, the record does not establish that either AWG or Capstone bore animus towards Cooper as a result of those protected activities. Similarly, the record does not establish a nexus between Cooper's protected activities and the termination of her employment.

By her own admission, Cooper was having trouble keeping up with the demands of the auditor position. On November 1, 2019, when she learned that Capstone had not found another position for her, Cooper did not ask to return to work as an auditor. Capstone was not under any obligation to find another position for her in the absence of a discriminatory motive. There is no evidence that it did not find Cooper another job due to animus towards Cooper as a result of her protected complaints. Cooper, as Capstone argues, abandoned her job and then Capstone terminated her employment as a result.

*VP Casey's alleged 8(a)(1) statements*

The General Counsel alleges that VP Tim Casey violated Section 8(a)(1) in telling Joyce Henson on October 23, 2019, that she was terminated for engaging in protected activities and on November 6, by stating the same reason for her termination. On October 23, Casey told Henson that she was being terminated due to what transpired the day before and for disrupting Capstone's relationship with its business partner AWG. Henson engaged in both protected and unprotected activity on October 22.

Henson engaged in protected concerted activity in the group meeting with Capstone supervisors and unprotected conduct in her private meeting with them. There is no evidence that she engaged in protected activity on October 22 in her encounter with Griffin. Thus, I conclude from an objective or subjective standpoint, Casey's statement does not mean he was terminating her for protected activity.

I reach the same conclusion with regard to Casey's November 6, 2019, voicemail message. That message clearly relates to Henson's encounter with Griffin on October 22. The record does not show that Henson engaged in protected concerted activity in this encounter. I therefore dismiss both allegations regarding Casey's statements.

CONCLUSION OF LAW

Neither AWG nor Capstone Logistics violated the Act in terminating the employment of Joyce Henson and Peggy Cooper. Capstone, by Tim Casey, did not violate the Act in telling Joyce Henson the reason she was being terminated.[18]

On these findings of fact and conclusions of law and on the entire record, I issue the following recommended[19]

ORDER

The complaint is dismissed.

Dated, Washington, D.C. May 10, 2022

---

[18] While the record contains evidence that would otherwise support a finding of pretext (lack of investigation, departure from normal practices, disparate treatment, etc.), the General Counsel failed to meet its initial burden of persuasion. Thus that evidence is irrelevant.

[19] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

# CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2024, a true and correct copy of the foregoing was filed via the Court's CM/ECF system and served via electronic filing upon all counsel of record in this case.

Respectfully submitted,

*s/ Edward F. Harold*
Edward F. Harold
La. Bar No.: 21672
FISHER & PHILLIPS LLP
201 St. Charles Avenue, Suite 3710
New Orleans, Louisiana 70170
(504) 522-3303
eharold@fisherphillips.com

Reyburn W. Lominack, III
S.C. Bar No.: 72833
FISHER & PHILLIPS LLP
1320 Main Street, Suite 750
Columbia, South Carolina 29201
(803) 255-0000
rlominack@fisherphillips.com

*Counsel for Petitioner/Cross-Respondent*
