UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

CAPSTONE LOGISTICS, L.L.C.,

Petitioner/Cross-Respondent

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent/Cross-Petitioner
_____

ON PETITION FOR REVIEW AND
CROSS-APPLICATION FOR ENFORCEMENT OF AN ORDER OF
THE NATIONAL LABOR RELATIONS BOARD
_____

BRIEF FOR RESPONDENT/CROSS-PETITIONER
THE NATIONAL LABOR RELATIONS BOARD
_____

KIRA DELLINGER VOL
*Supervisory Attorney*

GREG P. LAURO
*Attorney*

*National Labor Relations Board*
**1015 Half Street, SE**
**Washington, DC 20570**
**(202) 273-0656**
**(202) 273-2965**

JENNIFER A. ABRUZZO
*General Counsel*
PETER SUNG OHR
*Deputy General Counsel*
RUTH BURDICK
*Deputy Associate General Counsel*
DAVID HABENSTREIT
*Assistant General Counsel*

## STATEMENT REGARDING ORAL ARGUMENT

The National Labor Relations Board ("the Board") submits that this case does not require oral argument. This case involves the application of well-established legal principles to factual findings that are well supported by the record evidence. However, if the Court determines that oral argument would be of assistance, the Board respectfully requests the opportunity to participate.

# TABLE OF CONTENTS

**Headings**                                                                     **Page(s)**

Statement regarding oral argument…………………………………………..i

Table of contents…………………………………………………………………..ii

Table of authorities…………………………………………………………...v

Statement of jurisdiction .............................................................................1

Issues presented...........................................................................................2

Statement of the case...................................................................................2

    I.      The Board's findings of fact ................................................2

        A.   Capstone hires Henson and others to work as auditors for AWG ... 2

        B.   Henson advocates on behalf of the auditors, prominently raising various safety and pay concerns…………………………………...4

        C.   AWG expresses annoyance to Capstone over the auditors bringing Capstone-related matters to AWG………………………..6

        D.   During an October 22 group meeting with Capstone, Henson reiterates the auditors' safety and pay concerns…………………………………………………………...7

        E.   Capstone directs Henson to address concerns only to Capstone, not customers…………………………………………………………7

        F.   Henson appeals to AWG's customer; AWG calls Capstone about Henson and Capstone discharges her as a result……………………………………………………...8

        G.   Capstone clarifies that it discharged Henson for taking concerns to customer………………………………………………10

    II.  Procedural history ......................................................................11

## TABLE OF CONTENTS (cont'd)

**Headings**                                                                                                    **Page(s)**

   III. The Board's conclusions and order.............................................................11

Summary of argument......................................................................................12

Standard of review ..........................................................................................16

Argument..........................................................................................................17

   I.     Substantial evidence supports the Board's finding that Capstone violated Section 8(a)(1) of the Act by discharging Henson…………………………………………………………………..17

        A.     Capstone unlawfully discharged Henson for her protected appeal to AWG's customer………………………………………18

           1.   Henson's Linkedin message to Rouse, which sought help advocating the auditors' concerns, was protected……………….18

           2.   Capstone knew of Henson's protected concerted activity when it discharged her………………………………………………..25

           3.   Capstone admittedly discharged Henson for her protected concerted Linkedin message ........................................................32

           4.   Capstone unlawfully discharged Henson for her protected concerted LinkedIn message under *Wright Line*…………………36

              a.  Protected concerted activity was a motivating factor in Capstone's discharge decision ...........................................37

              b. Capstone did not prove its affirmative defense ……………..41

        B.     Capstone unlawfully discharged Henson because it believed she had engaged in protected concerted activity during her October 22 interaction with AWG's Griffin……………………..50

**TABLE OF CONTENTS (cont'd)**

| Headings | Page(s) |
|---|---|

II.    Substantial evidence supports the Board's finding that Capstone violated Section 8(a)(1) by telling Henson that she was discharged for her protected concerted activity……………………………53

Conclusion .......................................................................................................57

Certificate of service………………………………………………………58

Certificate of compliance……………………………………………………59

# Table of Authorities

**Cases**                                                                                   **Page(s)**

*Allied Aviation Fueling of Dallas LP*,
    347 NLRB 248 (2006), *enforced*,
    490 F.3d 374, 379 (5th Cir. 2007) ...................................................................32

*Allied Aviation Service Co. of New Jersey, Inc.*,
    248 NLRB 229 (1980), *enforced mem.*,
    636 F.2d 1210 (3d Cir. 1980) ....................................................... 18, 24

*Am. Arb. Assoc., Inc.*,
    233 NLRB 71 (1977) .................................................................................24

*Beth Israel Hosp. v. NLRB*,
    437 U.S. 483 (1978) ..................................................................................55

*Blue Circle Cement Co. v. NLRB*,
    41 F.3d 203 (5th Cir. 1994) .......................................................................24

*CleanPower, Inc.*,
    316 NLRB 496 (1995) ...............................................................................18

*Cordua Rest., Inc. v. NLRB*,
    985 F.3d 415 (5th Cir. 2021) ................................................ 17, 36, 37, 38, 42, 44

*Crown Petro. Corp. v. NLRB*,
    430 F.2d 724 (5th Cir. 1970) .....................................................................25

*DIRECT-TV, Inc. v. NLRB*,
    837 F.3d 25 (D.C. Cir. 2016) ...................................................................21, 22

*D&D Distr. Co. v. NLRB*,
    801 F.2d 636 (3d Cir. 1986) ......................................................................27

*E.C. Waste, Inc. v. NLRB*,
    359 F.3d 36 (1st Cir. 2004)........................................................................25

*Eastex, Inc. v. NLRB*,
    437 U.S. 556 (1978) .......................................................................... 18, 22, 23

**Cases**                                                              **Page(s)**

*El Paso Elec. Co. v. NLRB*,
    681 F.3d 651 (5th Cir. 2012) ........................................................ 16, 28

*FedEx Freight East, Inc. v. NLRB*,
    431 F.3d 1019 (7th Cir. 2005) ............................................................39

*Flex Frac Logistics, L.L.C. v. NLRB*,
    746 F.3d 205 (5th Cir. 2014) ..............................................................16

*Gulf States Mfg., Inc. v. NLRB*,
    704 F.2d 1390 (5th Cir. 1983) ............................................................33

*Hicks Oils & Hicksgas*,
    293 NLRB 84 (1989), *enforced,*
    942 F.2d 1140 (7th Cir. 1991) ............................................................44

*IBEW 605 v. NLRB*,
    973 F.3d 451 (5th Cir. 2020) ........................................................ 24, 33

*Independent Elec. Contractors of Houston, Inc. v. NLRB*,
    720 F.3d 543 (5th Cir. 2013) ..............................................................35

*In-N-Out Burger, Inc. v. NLRB*,
    894 F.3d 707 (5th Cir. 2018) ..............................................................18

*Int'l Ladies' Garment Workers' v. Quality Mfg. Co.*,
    420 U.S. 276  (1975) ..........................................................................34

*J. Vallery Elec., Inc. v. NLRB*,
    337 F.3d 446 (5th Cir. 2003) ..............................................................16

*JCR Hotel, Inc. v. NLRB*,
    342 F.3d 837 (8th Cir. 2003) ..............................................................50

*Kajima Engineering & Constr.*,
    331 NLRB 1604 (2000) ........................................................ 25, 26, 46

**Cases**                                                          **Page(s)**

*Kinder-Care Learning Ctrs., Inc.*,
  299 NLRB 1171 1990) .........................................................................21

*Limestone Apparel Corp.*,
  255 NLRB 722 (1981)*, enforced mem.,*
  705 F.2d 799 (6th Cir. 1982) ............................................................37

*Miller Elec. Pump & Plumbing*,
  334 NLRB 824 (2001) .......................................................................53

*Mobile Exploration, Inc. v. NLRB*,
  200 F.3d 230 (5th Cir. 1999) .................................................... 18, 19

*Montgomery Ward & Co.*,
  316 NLRB 1248 (1995)*, enforced mem.,*
  97 F.3d 1448 (4th Cir. 1996) ...........................................................25

*NLRB v. ADCO Elec., Inc.*,
  6 F.3d 1110 (5th Cir. 1993.) ............................................................45

*NLRB v. Brookwood Furniture*,
  701 F.2d 452 (5th Cir. 1983) .................................................. 17, 35, 53

*NLRB v. Burnup & Sims, Inc.*,
  379 U.S. 21 (1964) ...........................................................................34

*NLRB v. Delta Gas, Inc.*,
  840 F.2d 309 (5th Cir. 1988)..................................... 36, 45, 46, 47, 53

*NLRB v. Esco Elevators, Inc.*,
  736 F.2d 295 (5th Cir. 1984) ...........................................................39

*NLRB v. Ingredion Inc.*,
  930 F.3d 509 (D.C. Cir. 2019)..........................................................35

*NLRB v. Maine Coast Regional Health Facilities*,
  999 F.3d 1 (1st Cir. 2021) ................................................................19

**Cases**                                                                    **Page(s)**

*NLRB v. Mike Yourek & Son, Inc. v. NLRB,*
   53 F.3d 261 (9th Cir. 1995) .......................................................19

*NLRB v. Red Top, Inc.,*
   455 F.2d 721 (8th Cir. 1972) ....................................................24

*NLRB v. RELCO Locomotives, Inc.,*
   734 F.3d 764 (8th Cir. 2013) ................................... 26, 30, 45, 46, 48

*NLRB v. S.E. Nichols, Inc.,*
   862 F.2d 952 (2d Cir. 1988) ....................................................38

*NLRB v. Sambo's Rest., Inc.,*
   641 F.2d 794 (9th Cir. 1981) ...................................................34

*NLRB v. SW Bell Telephone Co.,*
   694 F.2d 974 (5th Cir. 1982) ...................................................49

*NLRB v. Transp. Mgmt. Corp.,*
   462 U.S. 393 (1983) ....................................................... 36, 49

*Parkwood Development Ctr., Inc. v. NLRB,*
   521 F.3d 404 (D.C. Cir. 2008) .................................................33

*Pergament United Sales, Inc.,*
   296 NLRB 333 (1989)*, enforced,*
   920 F.2d 130 (2d Cir. 1990) ............................................... 34, 35

*Reef Indus, Inc. v. NLRB,*
   952 F.2d 830 (5th Cir. 1991) ...................................................23

*Remington Lodging & Hosp., LLC v. NLRB,*
   847 F.3d 180 (5th Cir. 2017) ......................... 17, 31, 32, 36, 41, 46, 50

**Cases**                                                                **Page(s)**

*Sheraton Hotel Waterbury*,
   312 NLRB 304 (1993)......................................................................44

*Texas World. Serv. Co., v. NLRB*,
   928 F.2d 1426 (5th Cir. 1991).......................................................49

*Universal Camera Corp. v. NLRB*,
   340 U.S. 474 (1951) ......................................................................16

*Waste Mgt. de Puerto Rico*,
   339 NLRB 262 (2003)....................................................................25

*Woelke & Romero Framing v. NLRB*,
   456 U.S. 645 (1982) ................................................................ 23, 33

*Wright Line*,
   251 NLRB 1083 (1980)*, enforced on other grounds*,
   662 F.2d 889 (1st Cir. 1981) .................................................... 36, 37


**Statutes**                                                             **Page(s)**

National Labor Relations Act, as amended
   (29 U.S.C. § 151 et seq.)


Section 7 (29 U.S.C. § 157) ...................................................................16

Section 8(a)(1) (29 U.S.C. § 158(a)(1))...................................................10

Section 10(a) (29 U.S.C. § 160(a)).........................................................2

Section 10(e) (29 U.S.C. § 160(e)) ................................................ 16, 23

Section 10(f) (29 U.S.C § 160((f))..........................................................2

# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

### No. 23-60513
_____

### CAPSTONE LOGISTICS, L.L.C.,

**Petitioner/Cross-Respondent**

**v.**

### NATIONAL LABOR RELATIONS BOARD,

**Respondent/Cross-Petitioner**

## ON PETITION FOR REVIEW AND CROSS-APPLICATION FOR ENFORCEMENT OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD
_____

## BRIEF FOR
## THE NATIONAL LABOR RELATIONS BOARD
_____

## STATEMENT OF JURISDICTION

Capstone Logistics, L.L.C. ("Capstone") petitions for review, and the

National Labor Relations Board cross-applies for enforcement, of an Order the

Board issued against Capstone on August 22, 2023 (372 NLRB No. 124).

(ROA.1093-1107.)[1]  The Board had jurisdiction over the proceedings below

---

[1]  "ROA" refers to the record on appeal, filed on November 20, 2023.  Where applicable, references preceding a semicolon are to the Board's findings; those following are to the supporting evidence.  "Br." refers to Capstone's opening brief.

pursuant to Section 10(a) of the National Labor Relations Act ("the Act"), 29

U.S.C. § 160(a).  The Court has jurisdiction over this appeal pursuant to Section

10(e) and (f), 29 U.S.C. § 160(e) and (f).  Venue is proper because the unfair labor

practices occurred within this Circuit.  The petition and cross-application were

timely as the Act places no time limit on such filings.

## ISSUES PRESENTED

1.     Whether substantial evidence supports the Board's findings that

Capstone violated Section 8(a)(1) of the Act by discharging employee Joyce

Henson because she engaged in protected concerted activity (appealing to third

parties for assistance in improving her and her coworkers' terms and conditions of

employment), or because Capstone believed she had engaged in such activity.

2.     Whether substantial evidence supports the Board's finding that

Capstone violated Section 8(a)(1) of the Act by informing Henson that it had

discharged her because of her protected concerted activity.

## STATEMENT OF THE CASE

## I.     THE BOARD'S FINDINGS OF FACT

### A.     Capstone Hires Henson and Others To Work as Auditors for AWG

Capstone is in the business of providing labor to other companies, including

Associated Wholesale Grocers ("AWG"), a national grocery distributor.

(ROA.1102; ROA.361-63, 367.) Around late September 2019, Capstone began

providing auditors to work at AWG's food-distribution warehouse in Pearl River,

Louisiana ("the Facility"). (ROA.1093, 1103; ROA.58-62, 393-94, 643.)

Capstone already provided other types of labor for the Facility, where Capstone

maintains an office for its on-site manager. (ROA.1104; ROA.37-38, 360, 367.)

Auditors at AWG use scan guns to ensure the accuracy of large customer

orders, usually destined for grocery chains. They identify any missing items by

scanning the contents of the orders, which have been prepared and stacked on

pallets, then complete the orders. The auditors must lift items weighing up to 80

pounds and use forklifts or jacks to transport heavier items. (ROA.1093, 1103;

ROA.95-97, 406-07, 881-94, 904.) After verifying that orders are complete,

auditors rebuild the pallets. (ROA.1093; ROA.95-97.)

When Capstone hired auditors for the Facility, it told them that they would

be paid an hourly wage during their training and would thereafter receive

production pay—16 cents per case scanned. (ROA.1093, 1103; ROA.92, 116, 185,

226, 288-89, 421.) Capstone hired Joyce Henson with the intent that she would

become lead auditor at the Facility. (ROA.1093; ROA.89, 421, 441.) As lead

auditor, Henson would be entitled to both hourly and production pay. (ROA.1093,

1103; ROA.118, 158, 421-22.)

3

**B.    Henson Advocates on Behalf of the Auditors, Prominently Raising Various Safety and Pay Concerns**

In early October, Capstone manager Prince Wilson began training the auditors to operate forklifts and jacks.  The training occurred in a room where other equipment was stored, and two auditors had accidents:  one bumped into another employee with her forklift, while another bumped into an electrical box or charging station.  (ROA.1103 & n.6; ROA.71, 77-82, 105, 235-39, 243-45.) Henson told Wilson in front of other auditors that it was dangerous to train them in that location and requested that the training be moved.  (ROA.1103; ROA.77-78.)

Shortly thereafter, Henson discussed those safety concerns with AWG's training supervisor, Glenn Baptiste, in the presence of Wilson and two auditors. Baptiste stated that he did not understand why Capstone was training in the equipment room, explaining that AWG trained in open areas on a loading dock. (ROA.1103 & n.7; ROA.151-54, 241-42.)  Sometime later, Capstone moved the auditors' training to a loading dock.  (ROA.1105; ROA.82.)

Henson also sought better protective gear for the auditors in early October. The auditors' duties required them to spend time in low-temperature areas near or inside large freezer rooms, and AWG provided its own employees with freezer suits to wear in those areas.  (ROA.1103; ROA.97-98, 135-36, 249-52, 904.) When another auditor asked an AWG employee about the suits, he referred her to

Capstone. (ROA.1105; ROA.249-52.) Henson asked Wilson to provide the auditors with freezer suits, and he responded that there were none for Capstone employees. (ROA.1103; ROA.97-99, 249, 251.)

On October 16, Henson contacted Donnie Rouse—a personal friend of her stepfather and the owner of a grocery chain that was a major AWG customer. Henson told Rouse that she could not continue the auditor job at her current rate of pay. She asked him to call AWG about a raise. (ROA.1104; ROA.194-95.)

On October 17 or 18, Wilson brought the auditors to meet with two AWG officials, Director of Distribution Chris Griffin and manager Ryan Carroll. (ROA.1093, 1104; ROA.101-08.) Henson reiterated the auditors' as-yet-unresolved concerns about their training location and lack of freezer suits. (ROA.1093, 1104; ROA.101-08.) In addition, she raised concerns about production pay for her coworkers', whom she referred to as "my auditors," which would take effect after the training period. (ROA.1094 n.4; ROA.108.) She objected that the "flawed" system and technical problems made the work too slow for the auditors to be fairly compensated. (ROA.1093-94 & n.4, ROA.1104; ROA.108-09.) As Henson spoke, the other auditors nodded their heads in agreement. (ROA.1093; ROA.109.) Griffin responded that he would discuss their concerns with Capstone. (ROA.1093-94 & n.4, ROA.1104; ROA.109.)

At the end of the group meeting, Henson asked to speak privately with Griffin and Carroll. (ROA.1104; ROA.109.) After the other auditors left, Henson raised concerns about her own pay, which she did not want to discuss in front of the others because she would make more as the lead. (ROA.1094, 1104; ROA.110.) She also mentioned that she had contacted AWG customer Rouse. (ROA.1094, 1104; ROA.110-11.) Griffin expressed surprised that Henson knew Rouse and told her to contact Capstone about her pay, referring her to Capstone Vice President of Operations Tim Casey and Director of Operations Mike Ruder. (ROA.1094, 1104; ROA.110-11.)

## C. AWG Expresses Annoyance to Capstone over the Auditors Bringing Capstone-Related Matters to AWG

Later that same day, Griffin called Casey about the meeting with Henson and the other auditors. Griffin expressed annoyance that they came to him, an AWG official, instead of Capstone with Capstone-related matters. (ROA.1094; ROA.441-44, 511-13.) Griffin also complained that Henson did not know whom she reported to and told Casey about her connection to Rouse. (ROA.1094; ROA.511-13.) Casey assured Griffin that he would take care of it. (ROA.1094; ROA.443.)

**D.     During an October 22 Group Meeting with Capstone, Henson
           Reiterates the Auditors' Safety and Pay Concerns**

Around noon on October 22, Henson and the other auditors met with

Capstone officials, including Casey and Ruder.  (ROA.1094, 1104; ROA.114-15.)

Henson reiterated the auditors' safety concerns regarding their training area and

requested safety barriers to protect them from equipment driven by AWG

employees.  (ROA.1094, 1104; ROA.115, 156.)  Other auditors also discussed

safety concerns, including an accident that had occurred during training.

(ROA.1094, 1104; ROA.115-17.)  Henson then renewed her request that the

auditors receive freezer suits, and Casey responded that Capstone was only

required to provide them with gloves and vests.  (ROA.1094, 1104; ROA.115-16.)

Finally, Henson again raised "the pay issue for the auditors," stating that

they had been told that they would make 16 cents per case following their training

and were now being told they would be paid less, and revisiting her previously

expressed systemic concerns.  (ROA.1094, 1104; ROA.116, 185.)  Casey replied

that the auditors would be paid only 8 or 9 cents per case.  (ROA.1094, 1104;

ROA.116, 185.)

**E.     Capstone Directs Henson To Address Concerns Only to Capstone,
           Not Customers**

At a private meeting with the Capstone officials—right before or after the

October 22 group meeting—Henson complained that she was not making $200 per

day as promised.  (ROA.1094, 1104; ROA.117-18, 157-58, 448.)  Casey replied

that Capstone would investigate the matter and Henson would get what she was

due, namely, the same hourly rate as Capstone's other lead auditors plus the per-

case production pay.  (ROA.1094, 1104; ROA.118, 158.)

Casey also directed that if Henson had any issues, she should bring them

only to Capstone managers.  Casey specifically admonished her "not to go to our

partner" (i.e., customer), AWG, with any Capstone-related concerns.  (ROA.1094

& n.5, ROA.1104; ROA.446-48.)

### F.    Henson Appeals to AWG's Customer; AWG Calls Capstone about Henson and Capstone Discharges Her as a Result

At 2:43 p.m. that afternoon, not long after Casey's directive that Henson

bring Capstone-related matters only to Capstone, Henson sent a LinkedIn message

to AWG customer Rouse.  The message raised concerns about her fellow auditors'

pay and her pay, and implicitly asked Rouse to intervene with AWG officials on

their behalf:

> This is by far the worst company I have ever worked for.  Do you ever
> come to [S]lidell?  Would you like to have lunch with me and we talk
> about everything and I'll treat you!!!  I really need your opinion and
> feedback.  I'm really trying to stick it out.  Today at 12:00 pm we had
> a meeting with [C]apstone management.  They told my auditors that
> they w[ere] misinformed and they would only make $0.09 per case
> not $0.16.  I have not been given an amount that I will make.  As of
> right now I'm only making [$]10.00 h[ou]r and [t]his is week 3.

> I would love to talk anytime 985-290-8532 and answer any questions
> you might have.  The guy that runs things for AWG is Chris [G]riffin
> and Ryan Carroll their number is 985-863-1500.

 (ROA.1094, 1104-05; ROA.941-43.)

Shortly thereafter, Griffin learned about the LinkedIn message and approached Henson on the Facility's loading dock, and they had a brief interaction. (ROA.1095 & nn.8-9, ROA.1096-97 n.15, ROA.1105.)  At about 3 p.m., Griffin had a short phone conversation with Capstone official Casey about Henson. (ROA.1095 & n.9, ROA.1105 & n.10; ROA.459-64, 920, 930.)  Immediately after that conversation, Casey decided to discharge Henson.  (ROA.1105; ROA.466, 522.)

The next morning, October 23, Casey informed Capstone official Ruder that he was going to discharge Henson because she "had gone to the partner [AWG] with some concerns" after being told not to do so, thereby "violat[ing] proper communication."  (ROA.1095; ROA.562-63.)  Casey then telephoned Henson to inform her that he was terminating her because of what had transpired the day before, and for disrupting Capstone's relationship with AWG.  (ROA.1095, 1105; ROA.120-21, 203, 478.)  Casey did not ask Henson about her interaction with Griffin on October 22.  (ROA.1095, 1105; ROA.121.)

### G. Capstone Clarifies that It Discharged Henson for Taking Concerns to a Customer

Shocked and confused by her discharge, Henson went to the Facility the next day (October 24) and tried to speak with Casey, who was not there. (ROA.1105; ROA.122-23.) Henson also contacted Capstone's HR department repeatedly, seeking an explanation. (ROA.1095; ROA.124-26, 794.)

On November 6, Casey called Henson and left the following voicemail message, referencing his October 22 directive that Henson not take issues to Capstone's customers:

> My apologies nobody's gotten back to you yet on [a] reason for termination but … I think it's pretty clear … at the end of the day it was disruption of business. Even after we had spoke … [the] day before … and had an agreement with how we were going to go forward, you came in questioning the partner … which basically disrupted business on things we already talked about and I had told you that if you had any questions or issues, to come to me so I thought it best to separate ways.

(ROA.1095 & n.10, ROA.1105; ROA.802 (corrected transcript of voicemail, *see* ROA.130).) Capstone did not provide Henson with any additional explanation for, or documentation regarding, her discharge, despite company policy requiring documentation of every termination on a specific form issued to the discharged employee. (ROA.1098, 1105; ROA.39, 50-52, 134-35, 523-24.)

## II.     PROCEDURAL HISTORY

Acting on charges filed by Henson, the Board's General Counsel issued a complaint alleging that Capstone violated Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by discharging Henson because she engaged in protected concerted activity and by informing her that she had been fired for protected concerted activity.  (ROA.1093, 1102 & n.1; ROA.723-24.)  After a hearing, the judge dismissed both allegations.  (ROA.1105-07.)  The General Counsel and Henson filed exceptions before the Board, and Capstone filed limited cross-exceptions.

## III.     THE BOARD'S CONCLUSIONS AND ORDER

The Board (Chairman McFerran and Members Wilcox and Prouty) reversed the administrative law judge and found that Capstone had violated Section 8(a)(1) of the Act by:  (1) discharging Henson either because she engaged in protected concerted activity or because Capstone believed that she had done so; and (2) informing her that she was discharged for engaging in protected concerted activity.  (ROA.1093, 1095-99.)  The Board ordered Capstone to cease and desist from engaging in the violations found and from violating the Act in any like or related manner.  (ROA.1100.)  It also ordered Capstone to: offer Henson full reinstatement to her former job or, if that job no longer exists, to a substantially equivalent position; make Henson whole for any loss of earnings and other benefits, and for any direct or foreseeable pecuniary harms, suffered as a result of her unlawful

11

discharge; remove from its files any reference to the unlawful discharge, and notify

Henson that this has been done and that the discharge will not be used against her

in any way; and post a remedial notice.  (ROA.1100-01.)[2]

## SUMMARY OF ARGUMENT

**1.** Section 8(a)(1) bars employers from discharging employees for

engaging in protected concerted activity, or based on a belief they have done

so.  Substantial evidence supports the Board's finding that Capstone unlawfully

discharged Henson.

**(a)** Capstone discharged Henson—whom it employed as an auditor at

AWG—for sending a LinkedIn message to AWG customer Rouse.  As the Board

found, the message was protected and concerted, Casey knew of the message

before discharging Henson, and Casey effectively admitted that he discharged her

for the message, an unlawful motivation that circumstantial evidence also

demonstrates.

---

[2] The Board found it unnecessary to address complaint allegations that AWG and
Capstone are joint employers and that AWG's actions with respect to Henson also
violated Section 8(a)(1).  As the Board explained, any such finding would not
materially affect the remedy given the finding that Capstone unlawfully discharged
Henson.  (ROA.1093.)  The Board also affirmed the judge's dismissal of an
additional allegation that Capstone and AWG had unlawfully discharged another
employee.  (ROA.1093.)  Neither issue is before the Court.

12

**(i)** Employees have a statutory right to make concerted appeals to third parties beyond the employer-employee relationship in an effort to improve their working conditions. Henson's message to Rouse did just that. She referenced the "auditors" wages and implicitly asked him to contact AWG in the hopes that would lead AWG to convince Capstone to raise wages. The express terms of that group appeal, which continued Henson's prior concerted activities, belie Capstone's claims that it was an unprotected individual concern or too removed from the auditors' working conditions to be protected. Capstone's belated, unsupported argument that the message was so "disloyal" as to be unprotected is jurisdictionally barred.

**(ii)** Strong circumstantial evidence supports the inference that Capstone (Casey) knew of Henson's protected message, including: Casey's knowledge of— and animus towards—Henson's protected concerted activity (he had directed her to stop appealing outside Capstone), and the remarkably close timing connecting AWG official Griffin's discovery of the message, his call to Casey, and Casey's decision to discharge Henson. Capstone cannot dispute that Griffin knew of Henson's message before calling Casey, because it failed to do so before the Board. And its misleading claim that the knowledge finding conflicts with record evidence is founded on discredited testimony.

**(iii)** Capstone "effectively admitted" it discharged Henson for the message. (ROA.1097.) Casey stated that he discharged Henson for going to the "partner" after being told not to, and for disrupting Capstone's relationship with AWG the day before (a reference to the message's timing and impact). Capstone's hair-splitting claim that "partner" refers only to AWG, not Rouse, ignores context, including the message's suggestion that Rouse approach AWG. And its belated, meritless due-process challenge to the admitted-motive finding is jurisdictionally barred.

**(iv)** The evidence also shows that Henson's message was a motivating factor in her discharge. That includes Capstone's knowledge of and animus towards Henson's prior third-party appeals, the close timing between the message and the discharge, and Casey's stated reasons for the discharge. The proven, unlawful motive does not disappear merely because Capstone did not discharge every employee advocate.

And "no reliable evidence" (ROA.1098) supports Capstone's affirmative defense that, even absent the protected message, it would have discharged Henson for misconduct during her October 22 interaction with Griffin. As the Board found, the record does not support a finding that any misconduct occurred *or* that AWG reported it. Moreover, even *if* Henson had engaged in misconduct, as Capstone claims, or AWG had reported that she had, the defense would fail

because Capstone rushed to judgment without investigation, departed from its usual discharge procedures, and treated similarly situated employees more leniently. Its reliance on Henson's conduct *after* (and provoked by) the unlawful discharge is a non sequitur.

**(b)** Alternatively, if Casey did not know about Henson's LinkedIn message, he unlawfully discharged Henson because he believed she had raised protected group complaints to Griffin on October 22. That finding is supported by Casey's admission that he fired her for going to AWG after being told not to, the timing of the discharge following Casey's conversation with Griffin, and Capstone's hostility towards her prior appeal to AWG. Capstone's assertion that Casey believed Henson had only raised *individual* concerns ignores his knowledge that she had raised group and individual concerns together and that his ban on her bringing Capstone-related issues to AWG made no distinction between the two.

**2.** Employer statements violate Section 8(a)(1) if they would reasonably tend to coerce employees in the exercise of their statutory rights. Substantial evidence supports the Board's finding that Capstone (Casey) twice unlawfully informed Henson that she was discharged for violating Casey's directive against appealing outside Capstone—a directive that covered protected concerted appeals. Reasonable employees in Henson's position would infer that they could face

discipline for engaging in future protected concerted activity covered by the same directive.

## STANDARD OF REVIEW

The Board's findings of fact are conclusive if supported by substantial evidence on the record as a whole. 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *Cordua Rest., Inc. v. NLRB*, 985 F.3d 415, 422 (5th Cir. 2021). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera*, 340 U.S. at 477; *Flex Frac Logistics, L.L.C. v. NLRB*, 746 F.3d 205, 207 (5th Cir. 2014). Under that standard, a reviewing court may not "displace the Board's choice between two fairly conflicting views, even though the court [may] justifiably have made a different choice had the matter been before it de novo." *Universal Camera*, 340 U.S. at 488; *accord El Paso Elec. Co. v. NLRB*, 681 F.3d 651, 656-57 (5th Cir. 2012). The Court's "deference extends to [its] review of both the Board's findings of fact and its application of the law." *J. Vallery Elec., Inc. v. NLRB*, 337 F.3d 446, 450 (5th Cir. 2003).

# ARGUMENT

## I. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT CAPSTONE VIOLATED SECTION 8(a)(1) OF THE ACT BY DISCHARGING HENSON

Section 7 of the Act guarantees employees the "right to self-organization, to form, join, or assist labor organizations, . . . and to engage in other concerted activities for the purpose of . . . mutual aid or protection."  29 U.S.C. § 157.  An employer violates Section 8(a)(1) by discharging an employee for engaging in protected concerted activities within the meaning of Section 7, or because it believes the employee engaged in such activity.  *See Remington Lodging & Hosp., LLC v. NLRB*, 847 F.3d 180, 185-86 (5th Cir. 2017).

Here, the Board found that Capstone discharged Henson for one of two unlawful reasons, either because she sent a protected concerted message to AWG customer Rouse regarding the auditors' compensation, or because Capstone believed she had engaged in other protected concerted activity during her October 22 interaction with AWG's Griffin.  Whether a discharge was unlawfully motivated is a question of fact, and the Court will "not lightly displace the Board's factual finding of discriminatory intent."  *NLRB v. Brookwood Furniture*, 701 F.2d 452, 464 (5th Cir. 1983); *accord Cordua*, 985 F.3d at 424.

## A. Capstone Unlawfully Discharged Henson For Her Protected Appeal to AWG's Customer

Substantial evidence supports the Board's finding that Capstone violated Section 8(a)(1) of the Act by discharging Henson for sending the October 22 LinkedIn message. The message was concerted and protected within the meaning of Section 7, and Capstone both knew about the message before it discharged Henson and effectively admitted to discharging her for the message. Moreover, even if Capstone's statements were insufficiently clear to constitute an admission, the Board also found the discharge to be unlawfully motivated under the *Wright Line* analysis.

### 1. Henson's LinkedIn message to Rouse, which sought help advocating the auditors' concerns, was protected

The broad statutory language of Section 7, protecting concerted activities for mutual aid and protection, encompasses efforts by employees "to improve terms and conditions of employment" through appeals to third parties standing "outside the immediate employee-employer relationship." *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565 (1978); *accord Mobile Exploration, Inc. v. NLRB*, 200 F.3d 230, 238 (5th Cir. 1999). For example, the Board has long recognized employees' right to appeal to their employers' customers for assistance. *See CleanPower, Inc.*, 316 NLRB 496, 497-98 (1995) (janitorial employee engaged in protected concerted activity by threatening to bring group complaints about working conditions to

employer's customer in an attempt to enlist customer's support for employees' cause); *Allied Aviation Service Co. of New Jersey, Inc.*, 248 NLRB 229, 229-31 (1980) (employer unlawfully suspended and discharged employee for sending letters to employer's customers about safety issues), *enforced mem.* 636 F.2d 1210 (3d Cir. 1980). *See generally In-N-Out Burger, Inc. v. NLRB*, 894 F.3d 707, 717 (5th Cir. 2018) (discussing protection of employee message that reaches customers). Because the task of defining the scope of protected activity under Section 7 is "for the Board to perform in the first instance," this Court affords "considerable deference" to the Board's determination that particular employee activity is protected. *Mobile Exploration*, 200 F.3d at 237-38.

Substantial evidence supports the Board's finding (ROA.1096) that, applying the foregoing principles, Henson engaged in protected concerted activity by sending the October 22 LinkedIn message to a major customer (Donnie Rouse) of Capstone's customer AWG. On its face, Henson's message appealed to Rouse regarding concerns about the auditors' wages, a core term of employment. *See NLRB v. Maine Coast Regional Health Facilities*, 999 F.3d 1, 10-11 (1st Cir. 2021) (employee's protected concerted letter to newspaper editor supported employees' ongoing staffing concerns). The appeal was also protected and concerted, as the Board explained (ROA.1096 & n.13), because it was a "logical outgrowth" of Henson's and the auditors' prior course of protected concerted activity related to

19

their working conditions. *See Mobile Exploration, Inc.*, 200 F.3d at 238, 240

("individual employee action may also constitute concerted activity if it represents

either a 'continuation' of earlier concerted activities or a 'logical outgrowth' of

concerted activity") (citations omitted); *NLRB v. Mike Yourek & Son, Inc. v.*

*NLRB*, 53 F.3d 261, 265 (9th Cir. 1995) (lone act of employee concerted "if it

'stems from' or 'logically grew' out of prior concerted activity").  The message's

explicit complaint about the auditors' pay (not just Henson's own) followed from

Henson's earlier advocacy regarding their pay both during a group meeting earlier

that same day with Casey and other Capstone officials and during a group meeting

with Griffin and other AWG officials the previous week.  And those meetings were

just two instances of Henson's sustained advocacy on behalf of, in the presence of,

and often with the participation of, her fellow auditors—regarding not only their

wages but also various safety concerns, *see* pp. 4-9.

Significantly, Henson's message not only expressed concerted wage

complaints but actively sought assistance in addressing them.  As the Board found

(ROA.1096 & n.14), the message made plain on its face—by including a phone

number where Rouse could reach AWG officials Griffin and Carroll—that Henson

was enlisting Rouse's support in asking AWG to intervene with Capstone on the

auditors' behalf.  Thus, her appeal falls comfortably within her broad statutory

right to appeal to third parties in an effort to improve the auditors' wages and other working conditions.

Capstone strains credulity in claiming that Henson's appeal was "not concerted." (Br. 22-23.) Mischaracterizing her appeal as the act of a lone employee intending only to improve her own wages, Capstone discounts Henson's explicit appeal regarding her fellow auditors' pay as "bur[ied]" within her message to Rouse amidst "language unequivocally focusing on herself." (Br. 23.) Not so. Rather, after beginning the message with general complaints about Capstone and asking to meet Rouse, Henson turned to her specific complaints, highlighting the group issue by leading with the assertion that "my auditors" were "misinformed" about their pay rate, then specifying the difference between the rate they were promised and the rate they were making, before turning to her personal wage concern. Contrary to Capstone, therefore, the concerted appeal was hardly an "afterthought" (Br. 23, citation omitted)—particularly when, as just discussed, the message was a continuation of Henson's recent and sustained efforts to advocate for her coworkers. The plainly concerted nature of her course of conduct, and of the LinkedIn message in particular, is not negated by her previous complaint to Rouse regarding her "own pay rate" (Br. 23).

Also contrary to Capstone, Henson's message does not fall outside the Act's protection because she sent it to Rouse, who was Capstone's "customer's

customer." (Br. 22.) Legally, the Act's protection is not so limited. It extends to appeals for assistance addressed to third parties who may help influence the employer and affect the employees' interests. That may include, for example, "an employer's customers, its advertisers, its parent company, a news reporter, [or] the public in general." *Kinder-Care Learning Ctrs., Inc.*, 299 NLRB 1171, 1171 & nn.6-11 (1990). *See, e.g.*, *DIRECT-TV, Inc. v. NLRB*, 837 F.3d 25, 33 (D.C. Cir. 2016) (affirming that employees' participation in television interview "was protected concerted activity relating to their ongoing dispute about the [employer's] new pay policy"). As Capstone acknowledges (Br. 21), the Supreme Court in *Eastex* discussed protected appeals to the judiciary and legislators. And the Court did so in a case involving an issue less directly related to employees' interests than the wage issue Henson addressed: there, the (protected) message urged employees who already earned more than a proposed minimum wage to vote for legislators who would support that law because it would benefit employees generally. *Eastex*, 437 U.S. at 569-70.

Factually, there is no merit to Capstone's assertion that appealing to AWG's customers "can only directly impact the relationship between AWG and its customers," not working conditions at Capstone. (Br. 22.) AWG was undisputedly in a position to influence Capstone regarding the auditors' terms of employment. And Henson did appeal directly to AWG (and Capstone), only to be

rebuffed. She then explicitly sought Rouse's help in hopes that pressure from a large customer might persuade AWG to convince Capstone. *See DIRECT-TV,* 837 F.3d at 37 (noting that employees' protected participation in television interview occurred after failed attempts to resolve pay dispute directly with employer). Henson's approach made sense, given AWG's reaction when she first mentioned knowing Rouse. And AWG's Griffin apparently reacted, calling Capstone's Casey right after learning of Henson's message to Rouse. Particularly in the context of Henson's prior protected efforts to improve the auditors' wages and working conditions, the contention that her appeal to a large customer with a vested interest in AWG's operations at the Facility was unprotected because it was "too attenuated"—i.e., did not have a sufficiently "immediate relationship to employees' interests"—is baseless. (Br. 21, quoting *Eastex*, 437 U.S. at 567-68). *See generally Reef Indus, Inc. v. NLRB*, 952 F.2d 830, 838 (5th Cir. 1991) (employee appeal need not make specific demand of employer to be protected; activities that more generally convey employee displeasure with their employer may also reasonably be expected to impact terms and conditions of employment).

Finally, Capstone urges that Henson's message to Rouse was unprotected as "disloyal" or "disparaging" under Board precedent because it criticized Capstone as a bad employer. (Br. 23-24.) The Court is jurisdictionally barred from considering that claim, which is also baseless.

Section 10(e) of the Act, 29 U.S.C. § 160(e), places a jurisdictional limit on the issues courts of appeals may consider when they review Board orders. *Woelke & Romero Framing v. NLRB*, 456 U.S. 645, 665-66 (1982). On review, "[n]o objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). Section 10(e) stems from the "bedrock principle" that "courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the *appropriate time*." *IBEW 605 v. NLRB*, 973 F.3d 451, 460 (5th Cir. 2020) (emphasis in original, citation omitted).

Before the Board, the General Counsel excepted to the administrative law judge's finding that Henson's LinkedIn message primarily concerned her own pay and to his failure to find that the message constituted protected activity (ROA.980)—an issue the brief in support of exceptions also argued (pp. 19-21). Yet, none of Capstone's filings before the Board—its answering brief (ROA.1033-41), its own limited cross-exceptions (ROA.1051), and its supporting briefs—even refer to disloyalty or disparagement, much less argue that Henson's message was

unprotected on those grounds.[3]  The Court is, therefore, jurisdictionally barred

from considering that claim, which in any event lacks merit.[4]

> **2.   Capstone knew of Henson's protected concerted activity when it discharged her**

Employer knowledge of an employee's protected activity may be reasonably

inferred from circumstantial evidence, including: the employer's general

knowledge of protected activity; animus towards that activity; prior reports to the

employer about that activity; and the timing of the discharge in relation to that

activity. *Waste Mgt. de Puerto Rico*, 339 NLRB 262, 266, 271 (2003), *enforced*

---

[3] The Board is, with the filing of its brief, filing a motion to lodge the General Counsel's and Capstone's briefs in support of exceptions as non-record materials.

[4]  As Capstone's own cases (Br. 23-24) confirm, Henson's message was protected because it (1) focused on seeking help with the auditors' wage dispute with Capstone, and (2) involved no malicious falsehood, product disparagement, physical threats, or severe misconduct. *Compare Allied Aviation Serv. Co.*, 248 NLRB at 230-31 (appeal to customer regarding safety protected; absent malicious motive, airing sensitive issues in communication focused on labor dispute not disparaging); *with NLRB v. Red Top, Inc.,* 455 F.2d 721, 725-27 (8th Cir. 1972) (profanity, physical threats, personal disparagement of manager, and threats to complain to customers not protected appeal); *Am. Arb. Assoc., Inc.*, 233 NLRB 71, 75 (1977) ("childish" questionnaire sent to confidential client list, designed to embarrass employer, unprotected). *See also Blue Circle Cement Co. v. NLRB*, 41 F.3d 203, 208-09, 211 (5th Cir. 1994) (handbilling on employer's alleged burning of hazardous waste protected, not malicious or disparaging, because it arose from employee-health concerns).  While Henson briefly mentioned her low opinion of Capstone, epithets or accusations are common in labor disputes and do not suffice to forfeit protection. *Crown Petro. Corp. v. NLRB*, 430 F.2d 724, 729-31 (5th Cir. 1970) (profanity during grievance meeting did not destroy protection).

*sub nom. E.C. Waste, Inc. v. NLRB*, 359 F.3d 36, 42-43 (1st Cir. 2004); *Kajima Engineering & Constr.*, 331 NLRB 1604, 1604-05 (2000); *Montgomery Ward & Co.*, 316 NLRB 1248, 1253 (1995), *enforced mem.* 97 F.3d 1448 (4th Cir. 1996). Applying those principles, the Board reasonably inferred (ROA.1096-97) that Capstone—and specifically Casey—knew of Henson's LinkedIn message when Capstone, through Casey, decided to discharge her. (ROA.1096-97).

As the Board explained (ROA.1096), there is no dispute that even before Henson sent the LinkedIn message, Casey had general knowledge of Henson's and the auditors' protected concerted activities—including their group meeting with Casey and other Capstone managers the morning of October 22. Moreover, AWG's Griffin had previously reported such activity, complaining that Henson and the auditors approached AWG management with concerted complaints, remarking that Henson did not know whom to report to, and informing Casey about Henson's connection to Rouse. (ROA.1096; *see* p. 6.) In response, Casey promised to take care of it. (ROA.1094; *see* p. 6.) To the extent there can be any question of what Casey meant (*see* Br. 25 n.13), he demonstrated his meaning— and animus towards Henson's protected appeals to AWG (ROA.1097)—by admittedly directing Henson not to take Capstone-related issues to AWG. (ROA.1094; *see* p. 8.)

As the Board further found (ROA.1095-97 & nn.8, 15), Griffin learned of Henson's October 22 message to Rouse and promptly contacted Casey—a fact that was undisputed before the Board. *See NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 770, 781, 783 (8th Cir. 2013) (that another employee had informed management about some protected activity supported inference that employer knew of discriminatees' protected activity). And as Casey himself testified, he decided to discharge Henson "immediately" after speaking to Griffin. (ROA.1097 & n.16.) The strikingly close timing of his discharge decision in relation to Henson's protected concerted message (less than an hour earlier) bolsters the Board's knowledge finding. *See D&D Distr. Co. v. NLRB*, 801 F.2d 636, 641 (3d Cir. 1986) (inference of knowledge supported by timing of discharge a week after employee's protected conduct). As the Board aptly summarized, "Griffin's prior reporting to Casey along with the sequence of events [leading to the discharge] constitutes compelling circumstantial evidence that Griffin told Casey about Henson's October 22 LinkedIn message [to Rouse] prior to Casey's decision to discharge Henson." (ROA.1097.)

Capstone's attack on the Board's well-supported knowledge finding fails for the simple reason that it ignores half of the supporting evidence. After listing (Br. 25) only a portion of the facts the Board relied on (ROA.1096-97), Capstone complains that it "simply defies logic" to infer that Casey knew about the LinkedIn

message "based solely on events that occurred *before the message was even sent.*" (Br. 26, emphasis in original). As shown, however, the Board also relied on key events *after* the message was sent, notably (1) that Griffin learned of the message before he contacted Casey, who (2) decided immediately after their conversation to discharge Henson.

Those facts, particularly in light of the circumstances leading up to the message, disarm virtually all of Capstone's arguments. (Br. 27-29.) Because it is undisputed that Griffin knew of Henson's message before calling Casey, there is no need to delve into *how* he knew, including what Rouse may or may not have done to inform him. And the Court is jurisdictionally barred by Section 10(e) of the Act (*see* p. 24) from considering Capstone's belated challenge (Br. 27-29) to the Board's finding that Griffin knew. As the Board explained (ROA.1097 n.15), the judge explicitly inferred that Griffin knew of the message at that time (ROA.1105) and no party excepted to that finding before the Board. Indeed, Capstone explicitly declined to except. *See* Capstone Answering Br. p.12 n.14 (ROA.1026 n.14.) Having failed to challenge Griffin's knowledge of the message before the Board, it cannot now do so before the Court.

In any event, Capstone suggests at most that some evidence might support an inference that Griffin did not know of the message; it utterly fails to show that the Board's knowledge inference is unreasonable. *See El Paso Elec. Co.*, 681 F.3d

at 656-57 (court cannot reweigh evidence or displace Board's reasonable inferences), and cases cited at p. 16. For example, Capstone cites no evidence that Rouse either did not see the message or did not promptly contact Griffin. Instead, Capstone speculates about extra-record facts that could have been probative as to those questions. (Br. 27, noting lack of evidence about Rouse's work schedule, social-media habits, and relationship with Griffin). And Capstone criticizes the notion that Rouse contacted Griffin—during the workday—by noting that the message provided an office number, not Griffin's cell number. (Br. 12 n.8, 27.)

Capstone's criticism of the Board's inference that Griffin told Casey about the LinkedIn message is also remarkably weak given Griffin's established knowledge of the message, his prompt call to Casey—to whom he had previously complained about being drawn into Capstone's employees' issues—and Casey's decision immediately thereafter to discharge Henson. Capstone speculates (Br. 26-27) that Griffin did not have time during a one-minute call to tell Casey that Henson had again raised Capstone issues to AWG (through Rouse), despite Casey's prohibition. That speculation is inconsistent with Capstone's assertion (Br. 14, 28-29) that Griffin did have enough time to describe an unprecedented interaction with Henson earlier that day in sufficient detail to warrant immediate discharge without any investigation.

Capstone also critiques the judge's decision to discredit Casey's account of what Griffin said during their call, namely, that Henson "disrupted" Griffin, and was "unprofessional," "rude," and difficult to control earlier that day. (Br. 28-29.) But the judge (and Board) found that testimony "too self-serving in the context of the record to be credible" (ROA.1098), a reasonable determination under the circumstances just detailed. There is no basis for Capstone's apparent assumption that Casey must be credited merely because he was the "sole witness" (Br. 29) who testified about the call. His account was uncorroborated by any written report or other evidence of misconduct by Henson on or before that day. (ROA.1098.) Thus, Capstone's assertion that the Board's knowledge finding "conflicts with" (Br. 28) reliable record evidence is unfounded. Moreover, even assuming, counterfactually, that Griffin mentioned something about Henson's conduct to Casey, that would not disprove that he also mentioned her LinkedIn message—as he likely would have given that he learned about it just before calling Casey.

Finally, Capstone cannot obscure the ample circumstantial evidence supporting the Board's inference that Casey knew of Henson's LinkedIn message before firing her by distinguishing the specific facts of a few other cases. (Br. 29-31.) That is particularly true given that Capstone's distinctions depend on mischaracterizing the evidence in this case. Notably, Capstone ignores (*e.g.*, Br. 30) Henson's role as a leading and highly visible advocate for her coworkers' wage

and safety concerns on multiple occasions. Her fellow auditors identified her as a key "voice for us" in raising those issues to management. (ROA.275-76.) *See RELCO*, 734 F.3d at 770-72, 780-83 (relying in part on employees' visible role leading protected activity). Similarly, Capstone's emphasis that Henson's message was "private" (Br. 30) ignores the plain intent of the message—itself a continuation of her prior open advocacy—to get Rouse to contact Griffin, not maintain confidentiality. And while an employer's unfair labor practices may indicate animus supporting an inference of knowledge (Br. 30-31), Casey revealed his animus by prohibiting third-party appeals.

In sum, as the Board found, strong circumstantial evidence supports an inference of knowledge—including Casey's prior knowledge of and animus towards Henson's protected third-party appeals, Griffin's previous report of a similar appeal, and the remarkably close timing connecting Griffin's discovery of the message, his call to Casey, and Casey's decision to discharge Henson. As discussed below, Casey's later explanations for the discharge only serve to bolster and confirm the Board's reasonable inference that he knew of the LinkedIn message when he fired Henson—and fired her because of that protected appeal.

### 3. Capstone admittedly discharged Henson for her protected concerted LinkedIn message

Where an employer's admitted reason for a discharge is itself protected concerted activity, the admission "constitutes substantial evidence of unlawful motive sufficient to withstand [the Court's] deferential standard of review." *Remington*, 847 F.3d at 184. Substantial evidence supports the Board's finding that Capstone "essentially admitted" to discharging Henson for her protected concerted LinkedIn message. (ROA.1097.)

Significantly, as the Board explained (ROA.1097), just before discharging Henson on October 23, Casey told Capstone Director Ruder that "he had decided to discharge Henson *because* she had gone to the partner after being told not to do so"—a "statement[] that link[s] her discharge to her protected concerted activity in sending the LinkedIn message." (ROA.1097, emphasis added.) Casey then reinforced that link (ROA.1097) when he told Henson that she was fired for "what happened the day before" and for "disrupting Capstone's relationship with its business partner," which the Board reasonably interpreted as referring to the LinkedIn message's timing and impact. In light of Casey's admissions, Henson's discharge violated Section 8(a)(1), *Remington*, 847 F.3d at 184, and no further inquiry into Capstone's subjective motive (i.e., an analysis under *Wright Line*) is necessary to establish that violation. *See, e.g.*, *Allied Aviation Fueling of Dallas*

32

*LP*, 347 NLRB 248, 249 n.2 (2006), *enforced*, 490 F.3d 374, 379 (5th Cir. 2007) (*Wright Line* analysis not required where conduct for which employer claims to have discharged employee was protected concerted activity).

Other than rehashing its insistence that Casey did not know about the LinkedIn message (Br. 33), Capstone's only challenge to the Board's interpretation of Casey's statements is the hair-splitting assertion that because Capstone's "partner" was AWG, Casey's explanations for Henson's discharge could only refer to her interactions with AWG, not her message to Rouse (Br. 34). But that disregards important context. Casey had directed Henson to bring issues *only* to Capstone. Moreover, while Henson's message was sent to Rouse, it was an explicit appeal to approach AWG to influence Capstone—and it was AWG who brought it to Casey's attention. In other words, the message both violated Casey's explicit directive and was, by design, communicated to AWG, disrupting AWG's relationship with Capstone. Accordingly, the Board reasonably understood Casey's explanations as referencing her LinkedIn message.[5]

Capstone also argues (Br. 32-33) that the Board violated due process by finding that Casey admitted to an unlawful motivation, rather than determining

---

[5] While Capstone argues that the Board's cases are inapposite, based on its position that Casey did not admit to discharging Henson for her LinkedIn message, it does not challenge the legal proposition that where a stated reason for a discharge is unlawful, the Board need not further analyze motivation. (Br. 34-35.)

motive under the *Wright Line* framework the judge had used to analyze motivation. That claim fails for two simple reasons: Capstone never raised it to the Board and, in any event, the argument is baseless.

Section 10(e) of the Act bars the Court from considering objections not presented to the Board. *See* p. 24. That bar applies even if the Board introduces a new theory or issue *sua sponte*, in which case a party must file a motion for reconsideration before the Board to satisfy Section 10(e). *See Woelke & Romero*, 456 U.S. at 666; *IBEW 605*, 973 F.3d at 461; *Parkwood Development Ctr., Inc. v. NLRB*, 521 F.3d 404, 410 (D.C. Cir. 2008); *Gulf States Mfg. Inc. v. NLRB*, 704 F.2d 1390, 1396-97 (5th Cir. 1983). And it applies to due-process challenges. *Int'l Ladies' Garment Workers' v. Quality Mfg. Co.*, 420 U.S. 276 n.3 (1975); *NLRB v. Sambo's Rest., Inc.*, 641 F.2d 794, 796 (9th Cir. 1981). Capstone never argued to the Board that the admitted-motive analysis violated due process, so the Court is jurisdictionally barred from considering that argument.

In any event, the argument is factually and legally baseless. As an initial matter, Capstone's claim is founded on the mistaken assumption that the Board found Henson's discharge unlawful under *NLRB v. Burnup & Sims, Inc.*, 379 U.S. 21, 23 (1964). (Br. 32-33.) In fact, the Board never cited that case or applied the associated analysis. As described, the Board found that Henson was, as the

complaint in this matter alleged, "discharged" for "protected . . . concerted" activity "in violation of Section 8(a)(1)."  (ROA.723-24.)

That the Board found Capstone had admitted to that unlawful motivation, in addition to determining the motivation using the *Wright Line* framework employed by the judge, does not change the fact that Capstone had notice of, and actually litigated, the unlawful conduct (motivation) alleged and ultimately found— including the meaning and relevance of Casey's statements explaining the discharge.  There was no deprivation of due process because the violation found (discharge for protected concerted LinkedIn message) is "closely connected" (identical) to the one alleged and the relevant facts and law were "fully litigated." *Pergament United Sales, Inc.*, 296 NLRB 333, 334 (1989) (explaining two-part due-process standard), *enforced*, 920 F.2d 130, 134 (2d Cir. 1990); *accord Independent Elec. Contractors of Houston, Inc. v. NLRB*, 720 F.3d 543, 552-53 (5th Cir. 2013) ("*IEC*").

The Board's use of an admitted-motive analysis here is entirely unlike the *sua sponte* Board rationale the Court found to violate due process in *IEC* (cited at Br. 32), where the Court found that the employer had been prejudiced by the Board's "novel" and "previously unrecognized theory," which employed a materially different burden of proof under a different section of the Act than the allegation pled and litigated before the administrative law judge.  *Id.* at 552-53 &

n.16.[6]  And unlike the employer in *IEC*, Capstone cannot show that it suffered any

prejudice as a result of the Board's admitted-motive finding, as it must to prove a

due-process violation.  *NLRB v. Ingredion Inc.*, 930 F.3d 509, 519 (D.C. Cir.

2019); *Brookwood*, 701 F.2d at 469.  Indeed, Capstone argues (Br. 31, 35) that

*Wright Line*, under which the Board also found Henson's discharge unlawful

(discussed below), is the correct test.

### 4. Capstone unlawfully discharged Henson for her protected concerted LinkedIn message under *Wright Line*

Even assuming Casey's statements did not effectively admit that Capstone

unlawfully terminated Henson for her LinkedIn message, the Board found

(ROA.1097) that the same conclusion would be warranted under *Wright Line*, 251

NLRB 1083, 1089 (1980), *enforced on other grounds*, 662 F.2d 889 (1st Cir.

1981), *approved in NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393 (1983).  Under

*Wright Line*, "[t]he Board may rely on circumstantial evidence to infer that an

employee's protected activity was a motivating factor in an employer's decision to

---

[6]  While the Court in *IEC* did consider a due-process challenge not raised to the
Board, it reaffirmed that generally "a party must raise any issues to the Board
before appealing them."  720 F.3d at 551.  It held that it had jurisdiction over the
due-process claim only because of very particular circumstances, including that the
Board was effectively on notice of, and had preemptively analyzed and rejected,
the claim; and that only the union-intervenor, not the Board, argued that
Section10(e) barred consideration of the claim.  720 F.3d at 551-52.

fire the employee." *Cordua Rest., Inc. v. NLRB*, 985 F.3d 415, 423 (5th Cir. 2021).

"In particular, the Board may infer a discriminatory motive where the evidence

shows that: (1) the employee engaged in concerted activities protected by Section

7; (2) the employer knew of the employee's engagement in those activities; and (3)

the employer harbored animus toward the employee's protected activities." *Id.*

If substantial evidence supports the Board's finding that protected activity

was a "motivating factor," the discharge is unlawful unless the record as a whole

compels acceptance of the employer's affirmative defense that it would have taken

the same action absent protected activity. *Remington*, 847 F.3d at 183; *NLRB v.*

*Delta Gas, Inc.*, 840 F.2d 309, 311 (5th Cir. 1988). However, if the employer's

stated non-discriminatory reasons for its action are pretextual—that is, if they

either did not exist or were not in fact relied upon—the employer's burden has not

been met, and the inquiry is logically at an end. *Limestone Apparel Corp.*, 255

NLRB 722 (1981), *enforced mem.,* 705 F.2d 799 (6th Cir. 1982); *see also Cordua*,

985 F.3d at 427; *Wright Line*, 251 NLRB at 1084.

### a.   Protected concerted activity was a motivating factor in Capstone's discharge decision

As shown, Henson engaged in protected concerted activity by sending the

October 22 LinkedIn message (pp. 18-24), and Capstone knew of the message

before discharging her (pp. 25-31). Substantial evidence supports the Board's

further finding (ROA.1097) that Capstone harbored animus against that activity, and thus that the message was a motivating factor in her discharge.

In finding animus, the Board first looked at Capstone's established hostility towards Henson directing her appeals to third parties. After Henson and the auditors raised Capstone-related issues to AWG at their October 17 meeting, Casey explicitly directed Henson not to do it again, insisting that she only bring such concerns directly to Capstone. The Board's interpretation of that directive as demonstrating hostility (ROA.1097) was confirmed by Casey's reaction to Henson's next third-party appeal, the LinkedIn message urging Rouse to contact AWG about the auditors' wages. The following morning, immediately before discharging Henson, Casey told Director Ruder that he planned to do so because she had gone to AWG against his orders (pp. 9, 32). And when he informed Henson of her discharge, he stated that it was because what happened on October 22 had disrupted Capstone's relationship with AWG (pp. 9-10, 32). As the Board found, both statements "amplify" Capstone's unlawful motive (ROA.1097), echoing Casey's demonstrated animus towards third-party appeals and connecting it directly to Henson's discharge (*contra* Br. 38-39).

Finally, the striking timing of Henson's discharge bolsters the evidence of animus. As the Board found (ROA.1097), that Casey made the discharge decision immediately after learning of Henson's LinkedIn message makes the motivation

38

"stunningly obvious." *NLRB v. S.E. Nichols, Inc.*, 862 F.2d 952, 959 (2d Cir. 1988). *Accord Cordua*, 985 F.3d at 426 (close timing of employer's actions in relation to employee's protected activity is "significant indicator" of unlawful motive).

In contesting the Board's animus finding, Capstone coyly asks "what 'hostility?'" the Board could have discerned from Casey's meeting with Henson after she first appealed to AWG. (Br. 36.) Capstone insists that Casey had "no concerns" about that appeal and that his meeting with Henson was not disciplinary, just intended to address her "odd" confusion about her chain of command. (Br. 36-37.) The tone of the conversation, Capstone notes, was "[l]ight, professional, and supportive," and Henson felt no "animosity." (Br. 37-38.) But the Board's animus finding is not, as Capstone implies, based on an unpleasant interpersonal confrontation or retaliation for past protected activity. It is based instead on an element of the meeting that Capstone disregards: Casey's explicit direction that Henson only take Capstone-related issues to Capstone, not to AWG. And, as noted, the animus underpinning Casey's directive was manifested shortly thereafter in his swift and draconian reaction when Henson next engaged in similar protected activity—in violation, as he explained, of his directive.

Capstone's argument (Br. 37, 47) that any evidence of its animus is negated because it did not discipline other auditors who participated in Henson's first

39

appeal to AWG is factually and legally baseless. First, as just discussed, Capstone also did not discipline Henson for that first appeal. And there is no evidence that any other auditor made a subsequent third-party appeal. Second, contrary to Capstone's suggestion (Br. 37, citing *NLRB v. Esco Elevators, Inc.*, 736 F.2d 295, 298 (5th Cir. 1984)), Henson had played a prominent role in a sustained course of protected concerted activity, as discussed above (pp. 4-9, 30). And, in any event, an employer does not have to discharge every employee advocate to violate the Act. *See FedEx Freight East, Inc. v. NLRB*, 431 F.3d 1019, 1030 (7th Cir. 2005) ("A discriminatory motive, otherwise established, is not disproved by an employer's proof that it did not weed out all" employee advocates); *accord Delta*, 840 F.2d at 312.[7]

Capstone's challenge (Br. 39-40) to the Board's reliance on the remarkably short time between Casey learning of Henson's message and his decision to discharge her is also unavailing. It does not contest that such close temporal proximity is significant, but asserts instead that the impact is "vitia[ed]" by "the

---

[7] Capstone highlights (Br. 47) that the Board dismissed an allegation that Casey unlawfully fired another auditor, Peggy Cooper, for protected concerted activity. There is no inconsistency between that dismissal and the finding that he unlawfully discharged Henson. Among other differences from Henson, Cooper: (1) did not make a protected concerted third-party appeal after the auditors first collectively spoke to AWG, ROA.1105-06, (2) was not directed by Casey to cease such activity, ROA.1094, 1097, 1105-07, and (3) acknowledged that she could not adequately perform the auditor job, ROA.1106-07.

intervening event of [Henson's] interaction with Griffin," which occurred (like the

LinkedIn message) right before Griffin's conversation with Casey. (Br. 40.) That

argument fails for two reasons, both discussed below. First, the Board found "no

reliable evidence" (ROA.1098, 1105) of what occurred during that interaction,

much less proof of misconduct by Henson that would have precipitated her

discharge (pp. 41-50). Second, the Board found that if Casey did discharge

Henson because of her interaction with Griffin, the discharge was still unlawfully

based not on misconduct (see first point) but on Casey's belief that she had

engaged in protected concerted activity (pp. 50-53).

### b. Capstone did not prove its affirmative defense

Because substantial evidence supports finding that Henson's protected

concerted LinkedIn message was a motivating factor in her discharge, Capstone

violated the Act unless the record compels acceptance of its affirmative defense

that it would have discharged Henson even absent that activity. *See Remington*,

847 F.3d at 183, and cases cited at p. 37. Substantial evidence supports the

Board's finding that Capstone failed to establish that defense. Capstone asserts

that Casey in fact discharged Henson for misconduct on October 22 (being

disruptive, rude, and difficult to control) that Griffin reported to Casey. But as the

Board found, Capstone failed to prove that affirmative defense because there is no

credited evidence either that the misconduct occurred or that Griffin reported it,

much less that if Casey had believed the supposed report, he would have discharged Henson for it in the absence of her protected concerted activity.  For each of those reasons, Capstone's defense fails.

**First,** the Board agreed with the judge, who found (after describing Henson's account) that there is "no reliable evidence about what had happened during Henson's interaction with Griffin." (ROA.1098.)  While Casey testified that Griffin told him what had transpired, the judge found that account to be hearsay.  Thus, even if Griffin made the reported statements about the interaction, those statements could not prove the truth of what actually occurred between Griffin and Henson.[8]  (ROA.1105.)  Griffin himself did not testify or make any written report of untoward conduct by Henson that afternoon or at any time prior to that afternoon—and there is no other evidence of such misconduct in the record. (ROA.1098.)  Because there is no evidence Henson engaged in the misconduct for which Capstone claims to have fired her, the explanation is pretextual and

---

[8] Capstone's contention that Casey's testimony was not hearsay because he did not testify to "statements" by Henson is puzzling.  (Br. 42.)  Casey testified as to statements by *Griffin* regarding an event Casey did not witness.  The testimony is therefore hearsay as to, and cannot prove the truth of, what Henson did—as Capstone subsequently acknowledges (Br. 43).  In any event, the hearsay finding was ultimately superfluous because, as discussed below, the judge also discredited Casey's account that Griffin made the statements Casey attributed to him.

Capstone's affirmative defense fails. *See Cordua*, 985 F.3d at 427, and cases cited at p. 37.

**Second,** the Board agreed with the judge that Casey's testimony that Griffin reported that Henson had been rude, disruptive, and uncontrollable was simply not credible in the context of the record as a whole (*contra* Br. 45-46). (ROA.1098, 1105.) As discussed above (pp. 29-30), the lack of any prior misconduct by Henson or any corroboration of Casey's account support that credibility finding.[9] And so do the circumstances of Casey and Griffin's conversation: substantial evidence of events both before and after the call indicates that Griffin in fact complained about Henson making another protected third-party appeal, to Griffin's annoyance and against Casey's express direction (pp. 26, 37). Notably, Casey's own explanations of why he discharged Henson not only referred to her "disruption" of Capstone's *business* with AWG (Br. 46), but also emphasized that her conduct was in violation of his express instructions (not to repeat her prior protected concerted appeals outside Capstone). Once again, therefore, Capstone's affirmative defense fails because it relies on something (Griffin's supposed report) that never happened.

---

[9] There is no merit to Capstone's suggestion (Br. 51) that Henson's subsequent emotional reaction to her abrupt, unlawful discharge "confirm[s]" the entirely different claim that she engaged in unprecedented, disruptive misconduct at work.

Moreover, as the Board observed, Capstone claims that Casey reasonably relied on Griffin's purported report of Henson's October 22 misconduct "simply because he had known Griffin for years and believed him to be credible." (ROA.1098.) In other words, Casey—who decided to discharge Henson immediately after talking to Griffin—admittedly (*e.g.,* ROA.522-24) made no effort to substantiate any claim of misconduct. Despite the vague nature of Griffin's purported report, Casey did not ask Griffin for any details of what happened during the interaction or for written follow-up. Nor did he ask Henson, the other participant in the interaction, for her account, or attempt to talk to the other employees who supposedly witnessed it (*see* Br. 42). Casey's lack of follow-up both undermines his testimony that Griffin reported serious misconduct and supports the Board's further finding, discussed below, that any such report was not the reason for Henson's discharge. *See Cordua*, 985 F.3d at 427 (employer's one-sided or cursory investigation into employee's purported misconduct may constitute "significant evidence" of unlawful motive); *Sheraton Hotel Waterbury*, 312 NLRB 304, 322 (1993) (failure to interview other witnesses to alleged insubordination indicated unlawful motivation).[10]

---

[10] Capstone's contention (Br. 43, 46) that Casey's rush to judgment after his phone call with Griffin corroborates his account of what Griffin said is nonsensical. It supports the undisputed fact that Casey fired Henson based on what he learned during the call, but does not illuminate the details of the conversation.

**In any event,** the Board found (ROA.1098) that, even assuming Griffin did report that Henson was rude, disruptive, and difficult to control, *and* assuming Casey reasonably believed him, Capstone failed to prove that it *would have* discharged her for that reason even absent her protected concerted activity. (ROA.1098.) "Under *Wright Line*, an employer cannot carry its burden of persuasion by merely showing that it had a legitimate reason for [its action], but must show by a preponderance of the evidence that the action would have taken place even without the protected conduct." *Hicks Oils & Hicksgas*, 293 NLRB 84, 85 (1989), *enforced* 942 F.2d 1140 (7th Cir. 1991); *accord Cordua*, 785 F.3d at 424-25.

Significantly, the record shows that Capstone imposed lesser forms of discipline on other employees who had been rude, disruptive, insubordinate, and difficult to control. *See Delta*, 840 F.2d at 313 (*Wright Line* defense of discharge rejected as pretextual where employer had imposed "lessor sanctions" on other employees for similar or worse conduct); *see also RELCO*, 734 F.3d at 787 (circumstantial evidence of unlawful motive includes "tolerance of behavior for which the employee was allegedly fired, and disparate treatment of the discharged employee[]"); *accord NLRB v. ADCO Elec., Inc.*, 6 F.3d 1110, 1119 (5th Cir. 1993.) For example, Capstone gave just a two-day suspension to an employee (M. Rawls) for "creating or causing a disturbance, which is disruptive to the

workplace" and for "insubordination; refusal to perform a job duty." (ROA.1098; ROA.807.) In another instance, Capstone merely warned an employee (J. Oberkiser) for violating company policies by being "disrespectful and cursing to his direct supervisor." (ROA.1098 & n.19; ROA.918.)

Notably, unlike those employees, Henson is not alleged to have sworn at a supervisor (or at all) or to have refused to do her job. Yet, Capstone treated Henson more harshly. It immediately fired her the first time she purportedly engaged in rude or disrespectful conduct. And in doing so, Capstone—as Casey admitted (ROA.50-51, 523-24)—departed from its typical practice by failing to issue Henson a contemporaneous (or any) written notice or explanation of her termination. As the Board found (ROA.1098), that departure further undermines Capstone's claim that it would have discharged Henson even absent her protected concerted activity. *RELCO*, 734 F.3d at 787; *Delta*, 840 F.2d at 313; *Kajima Engineering & Construction*, 331 NLRB at 1605.[11]

Contrary to Capstone (Br. 49-50), the Board did not ignore evidence that Capstone had purportedly discharged other employees (*e.g.*, J. Oberkiser and M.

---

[11] Capstone's arguments that the lack of paperwork was not suspicious because Casey did not usually complete the paperwork or the management structure was in flux (Br. 48), and that the comparator employees were not at the same site (Br. 49) are unavailing. Capstone does not deny that regular procedure was not followed. And it affirmatively admitted that its policies apply equally regardless of the partner or facility. (ROA.1098 n.19.)

Smith) for similar or less serious outbursts.  If anything, those instances reinforce the Board's finding that Capstone treated Henson differently because those employes were discharged only after repeated instances of more severe disruptive and disrespectful misconduct.  *See Remington*, 847 F.3d at 186 (*Wright Line* defense not supported by prior discharge of other employees who were not "similarly situated").  Oberkiser, as just noted, received a warning the first time he was disrespectful and cursed at a supervisor.  According to Capstone's own documentation, he was discharged only after repeating his disrespectful conduct, "throwing a pen," "abandoning his job," and thereby continuing his "history of outbursts" after being previously "warned to keep his attitude under control." (ROA.916, 918).  Likewise, Capstone's documentation of Smith's discharge indicates that it was precipitated by repeated and aggravated misconduct over multiple interactions.  When a manager brought Smith in to discuss discipline for his refusal to complete his assignment, and warned him that "we can't continue to have these conversations," Smith responded by "swearing at and being disrespectful" towards the manager and another employee, and "toss[ing] his badge" at the manager, which led to Smith being immediately escorted from the premises.  (ROA.927; *see* ROA.628-29.)

In stark contrast to its treatment of those employees, Capstone immediately discharged Henson, who had no prior misconduct, much less any warning, after

one instance in which she is not alleged to have cursed, abandoned her job, or thrown objects. Indeed, because Casey neither investigated Griffin's supposed report nor—contrary to usual practice—contemporaneously documented Henson's misconduct in a termination letter, Capstone is able to provide few details regarding her purported misconduct. *See Delta*, 840 F.2d at 313 (finding pretext where employer "swiftly concluded to invoke the 'last resort,' after only a cursory investigation"). Without any detail, even assuming the veracity of Casey's second-hand account, Capstone cannot meet its burden to prove its assertion that Henson's conduct was worse than other employees', much less so much worse as to warrant immediate discharge. Nor can it fill that evidentiary hole simply by asserting that none of the other employees' outbursts were "directed towards a customer or in a customer's presence." (Br. 48.) Smith and Oberkiser were also at customer sites during their misconduct. And Capstone cites no record evidence supporting its bare assertion that it had "never before received a report from a customer like the one Griffin made about Henson." (Br. 48.)

**Finally,** Capstone cannot meet its defensive burden to prove it would have discharged Henson in the absence of her protected concerted activity by seizing (Br. 50-51) on conduct—returning to the Facility, acting "distraught," and making "inflammatory" remarks—that occurred *after* Capstone had already discharged Henson, and which was provoked by her unlawful discharge. Because Capstone

never raised it to the Board, Section 10(e) bars consideration of that claim (*see* p. 24), which in any event lacks merit.

As an initial matter, Casey did not reference Henson's October 23 conduct, or any post-discharge events, as a reason for Henson's discharge even when he left her a voicemail explanation two weeks later. Nor did Capstone document those grounds for the discharge in its belated termination paperwork (ROA.812) completed a month later (which it never provided to Henson). Such shifting explanations (and relying on incidents not mentioned to the discharged employee) are indicative of unlawful motivation in their own right. *RELCO*, 734 F.3d at 787 (employer's decision to add "after the fact" justifications for discharge is grounds for inferring animus); *Texas World. Serv. Co. v. NLRB*, 928 F.2d 1426, 1436 (5th Cir. 1991) (employer's reliance on shifting explanations for adverse action weakened its defense and strengthened Board's inference of unlawful motive).

More fundamentally, Capstone cannot cleanse its actual, contemporaneous, unlawful motive for a discharge by pointing to subsequent events. *See Transp. Mgmt.*, 462 U.S. at 396 (affirming that stated justification "was clearly a pretext" where employer had already decided to discharge employee prior to learning of alleged misconduct). As a matter of simple logic, conduct that had yet to happen at the time of discharge cannot satisfy Capstone's burden to show it *would have* lawfully discharged Henson when it did. Unsurprisingly, Capstone cites no case

holding that it can.  Nor does it cite a case for the even more radical proposition that an employer can retroactively satisfy its defensive burden by citing behavior provoked by the unlawful discharge it seeks to defend—here, Henson's understandably "distraught" reaction to her abrupt discharge for protected concerted activity.  *See NLRB v. SW Bell Telephone Co.*, 694 F.2d 974, 978 (5th Cir. 1982) ("It has long been settled that an employer may not rely on employee conduct that it has unlawfully provoked as a basis for disciplining an employee.")

**B.    Capstone Unlawfully Discharged Henson Because It Believed She Had Engaged in Protected Concerted Activity During Her October 22 Interaction with AWG's Griffin**

Substantial record evidence also supports the Board's finding (ROA.1098-99) that, even assuming Capstone did not know about Henson's protected LinkedIn message, Casey's belief that she had raised group employment complaints to Griffin on October 22 was a motivating factor for Capstone's decision to discharge her.  *See Remington*, 847 F.3d at 185 (to establish an unlawful discharge under Section 8(a)(1), "it is sufficient if the employer was motivated by suspected [protected concerted] activity in discharging the employee"); *JCR Hotel, Inc. v. NLRB*, 342 F.3d 837, 839, 840-41 (8th Cir. 2003) (same).  As the Board found, "if Casey did not believe that Henson had brought [such] complaints to AWG's Chris Griffin on October 22, there would have been no reason for Casey to claim—when explaining the reason for her discharge—that Henson had violated his directive not

to bring Capstone-related issues or concerns to AWG." (ROA.1099.) That Casey gave exactly that explanation for the discharge was established, the Board noted, by Ruder's testimony, Casey's voicemail to Henson, and Capstone's attorney's own concessions. (ROA.1099 n.20; ROA.344-45, 562-63, 802, *see* ROA.130.)

As the Board further noted, Casey had good reason—even if he was unaware of the LinkedIn message—to believe that Henson had raised group complaints to Griffin, because Henson had raised group complaints to Capstone officials, including Casey and Ruder, earlier that same day. While Capstone attempts to undermine that inference (Br. 53), it does not directly question the Board's underlying credibility and factual finding regarding the earlier protected concerted activity (ROA.1094 & n.7, ROA.1104). Nor does it explain (Br. 53) how Casey's asserted inability to recall Henson's concerted October 22 complaints at the administrative hearing over sixteen months later supports an inference that he would not have remembered them just a few hours later.[12] Moreover, Casey also knew that Henson had recently raised group concerns to Griffin. Indeed, it was Griffin's complaint about that earlier protected appeal that had prompted Casey to issue the directive he discharged Henson for violating. As the Board aptly

---

[12] Likewise, while it may have been "common" (Br. 53) for auditors to raise pay concerns, only Henson made a third-party appeal on the subject after being told not to do so (*see* pp. 8, 26, 37).

summarized, "the evidentiary admissions, the timing of the discharge, and Capstone's hostility toward Henson's act of raising the auditors' issues to AWG," taken together, support finding that "Henson's discharge was motivated by Capstone's belief that she had engaged in protected concerted activity during her October 22 interaction with Griffin." (ROA.1099 & n.22.)[13]

In challenging this rationale for the unlawful-discharge violation, Capstone's defense (Br. 52-54) boils down to repeating its implausible assertion that Casey had no reason to believe that Henson's appeal to AWG involved protected *group* complaints, as opposed to unprotected personal complaints, or only harbored animus against the personal complaints. But as Casey knew, each time Henson had raised her personal salary concerns (to Capstone or AWG), she had also raised group salary concerns and other group conditions of employment, notably safety issues. As discussed above (pp. 4-9; *see also* ROA.1096), her group and individual appeals were intertwined, and both formed part of the same course of protected concerted activity. Moreover, as the Board found when rejecting the notion that Capstone only harbored animus against non-concerted complaints, Casey's "broad

---

[13] As discussed above (pp. 27, 38), the proximate timing of the discharge to Henson's protected concerted appeals and to Casey's conversation with Griffin supports a link, whether it be to the LinkedIn appeal or another (real or imagined) appeal directly to Griffin just before he spoke to Casey.

directive not to bring Capstone-related issues or concerns to AWG certainly was not limited to Henson's individual concerns." (ROA.1097.)[14]

In sum, substantial evidence supports the Board's finding that Casey's belief that Henson had made a protected concerted appeal to Griffin on October 22 was a motivating factor in Casey's decision to discharge Henson—to the extent Casey did not know of the protected LinkedIn appeal to Griffin via Rouse. Capstone does not specifically argue a *Wright Line* affirmative defense in its opposition to this alternative rationale. (Br. 52-54.) In any event, such a defense would fail, as the Board found (ROA.1099), for the reasons discussed regarding Capstone's affirmative defense to the LinkedIn rationale (*see* pp. 41-50).

## II. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT CAPSTONE VIOLATED SECTION 8(a)(1) BY TELLING HENSON THAT SHE WAS DISCHARGED FOR HER PROTECTED CONCERTED ACTIVITY

Substantial evidence supports the Board's finding that Capstone also unlawfully told Henson that it was discharging her because of her protected concerted appeals to AWG. The test for a coercive statement under Section 8(a)(1)

---

[14] Capstone assumes that Casey's directive was "lawful" (Br. 52). But the Board made no such finding as there was no allegation regarding the directive's legality. (ROA.1097.) In any event, as the Board explained, the absence of an allegation or finding that the directive was unlawful "cannot immunize Capstone's decision to discharge Henson because she engaged in protected concerted activity." (ROA.1097, citing cases for the proposition that protected concerted activity does not lose protection solely because it contravenes an employer policy).

is whether, considering the totality of the circumstances, the statement would reasonably tend to coerce employees in the exercise of their statutory rights. *Delta*, 840 F.2d at 311. Under that objective test, neither actual coercion nor unlawful motive is required. *Brookwood*, 701 F.2d at 459; *Miller Elec. Pump & Plumbing*, 334 NLRB 824, 824-25 (2001).

As the Board found (ROA.1099), Casey effectively told Henson—twice—that she was discharged because she had violated his directive against appealing to third parties (including AWG) regarding working conditions at Capstone, i.e., was only to take Capstone-related matters to Capstone. Thus, he told Henson on October 23 that she was discharged for what happened on October 22 (the day she made a protected concerted appeal to Rouse to approach AWG regarding the auditors' wages), which disrupted Capstone's relationship with AWG. (ROA.1099.) And to the extent that reference to disruption might have been at all ambiguous, even in context (and it was not, *see* pp. 32-33, 38, 43), Casey's November 6 voicemail further explaining the discharge erased any doubt. Casey referenced his directive and specifically stated that Henson was discharged for "*question[ing]* the partner (AWG) *after being told not to bring Capstone-related issues to AWG*." (ROA.1099 (emphasis added); ROA.802.) As the Board aptly explained, "there can be no doubt that an employee in Henson's position would reasonably conclude from Casey's explanations (in both the discharge call and in

54

the subsequent voicemail message) that Capstone [was stating that it] terminated her for engaging in protected concerted activity." (ROA.1099.)

Capstone does not dispute (Br. 54) that if Henson was unlawfully discharged for her protected concerted appeal to Rouse/AWG, then it was also unlawful to tell her that she was discharged for that reason. Its sole argument is that *if* the discharge was lawful, then "telling her why she was discharged cannot be unlawful." (Br. 54). Because the Board found the discharge was unlawful, it did not have occasion to address whether Casey's statements would still be unlawful if the discharge was not. But Capstone's argument does not necessarily follow. Regardless of why Capstone discharged Henson, Casey's statements claiming that he discharged her for violating his directive against third-party appeals still presented reasonable employees with a clear warning: if they engaged in such appeals—including protected concerted appeals—in the future (*e.g.*, by "questioning the partner (AWG)") they could suffer adverse consequences including discharge.[15] Such a warning constitutes an unlawful threat of retaliation

---

[15] As the Board explained (ROA.1099; *see* pp. 26, 37), the directive Casey explicitly referenced was broad and covered protected concerted third-party appeals. Thus, even if the directive also covered unprotected activity (like personal complaints), and *even if* Henson were fired for unprotected activity, a statement asserting retaliation for violating the broad directive would, by definition, coerce employees in the exercise of rights also covered by the directive. *See Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 492-93 (1978) (overbroad restriction

against, and would thus reasonably tend to interfere with, employees' exercise of

their statutory rights in violation of Section 8(a)(1).

---

on protected conduct is, by itself, "presumptively an unreasonable interference"
with employees' Section 7 rights in violation of Section 8(a)(1)).

## CONCLUSION

The Board respectfully requests that the Court deny Capstone's petition for review and enforce the Board's Order in full.

Respectfully submitted,

/s/ Kira Dellinger Vol
KIRA DELLINGER VOL
    *Supervisory Attorney*

/s/ Greg P. Lauro
GREG P. LAURO
    *Attorney*

*National Labor Relations Board*
1015 Half Street, SE
Washington, DC 20570
(202) 273-0656
(202) 273-2965

JENNIFER A. ABRUZZO
    *General Counsel*
PETER SUNG OHR
    *Deputy General Counsel*
RUTH E. BURDICK
    *Deputy Associate General Counsel*
DAVID HABENSTREIT
    *Assistant General Counsel*
National Labor Relations Board
March 2024

# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

| | | |
|---|---|---|
| CAPSTONE LOGISTICS, L.L.C. | ) | |
| | ) | |
| Petitioner/Cross-Respondent | ) | No. 23-60513 |
| | ) | |
| v. | ) | Board Case Nos. |
| | ) | 15-CA-257443 |
| NATIONAL LABOR RELATIONS BOARD | ) | 15-CA-259712 |
| | **)** | |
| Respondent/Cross-Petitioner | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2024, I electronically filed the foregoing

document with the Clerk of the Court for the United States Court of Appeals for

the Fifth Circuit by using the CM/ECF system.  I certify that the foregoing

document was served on all parties or their counsel of record through the appellate

CM/ECF system.

/s/ Greg P. Lauro
Greg P. Lauro
Attorney
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC  20570
(202) 273-2965

Dated at Washington, DC
this 7th day of March 2024

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

CAPSTONE LOGISTICS, L.L.C. )
          )
  Petitioner/Cross-Respondent ) No. 23-60513
          )
  v.        ) Board Case Nos.
          ) 15-CA-257443
NATIONAL LABOR RELATIONS BOARD ) 15-CA-259712
          **)**
  Respondent/Cross-Petitioner )

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the Board

certifies that this brief contains 12,505 words of proportionally-spaced, 14-point

type, and the word processing system used was Microsoft Word 365.


    /s/ Greg P. Lauro
    Greg P. Lauro
    Attorney
    NATIONAL LABOR RELATIONS BOARD
    1015 Half Street, SE
    Washington, DC  20570
    (202) 273-2965


Dated at Washington, DC
this 7th day of March 2024