# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

| | | |
|---|---|---|
| CAPSTONE LOGISTICS, L.L.C. | ) | |
| | ) | |
| Petitioner/Cross-Respondent | ) | No. 23-60513 |
| | ) | |
| v. | ) | Board Case Nos. |
| | ) | 15-CA-257443 |
| NATIONAL LABOR RELATIONS BOARD | ) | 15-CA-259712 |
| | **)** | |
| Respondent/Cross-Petitioner | ) | |

## UNOPPOSED MOTION OF
## THE NATIONAL LABOR RELATIONS BOARD
## TO LODGE BRIEFS IN SUPPORT OF EXCEPTIONS

To the Honorable, the Judges of the United States
   Court of Appeals for the Fifth Circuit:

The National Labor Relations Board respectfully requests permission to lodge with the Court the attached briefs in support of exceptions filed by Capstone and the Board's General Counsel in the underlying Board proceeding. In support, the Board shows as follows:

1.    As discussed in the Board's brief (p. 24), Section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e), bars this Court from considering any argument not raised to the Board, absent "extraordinary circumstances."

2.    The Board's brief (p. 24) cites the foregoing briefs in support of exceptions to show that Capstone's opening brief to the Court raises arguments not

brought before the Board.  The briefs in support of exceptions will aid the Court in evaluating the Board's contentions.

3.     The record in a Board case does not include briefs in support of exceptions.  The Board's regulations (29 C.F.R. § 102.45(b)) provide that:

> The charge upon which the complaint was issued and any amendments thereto, the complaint and any amendments thereto, motions, rulings, orders, the stenographic report of the hearing, stipulations, exhibits, documentary evidence, and depositions, together with the administrative law judge's decision and exceptions, and any cross-exceptions or answering briefs as provided in section 102.46, shall constitute the record in the case.

4.     Accordingly, the Board's normal practice in cases where a party's brief from the Board proceedings may prove helpful to the Court is to request that the Court permit the brief to be lodged separately from the formal record.

5.     Counsel for Capstone does not oppose this motion.

WHEREFORE, the Board respectfully requests that the Court grant its motion to lodge the briefs in support of exceptions.

Respectfully submitted,

/s/ Ruth E. Burdick

Ruth E. Burdick
Deputy Associate General Counsel
National Labor Relations Board
1015 Half Street SE
Dated at Washington, DC          Washington, DC 20570
this 7th day of March 2024       (202) 273-2960

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD


CAPSTONE LOGISTICS, LLC & ASSOCIATED
WHOLESALE GROCERS, INC., AS JOINT
EMPLOYERS

        and                                Case 15-CA-257443


JOYCE HENSON, AN INDIVIDUAL
                                    Case 15-CA-259712
        and

PEGGY COOPER, AN INDIVIDUAL


BRIEF OF COUNSEL FOR THE GENERAL COUNSEL
IN SUPPORT OF EXCEPTIONS TO THE DECISION
OF THE ADMINISTRATIVE LAW JUDGE


Respectfully Submitted by:

William T. Hearne
Counsel for Acting General Counsel
National Labor Relations Board
Subregion 26
80 Monroe Avenue, Suite 350
Memphis, Tennessee  38103

## TABLE OF CONTENTS

I.     BACKGROUND FACTS...................................................................  1

     A.     Respondent's Business Operations.............................................  1

     B.     Capstone Supplies Auditors.....................................................  2

     C.     Capstone Auditor Training.......................................................  3

     D.     Auditing Training of Capstone Auditors by AWG Personnel..............  6

     E.     Capstone Auditors Meet with AWG Managers...........................  8

     F.     Events of October 22, 2019 and Discharge of Henson......................  10

     G.     Discharge of Cooper.............................................................  14

II.    THE JUDGE INCORRECTLY FOUND JOYCE HENSON WAS
     NOT TERMINATED IN RETALIATION FOR HER PROTECTED
     ACTIVITIES (Exceptions 3, 4, 5, 6, 7, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20).....  18

     A.     While the Judge Found Henson Engaged in Protected Activities,
          the Judge Failed to Acknowledge the Full Extent of Henson's
          Protected Activities (Exceptions 3, 4, 13, 14).................................  18

     B.     The Judge Incorrectly Found There Was No Evidence of Animus
          Toward Henson's Protected Activities. (Exceptions 5, 6, 11, 12,
          13, 14, 16, 17, 18)................................................................  21

     C.     ALJ Amchan Incorrectly Found Capstone Lawfully Discharged
          Henson (Exceptions 19, 20)....................................................  24

III.   THE JUDGE INCORRECTLY DETERMINED CASEY DID NOT
     UNLAWFULLY INFORM EMPLOYEES THEY WERE
     TERMINATED BECAUSE OF THEIR PROTECTED CONCERTED
     ACTIVITIES (Exception 28)......................................................  28

IV.   THE JUDGE IMPLIEDLY FAILED TO SPECIFICALLY FIND THAT
     RESPONDENTS CAPSTONE AND AWG WERE JOINT EMPLOYERS
     WITHIN THE MEANING OF THE ACT CONCERNING THE
     AUDITORS (Exception 21).......................................................  29

V.    THE JUDGE INCORRECTLY FOUND PEGGY COOPER WAS
     NOT TERMINATED IN RETALIATION FOR HER PROTECTED
     CONCERTED ACTIVITIES (Exceptions 1, 8, 9,10, 22, 23, 24, 25, 26, 27).....  33

A.      ALJ Amchan Incorrectly Found Cooper Did Not Engage
in Protected Concerted Activities Following Henson's
Discharge (Exceptions 1, 8, 9, 10)…………………………………...  33

B.      ALJ Amchan Incorrectly Found Capstone Lawfully
Discharged Cooper (Exceptions 22, 23, 24, 25, 26, 27)………………  34

VI.    CONCLUSION……………………………………………………………...  37

## TABLE OF AUTHORITIES

<u>Cases</u>

*Allied Aviation Service Co.*, 248 NLRB 229 (1980)……………………………… 19, 21, 29

*Browning-Ferris Industries of California, Inc. d/b/a BFI Newby
    Island Recyclery*, 362 NLRB 1599 (2015)……………………………… 30, 31, 32, 33

*Browning-Ferris Industries of California, Inc. d/b/a BFI Newby
    Island Recyclery*, 369 NLRB No. 139, fn. 2 (July 29, 2020)…………….. 30, 31

*Browning-Ferris Industries of California, Inc. v. National Labor
    Relations Board*, 911 F.3d 1195 (D.C. Cir 2018)……………………… 31

*Cordura Publications*, 280 NLRB 230 (1986)………………………………….. 21, 29

*Eastex, Inc. v. NLRB*, 437 U.S. 556 (1978)…………………………………… 29, 32

*La Gloria Oil & Gas Co.*, 337 NLRB 1120 (2002)……………………………… 25

*Laerco Transportation*, 269 NLRB 324 (1984)………………………………… 30

*Lou's Transport, Inc.*, 361 NLRB 1446 (2014)………………………………… 18, 19

*Medic One, Inc.*, 331 NLRB 464 (2000)………………………………………… 25, 35

*National Dance Institute—New Mexico, Inc.,* 364 NLRB 342 (2016)………….. 35

*National Steel & Ship-building Co.*, 324 NLRB 1114 (1997)…………………… 36

*New Orleans Cold Storage & Warehouse Co.*, 326 NLRB 1471 (1998)……….. 26

*Ozburn-Hessey Logistics, LLC*, 362 NLRB 1532 (2015),
    *enfd.* 689 Fed. Appx. 639 (D.C. Cir. 2016)……………………………… 27

*Parkview Lounge, LLC d/b/a Ascent Lounge*, 366 NLRB No. 71 (2018)………. 19, 20, 34

*Pro-Spec Painting, Inc.*, 339 NLRB 946, 949 (2003)…………………………… 36

*Retro Environmental Inc./Green Jobworks, LLC*, 364 NLRB 922 (2016)……… 31, 32

*Talsol Corp.*, 317 NLRB 290, 317 (1995)……………………………………… 20

*TLI, Inc.*, 271 NLRB 798 (1984), *enfd. mem.* 772 F.2d 894 (3d Cir. 1985)……. 30

*Yellow Enterprise Systems, Inc.*, 342 NLRB 804, 806 (2004)……………........   27

Other Authorities

*Joint Employer Status Under the National Labor Relations*
     *Act*, 85 FR 11184 (April 28, 2020)………………………………………   29, 30

# I.    BACKGROUND FACTS

## A.    Respondent's Business Operations

Respondent Associated Wholesale Grocers, Inc. (herein AWG) operates grocery distribution warehouses in several different locations in the United States, including one in Pearl River, Louisiana (called the AWG Gulf Coast facility), where it stores goods purchased in bulk from third parties for resale and distribution to customers of AWG. (ALJD 2:21-22; Tr. 359; RX 1).[1]  Capstone Logistics, LLC (herein Capstone) is a contract logistics company which provides employees to provide services to warehouse operators throughout the United States, including several food or grocery distribution centers. (ALJD 2:19-20; Tr. 358; RX 1).  During the relevant time period, Capstone contracted with AWG to provide employees to perform various services at several AWG warehouses, including the AWG Gulf Coast facility. (ALJD 2:29-31; Tr. 358-9; RX 1-3).  Prior to October 2019, Capstone's operations at the AWG Gulf Coast facility included unloaders, clerks, and sanitation employees. (ALJD 2:33-4; Tr. 372-3, 376; RX 3).  The unloaders, clerks and a portion of the sanitation employees worked an overnight shift with the unloaders and sanitation employees starting between 12:00 a.m. and 1:00 a.m. and clerks starting about an hour prior to the unloaders. (ALJD 2:34-7; Tr. 385-6).  The remaining sanitation employees worked a daytime shift starting at about 10:00 a.m. (ALJD 2:36-7; Tr. 387),  Capstone maintained an office at the AWG Gulf Coast facility for use by its supervisors and clerks. (Tr. 474).  Capstone had three supervisors working on-site, one Site Manager and two Site Supervisors, who primarily worked the same hours as the unloaders in order to manage unloading operations. (ALJD 3:fn. 5; Tr. 359-60, 386-7).  Capstone's operations at its facilities, including the AWG Gulf Coast facility, were overseen off-site by a Director of Operations, who managed about 5 facilities in total. (Tr. 360-3).

---

[1] Herein, all references to the transcript and exhibits shall be as follows: Administrative Law Judge Decision – ALJD page(s):line(s); Transcript  -  Tr. page(s); General Counsel Exhibits  -  GCX; and Respondent Exhibits  -  RX.

A Director of Operations reported to a Vice-President of Operations, who managed operations at up to 60 sites in total. (Tr. 360-3). The Director of Operations typically visited each facility about once a month while the Vice-President of Operations would only visit facilities about 3-4 times year unless operational issues at a facility required his presence. (Tr. 360-3).

B.  Capstone Supplies Auditors

In September 2019[2], AWG and Capstone contracted for Capstone to provide employees to perform auditing services for AWG at the AWG Gulf Coast facility. (ALJD 2:29-31; Tr. 408-14; RX 7-9). Previously, AWG employed auditors who checked pallets of goods to ensure the accuracy of customer orders prior to the orders leaving the facility for delivery to the customer. (Tr. 675). AWG outsourced the auditing function to Capstone by having Capstone employ and manage auditors who would replace the auditors currently employed by AWG. (ALJD 2:30-1; RX 7-9). Pursuant to this agreement, AWG selected the pallets of goods to be audited, delivered the pallets to the work location of the auditing employees, and compensated Capstone a set amount per case audited by the Capstone auditor. (ALJD 3:1-3; Tr. RX 2, 7-9). According to their agreement, once the Capstone auditing function was fully operational, Capstone would pay each auditor a set amount for each case audited, which it called performance pay. (ALJD 3:8-9; RX 2, 7-9). Until the performance pay model was implemented, Capstone paid its auditors a set hourly rate for performing auditing services. (ALJD 3:9-10; Tr. 408-14, RX 7-9).

In performing audits for AWG, the Capstone auditors would audit customer orders prepared by AWG employees. (ALJD 3:1-3; Tr. 391). The Capstone auditors worked a shift starting at 12:00 p.m. each work day, which is the same schedule worked by the AWG auditors. (Tr. 415). AWG selected the orders which would be audited and would place the pallets with the

---

[2] All dates are in 2019 unless otherwise noted.

orders in the Capstone auditors' work area. (ALJD 3:1-3; Tr. 391-2). In October and November 2019, audits were performed on the "cold" or refrigerated side of the AWG Gulf Coast facility. (ALJD 4:19; Tr. 93-4, 243-4). A Capstone auditor selected an available order to audit and moved the pallet to the Capstone employee's auditing area. (Tr. 93-4, 243-4). The Capstone auditor was provided a printed list of the cases which should be in each customer order and used an RF gun to scan a code located on each case on the pallet to confirm the order contained the correct products. (Tr. 94-6) After scanning each case, the auditor physically moved each case to a different pallet until all the cases on the original pallet were scanned. (ALJD 3:5-6; Tr. 94-6, 391-2). If the audit showed the order was correct, the auditor recorded the audit as completed and rewrapped the pallet to prepare it for loading and delivery to the customer. (Tr. 94-6, 391-2). If an item was incorrectly included in the order, the item was set aside in a designated area to be put back on the storage racks later by an AWG employee. (Tr. 94-6). If the auditor found an item or items missing from the order, the Capstone auditor retrieved the missing item or items from the freezer storage area to include the item in the customer order. (Tr. 94-6).[3] Once the order was corrected by the auditor, the auditor recorded the audit as complete and rewrapped the pallet for loading and delivery to the customer. (Tr. 94-6, 391-2).

C.    Capstone Auditor Training

Capstone began hiring auditors in late September to work at the AWG Gulf Coast facility. (ALJD 3:12-3; Tr. 57, 217). Joyce Henson, Peggy Cooper, and Valarie Marcel were the first three employees hired as auditors by Capstone. (ALJD 3:12-4; Tr. 59-60). These employees began work in the first week of October during which they went through orientation, conducted by then-

---

[3] While Capstone Vice President of Operations Tim Casey testified AWG employees are usually responsible for getting items missing from orders audited by Capstone auditors, this practice, in use at all other facilities where Capstone performs audits for AWG, was not followed at the AWG Gulf Coast facility during the relevant time period. (Tr. 396-7).

Capstone Site Manager Shadi Krishan, and were given a demonstration and general instructions about performing auditing work by AWG Lead Brady Bordelon and AWG Manager Robert Kelly. (ALJD 3:38-40; Tr. 59-62). Henson and Cooper were sent home early each of these days the first week they started because they needed equipment training before they could begin their auditing assignments. (ALJD 3:39-40; Tr. 67-8, 226-7).

Henson, Cooper, and Marcel began equipment training with Capstone Equipment Instructor Prince Wilson on October 7. (ALJD 3:18-21, 40-1; Tr. 69, 228-9). Wilson worked as a supervisor for Capstone in New York but was brought to the AWG Gulf Coast facility to conduct equipment and auditing training for the newly hired auditors. (ALJD 3:18-19; Tr. 415-7). Wilson trained the auditors for five days to operate two pieces of AWG-owned equipment, called the short jack and long jack, which moved pallets of cases to perform auditing work. (ALJD 3:19-21; Tr. 69, 228-9; Tr. 240-2). . The first three days of training were conducted in an area of the AWG Gulf Coast facility called the equipment room. (ALJD 3:41-4:1; Tr. 70, 230-1). Henson and Cooper described the equipment room as the location where maintenance is performed on the powered industrial trucks used at the warehouse, non-functioning equipment is stored, and equipment is parked and connected to a charging station when not in use. (ALJD 3:41-4:1; Tr. 70-2, 233-4). Henson and Cooper testified there was a constant stream of traffic in and out of the equipment room, including through the area where they were training, while they practiced operating the equipment. (Tr. 70-2, 233-4). Henson and Cooper testified the area of the equipment room where Wilson had them training was also surrounded by unused equipment and charging stations. (Tr. 70-2, 233-4).

All three of the new Capstone auditors had serious safety concerns about the area where training was being conducted which they discussed daily during lunch and break times. (Tr. 75-6,

234-5). Henson and Cooper brought their concerns to Wilson, informing him at least twice they did not feel it was safe to conduct the training in the equipment room because of the lack of space and constant stream of traffic and requesting training be moved to a different location. (ALJD 4:1-3, 8:13-17; Tr. 75-7, 235-6). Wilson did not respond to their concerns telling them only he was told to do the training in the equipment room. (Tr. 75-7, 235-6). Similarly concerned, AWG Training Warehouse Supervisor Glenn Batiste shared his qualms about using the area for Capstone auditor training with Wilson. (ALJD 4:5-10; Tr. 148-51, 237-8). Batiste approached Henson, Cooper, and Marcel with Wilson on the second or third day of training in the equipment room to offer some tips on operating the equipment, commenting they could easily get hurt if they were not operating the equipment properly. (ALJD 4:5-10; Tr. 148-51, 237-8). Henson asked Batiste if he could believe they were training in the equipment room and Batiste responded he did not know why they were being trained in the equipment room as he trained employees on the dock. (ALJD 4:5-10; Tr. 148-51). During this period, Marcel and Cooper both had accidents operating the equipment, which fortunately did not result in any injuries, while training in the equipment room, caused in part by the small area available for training. (ALJD 4:fn. 6; Tr. 78-9, 233-4). Cooper bumped Wilson with the short jack while he was trying to give her instructions as he was too close to her and Marcel lost control of her equipment and severely damaged two charging terminals. (ALJD 4:fn. 6; Tr. 238-9). Wilson directed Marcel and Henson to complete incident report forms concerning Marcel's accident to submit to AWG. (ALJD 4:fn. 6; Tr. 78-9). Wilson only agreed to move the final two days of equipment training to the docks following the discussion with AWG Manager Batiste. (ALJD 8:16-20).

D.    Auditing Training of Capstone Auditors by AWG Personnel

Following the end of equipment training, the Capstone auditors began training to perform audits the week beginning October 14. (Tr. 93-4, 243-4).  Auditors were assigned to train on the "cold" or refrigerated side of the AWG Gulf Coast facility, where the temperature was around 40 degrees. (ALJD 4:19-23, 25-8; Tr. 93-4, 243-4).  AWG lead Brady Bordelon conducted the training with the assistance of AWG auditors Reva DeSoto and Richard Dye. (ALJD 3:23-25, 27-8; Tr. 93-4, 678, 682).  The Capstone auditors were paired with an AWG auditor who guided the Capstone auditors on AWG auditing procedures. (Tr. 93-4, 245).  While Prince Wilson was present at the AWG Gulf Coast facility the week of October 14-18, Wilson did not conduct or assist with the auditor training, only occasionally visiting the work area. (ALJD 3:21; Tr. 246-7, 651, 677). Bordelon informed AWG Director of Distribution Chris Griffin that he was leading the auditor training for the new Capstone auditors. (Tr. 681).   Capstone did not have a supervisor working at the facility during the day shift when the Capstone auditors were at work because the site supervisors worked the same shift as the unloaders and Site Manager Shadi Krishan's employment with Capstone had ended the previous week for unknown reasons. (Tr. 436, 681).

Once the Capstone auditors began training to perform the auditing duties, they were concerned about safety in the area where the auditing work was being done. (Tr. 103-6).   Auditing was performed on the warehouse floor immediately adjacent to warehouse traffic lanes where AWG employees drove lift trucks and other equipment. (Tr. 104-5).  AWG equipment operators often moved large loads which prevented them from clearly seeing the auditors' work area which resulted, more than once, in an equipment operator making contact with the pallet of cases Henson was auditing at the time. (Tr. 104-5).  Henson talked with the other auditors, including Cooper, on several occasions about her safety concerns that they were at risk of injury due to contact with the

moving equipment and the other auditors agreed with these concerns. (Tr. 105-6). Henson told Capstone trainer Wilson about their concerns about working so close to the traffic lanes at least two times during the week they were being trained by the AWG auditors. (Tr. 105-6). Henson told Wilson she and the other auditors did not feel safe performing the audits immediately next to equipment traffic paths and asked whether the auditing work could be performed in areas Henson called "safety corrals," which she described as areas on the warehouse floor blocked off from equipment traffic by barricades or posts. (Tr. 104-6). Wilson was again dismissive of the auditors' safety concerns simply informing Henson the training was being done as instructed and to follow AWG lead Bordelon. (Tr. 105-6).

Henson and Cooper also testified the three auditors complained that they were not given proper equipment to perform the audits on the refrigerated side of the warehouse. (ALJD 4:19-28; Tr. 97-100, 248-9). Despite working in temperatures in the low 40 degree range and regularly having to go into the freezer section to retrieve items missing from orders, Capstone only provided the auditors with a thin mesh safety vest and thin gloves which did not provide protection from the cold. (ALJD 4:19-28; Tr. 97-100, 248-9). In contrast, the AWG employees working in the area had 'freezer suits' which insulated them from the temperatures in that section of the warehouse. Henson and Cooper discussed the lack of proper gear with each other and fellow auditor Marcel several times after starting the auditor training. (ALJD 4:19-28; Tr. 99-100, 248-9). Cooper asked AWG lead Bordelon whether they could get better equipment to deal with the cold, such as the freezer suits they saw AWG employees wearing, and Bordelon told her they would have to speak with someone from Capstone. (ALJD 8:23-5; Tr. 248-9). Henson raised the concerns about the lack of proper equipment with Wilson in Capstone auditors' work area while Cooper and Marcel were present and specifically asked if they could be provided with the jackets or freezer suits they

observed AWG employees wearing. (ALJD 4:19-28; Tr. 97-8). Wilson responded that such equipment was only for the AWG employees and Capstone did not have any cold temperature gear for the auditors. (ALJD 4:19-28; Tr. 97-8).

  E.  Capstone Auditors Meet with AWG Managers

  AWG lead Bordelon reported to his AWG managers that he was managing and training the Capstone auditors. (Tr. 681). In response, AWG Director of Distribution Griffin sent an email on October 17 to Capstone Director of Operations Mike Ruder (with a copy to Capstone Vice-President of Operations Casey) concerned that the Capstone auditors were not aware who their leads were and that AWG personnel were managing the Capstone auditors. (GCX 16). Shortly after Griffin sent that email, Capstone Director of Operations Ruder, who was off-site, called Wilson and told him AWG Director of Distribution Griffin wanted to meet with Wilson and the auditors. (Tr. 655). That same day, Wilson took Capstone auditors Henson, Cooper, Marcel, and new Capstone employee Mikeka Garcia, who had begun work that week, to Griffin's office at the Facility for the meeting. (ALJD 5:8-10; Tr. 100-2). Griffin and AWG Senior Manager Ryan Carroll were present. (ALJD 5:8-10; Tr. 100-2). At the start of the meeting, Griffin and Carroll introduced themselves and asked about the issues they wanted to discuss. (Tr. 253-4). Marcel first discussed the accident she had during training which damaged two electric charging ports. (Tr. 102-3). Henson then asked if they could be provided with freezer suits or cold temperature gear since they were working on the refrigerated side of the warehouse. (ALJD 5:12-14; Tr. 103). Griffin responded he would talk with Capstone about it. (Tr. 103). Henson then asked Griffin about moving the auditing work to one of the safety corrals and explained the auditors did not feel safe working in the open adjacent to operating equipment. (ALJD 5:12-14Tr. 103-5). Griffin again responded he would speak with Capstone about it. (Tr. 107). Henson also raised concerns the

auditors had about shifting to a production pay system and said they did not believe they would be able to make money under a production pay system because of problems with the auditing process. (ALJD 5:12-14; Tr. 107-8, 245-6). Griffin responded he would look into it and talk with Capstone about it. (Tr. 108). Henson then asked to meet privately with Griffin and Carroll and they agreed. (ALJD 5:17; Tr. 108). Once Wilson and the other auditors left, Henson testified she asked Griffin and Carroll for information about her pay rate as a lead and mentioned Donnie Rouse, owner of AWG customer, Rouse's Supermarkets, was a family acquaintance. (ALJD 5:17-34; Tr. 108-110). Griffin wrote down the contact numbers for Capstone managers Casey and Ruder for Henson telling her she would need to speak with them about her pay. (ALJD 5:34-6; Tr. 108-110).[4]

After leaving the meeting, Henson went to the Capstone office within the warehouse where she found Wilson talking on the phone with Ruder. (ALJD 5:38-40; Tr. 111-2). Wilson testified, because Ruder was not at the AWG Gulf Coast warehouse that week, he called Ruder immediately after the meeting to report what happened with AWG Director of Distribution Griffin. (ALJD 5:38-40; Tr. 647, 652). When she walked in, Wilson told Ruder Henson was there and put her on speaker so Ruder could speak with her directly. (ALJD 5:38-40; Tr. 111-2). Ruder informed Henson that he and Casey would be at the warehouse the following week and would meet with her about her pay. (ALJD 5:38-40; Tr. 111-2).

Because Casey testified Henson was hired with the intention she later be named as lead auditor, it is notable that, on October 17, Wilson had Henson take an online test to become a certified equipment trainer in anticipation of her serving as the lead auditor. (Tr. 82-4, 418-9; GCX 3). Casey testified Capstone only trains employees to become certified equipment trainers if they are going to be working as leads. (Tr. 434-5). Casey later testified that, by the end of that week,

---

[4] Neither Respondent Capstone nor Respondent AWG produced any documentation prepared by any attendee of the meeting which memorialized the events of this meeting.

the Employer considered Henson to be the lead auditor, even if it had not specifically communicated this information to Henson. (Tr. 438). While ALJ Amchan stated in his decision that "Henson asked Wilson if she could be designated as Capstone's lead auditor," there is no evidence in the record to support this finding. (ALJD 4:14-15; Tr. 82-4, 418-9, 438).

F.     Events of October 22, 2019 and Discharge of Henson

Henson testified she attended a meeting with Casey, Ruder and auditors Cooper, Marcel, and Garcia immediately after arriving at work on noon on October 22. (ALJD 5:42-4; Tr. 113-4) This meeting, which would have been at the time when the customary pre-shift meeting was held, was conducted in the Capstone office at the warehouse. (Tr. 113-4). Henson was the last auditor to arrive that day and the auditors' meeting with Casey and Ruder had already started when she entered the room. (Tr. 114-5). When Henson walked in, Marcel was discussing her accident during training with Casey and Ruder. (ALJD 6:17-9; Tr. 114-5). Casey and Ruder asked if the other auditors had anything to say and Henson then discussed the auditors' different safety concerns. (ALJD 6:4-7; Tr. 114-5). Henson explained the area where they had equipment training was dangerous, and she questioned whether Wilson was qualified to train them. (ALJD 6:4-13; Tr. 114-15). Casey responded that Wilson was very qualified to conduct the training. (ALJD 6:10-1; Tr. 114-5). Henson recalled Cooper spoke up and explained that she had problems with the training Wilson provided because his instructions were not clear, and he was hard to understand because of his accent. (ALJD 6:17-9; Tr. 115-6). Henson then raised the issue of the freezer suits or cold temperature gear and Casey responded they were only required to provide the auditors with the safety vests and thin gloves. (ALJD 6:12-4; Tr. 114-5). Henson said the auditors had concerns about the production pay system and that, because of problems with the auditing system and reductions to the rate of pay per case, the auditors would have trouble making money. (ALJD 6:15-

7; Tr. 115). Casey merely reiterated how the production pay model would work and the rate they would be making per case scanned (Tr. 115). At the end of the meeting, Henson asked to meet privately with Casey and Ruder, and they agreed to do so. (Tr. 116).

Once the other auditors left, Henson said earlier she had been told by former Capstone Site Manager Krishan before he left that she would be making $200 per day working as the lead auditor. (ALJD 6:21-3; Tr. 116-7). Casey explained she would make the amount per hour other lead auditors made and would also receive production pay for the auditing work she performed. (ALJD 6:23-4; Tr. 116-7). Henson mentioned she had applied online for the general (or site) manager position because they needed a manager onsite. (Tr. 117). Casey responded they had already hired someone but there was always room for promotion if she kept up the good work. (Tr. 117). Before their meeting ended, Casey told Henson to bring her concerns only to himself or Ruder and gave Henson a directive to not discuss or approach any AWG managers with Capstone related issues or concerns.[5] (ALJD 6:26-8; Tr. 443-5, 557). Casey issued this directive to Henson based on a conversation he had with AWG manager Griffin earlier that day where Griffin expressed annoyance that Henson and the other auditors were coming to him instead of Capstone supervisors about pay and other issues, and because Henson was texting with AWG customer Donnie Rouse about employment issues. (Tr. 438-9; 509-10).

Later on October 22, Henson sent a text message to AWG customer Donnie Rouse. (ALJD 6:30-44; RX 55).[6] The message reflects it was sent by Henson to Rouse at 2:43 p.m. . (ALJD 6:30-44; RX 55). In the message to Rouse, Henson wrote:

---

[5] Casey admitted during testimony employees are permitted to take safety or other workplace concerns to partners of Capstone but nonetheless directed Henson to not discuss or raise her concerns with AWG supervisors and only discuss them with Capstone supervisors. (Tr. 427).

[6] Henson testified she had previously sent text messages to Rouse concerning Capstone on October 16. (Tr. 189-93). In her October 16 text messages to Rouse, Henson said she had been designated as lead auditor and raised concerns about her hourly rate as lead auditor, which she understood to be more than $10 per hour lower than the hourly rate paid by AWG to its auditors employed directly by AWG. (Tr. 189-93).

This is by far the worse company I have ever worked for. Do you ever come to Slidell? Would you like to have lunch with me, and we talk about everything, and I'll treat you!! I really need your opinion and feedback. I'm trying to stick it out. Today at 12:00 pm we had a meeting with Capstone management. They told my auditors that they was misinformed and they will only make $0.09 per case not $0.16. I have not been given a amount that I will make. As of right now I'm making 10.00 hr and This is week 3.

I would love to talk anytime [phone number] and answer any questions you might have. The guy that runs things for AWG is Chris Griffin and Ryan Carroll their number is……………

(ALJD 6:33-42; RX 55).

Also later on the afternoon of October 22, a couple of hours after the meeting with Casey and Ruder, Henson briefly spoke with AWG Director of Distribution Griffin.[7] (ALJD 7:1-5; Tr. 187-8). Henson testified Griffin initiated the conversation as she passed by him on the dry side of the warehouse as he was coming out of the equipment room. (ALJD 7:1-5; Tr. 118-9). Griffin asked Henson how the meeting went. (ALJD 7:1-5; Tr. 118-9). Henson said it went fine. (ALJD 7:1-5; Tr. 118-9). Henson testified there was nothing else said between her and Griffin and she went on to begin work. (ALJD 7:1-5; Tr. 118-9). Henson specifically denied yelling at Griffin, raising her voice toward him, asking him any questions, raising any issues or concerns, or arguing with Griffin. (Tr. 118-9).

Casey testified he received a text message and phone call from Griffin that afternoon concerning Henson. (ALJD 7:10-11, fn. 10; Tr. 453, 461-2; RX 38, 47). In the 2:58 p.m. text message, Griffin asked Casey to call him. (ALJD 7:11; RX 38). Then, at about 3:01 p.m., Casey and Griffin then spoke by phone for about one minute. While Casey testified to what he claims occurred in the short conversation with Griffin, ALJ Amchan wholly discredited Casey's testimony concerned what was said in the call, noting that Griffin was not called by either

---

[7] Because Respondents Capstone and AWG did not present Griffin as a witness to testify concerning this conversation or any other issue, Henson's testimony concerning the interaction with Griffin on October 22 is unrebutted.

Respondent to testify at the hearing and Casey's claims about what Griffin said were too self-serving to be credited. (ALJD 7:12-16). Casey testified he decided, immediately after the call ended, to terminate Henson based on his conversation with Griffin and because Henson had failed to comply with the directive to only discuss work issues with Capstone managers. (ALJD 7:17-8; Tr. 463-4). Casey nonetheless took no action against Henson that day and allowed her to continue to work the remaining 4-5 hours of her shift. (Tr. 118-9). Casey admitted he did not attempt to perform any type of investigation concerning the allegation made by Griffin even though Henson was still at work and available to answer any questions Casey might have about Griffin's allegations or secure a statement from Henson and other employees about the events of that day.[8] (Tr. 519). Casey also admitted he did not ask Griffin to prepare any written statement to document the incident with Henson which formed the basis for her discharge. (Tr. 522). Casey further admitted he did not attempt to contact anyone in Human Resources to consult with them prior to making the decision to discharge Henson and did not prepare any paperwork documenting his decision to discharge Henson despite Capstone policies requiring completion of paperwork within one week after an employee is discharged. (Tr. 520-1, 544).

On the morning of the following day, October 23, Casey telephoned Henson and said she was being discharged. (ALJD 7:20; Tr. 119-20, 474). Henson testified she asked Casey the reason she was discharged and he said it was based on what happened the day before. (ALJD 7:20-3; Tr. 119-20). Henson testified that she was completely surprised by Capstone's decision to fire her and went to the AWG Gulf Coast facility at about noon that day to try to speak with Casey and find out the real reason for her discharge. (ALJD 7:24-8; Tr. 121-23). Casey was not there so she

---

[8] In response to a question from counsel for Respondent Capstone about whether he was concerned Henson would make a scene or cause an incident if he attempted to question her or inform her about her discharge while she was at work, Casey responded he was not concerned at all about that. (Tr. 535-6).

left. (ALJD 7:27-8; Tr. 121-23). Henson subsequently contacted Human Resources for Capstone to try to get additional information about her discharge. (Tr. 123-29). After several calls to Human Resources, Henson finally received a voice mail on November 6 from Casey. (ALJD 7:28-8:6; Tr. 128). He said she was fired for "disruption of business" for questioning the partner (AWG) after being told to come to him with any questions or issues she had. (ALJD 7:28=8:6; GCX 8(b)). Henson never received any documentation from Capstone about the reasons for her discharge. (ALJD 8:8-9; Tr. 133).

While not referenced by ALJ Amchan in his decision, General Counsel presented evidence showing Casey prepared an internal statement concerning Henson's discharge which was inconsistent with his testimony at the hearing. In an email Casey sent to Capstone Director of Human Resources on October 29, only one week after Henson's discharge, and one week prior to the voicemail left by Casey for Henson on November 6, Casey explained the facts concerning Henson's discharge as follows:

> This associate [Henson] came into work a day after Mike and I met Her [sic] to discuss issues with pay and communication. I gave Her [sic] my expectations of being a leader and contacting Mike or myself if any issues. The very next day she went directly to the partner and was unprofessional and refused to listen to him. Although he asked for us to not allow back due to disruption of business, I was Prepared [sic] to let her go anyway as she did not follow my instructions.

(RX 17, p.3). Thus, less than a week after Henson's discharge, Casey provided an entirely different timeline for the events which led to his decision to discharge her. Further, Casey admitted Respondent AWG, by manager Griffin, told Casey that Henson, prior to her discharge, was no longer allowed on Respondent AWG property.

G.    Discharge of Cooper

The week after Henson's discharge, incoming Capstone Director of Operations Andrew Powell brought in Shyane Mora, a lead auditor at an AWG warehouse in Kansas City, Kansas, to

assist with training the remaining auditors, including Cooper. (ALJD 8:27; Tr. 585-6, 631). Mora testified there were three auditors working for Capstone the first week she provided training: Cooper, Marcel, and Garcia. (Tr. 666).

Cooper testified Mora informed the auditors she was there to show the auditors a different way to perform the audits so, as Mora claimed, they could make money once production pay started. (ALJD 8:27-29; Tr. 259-61, 264). Cooper testified, while they were auditing the same type of pallets as before, Mora told the auditors they needed to keep track of the start and end time for each pallet they audit to make sure they were working fast enough and explained how they should be able to estimate the amount of time to audit a pallet of cases. (Tr. 264, 275-6). Cooper also testified Mora made some changes to the paperwork they had been using which required additional time to complete. (Tr. 264, 275-6). Cooper said she discussed her concerns about these changes with the other auditors but she was the only auditor who actually voiced concerns about the changes to Mora. (Tr. 267-8). Cooper said she complained in the presence of the other auditors to Mora about the changes she making to the auditing process and the paperwork during the days Mora was training them. (ALJD 8:29-30; Tr. 265-6). Cooper recalls specifically complaining to Mora about the timing requirement because of all the steps which they were required to follow in performing the audits, which would also include the auditors having to retrieve items missing from the pallets. (Tr. 275-6). Finally, Cooper testified she raised concerns with Mora about the pace of work the employees would be required to maintain in order to earn the rate of pay Mora described once the production pay system was implemented and auditors began earning $.08 for each case processed. (Tr. 275-6, 290-1).

Cooper was called in to a meeting with Casey and AWG lead Brady Bordelon on about October 31, after she had trained with Mora for 2-3 days. (ALJD 8:36-7; Tr. 268). Cooper said

Casey asked her about the auditing job and how she was doing with the new trainer. (Tr. 269). Casey also said they thought the job might be a bit too much for her. (ALJD 8:37-8; Tr. 269). Cooper said the job might be difficult for her but it was because of changes to the auditing process made by Mora which were inconsistent with the training the auditors had previously received. (ALJD 8:38-9, 40-1; Tr. 269). Casey said they could look for another suitable job for her at the warehouse, and Cooper said that would be fine as she needed a job and wanted to work. (ALJD 8:39-40; Tr. 269). Cooper specifically asked Casey if she should go back to auditing for the remainder of the work day and Casey replied she could go home for the day. (ALJD 8:40; Tr. 269-70). Cooper testified she never told Casey she did not want or was refusing to do the auditing job and she never told anyone she was quitting if they did not place her in a different job. (Tr. 270, 293-4). Cooper further testified neither Casey nor any other supervisor ever asked her if she was refusing to do the auditing job or was quitting. (Tr. 270). Casey also admitted during his testimony that Cooper never said she was quitting her job, never told him she was refusing to work unless she was placed in a different position, and never told him she would not perform the auditor position. (Tr. 48, 526).

Cooper testified she returned to the facility on the morning of November 1 prior to the start of the auditing shift to speak with Casey and see where she would be working. (ALJD 9:2-3; Tr. 270-1). Cooper said she approached Casey as he was coming out of the building with two men she did not recognize and asked him what he had found for her because she really wanted to work. (Tr. 271). Casey said he looked into it and he could not find anything for her. (ALJD 9:3-4; Tr. 271). Cooper commented it was a big warehouse and asked if he was saying he could not find anything for her. (Tr. 271). Casey repeated they did not have any jobs for her. (Tr. 271). Cooper

testified she never received a call from anyone with Capstone after that final conversation with Casey and never found out why she had been let go by Capstone. (Tr. 272).

ALJ Amchan noted Casey admitted he would attempt to place Cooper in a different position at the warehouse or with AWG. (ALJD 8:39-40). ALJ Amchan does not, however, provide details as to the cursory and limited attempt that was made by Casey to find a different job for Cooper. Mora testified Cooper allegedly told her she did not think she could keep up with the work when they start production pay and mentioned possibly moving to a position doing put-aways or sanitation. (Tr. 662). Mora testified she informed Casey and Powell about her alleged conversation with Cooper about Cooper's concerns and desire to move to a different position, such as put-aways or sanitation. (Tr. 662-3). Mora further sent a text message to Powell on the evening of October 31 inquiring when Cooper would be moved to a different position. (RX 39). Powell forwarded the text message to Casey who replied at 11:02 p.m. on October 31, writing, "Not sure but will talk to partner tomorrow." (RX 39). Casey testified he quickly determined Cooper could not fill any position with Capstone and had a brief conversation with AWG Operations Manager Griffin who said AWG did not have any open positions. (Tr. 493-4). Powell testified he also quickly determined Cooper could not fill any open Capstone positions and also spoke with Griffin about whether AWG had ay available positions for Cooper. (Tr. 594-6). Notably, Powell admitted he only asked Griffin if AWG had any light duty positions for Cooper to which Griffin replied in the negative. (Tr. 595-6). Powell forwarded Mora's text message to Casey again at 7:53 a.m. on November 1 and Casey responded at 8:14 a.m., "We will not we will be terming her." (GCX 15). Thus, before Cooper arrived at the warehouse on November 1 to return to work, Casey had already made the decision to terminate Cooper, irrespective of whether Cooper asked to return to auditing when she spoke with him on November 1.

II. THE JUDGE INCORRECTLY FOUND JOYCE HENSON WAS NOT TERMINATED IN RETALIATION FOR HER PROTECTED ACTIVITIES (Exceptions 3, 4, 5, 6, 7, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20)

A. While the Judge Found Henson Engaged in Protected Activities, the Judge Failed to Acknowledge the Full Extent of Henson's Protected Activities (Exceptions 3, 4, 13, 14)

In his Analysis section of his decision, ALJ Amchan finds Henson engaged in protected concerted activity writing, "[Henson] concertedly complained about the safety of the area in which new auditors were trained. I credit her testimony that she raised concerted concerns regarding the production or piecework rate at which the new auditors were to be paid after completing their training." (ALJD 9:40-10:2). This description of Henson's protected activities minimizes the full extent and repeated nature of Henson's protected activities during her brief period of employment. During equipment training in her first full week of work, Henson, along with Cooper, informed supervisor Wilson about their shared safety concerns about training in the equipment room on two of the three days the group trained in that area. (74-7, 235-6). Henson also raised their safety concerns with AWG Training Warehouse Supervisor Batiste during a conversation Batiste had with Wilson and the Capstone auditors. (Tr. 148-51). *Lou's Transport, Inc.*, 361 NLRB 1446 (2014)("…perceived workplace safety hazards are a fundamental matter of concern to employees and are, on that basis, inherently protected).

Then, in her second week of work, Henson engaged in further protected concerted activities while participating in auditing training when Henson spoke with Cooper and Marcel about her safety concerns that they were at risk of injury from contact from moving equipment because they were working alongside the warehouse traffic lanes. (Tr. 103-6). At least two times that week, Henson told Wilson she and the other auditors did not feel safe performing the audits immediately next to equipment traffic paths and asked whether the auditing work could be performed in areas Henson called "safety corrals," but Wilson dismissed their concerns. (Tr. 104-6). Henson and

Cooper also discussed with Marcel the lack of proper equipment to work on the refrigerated side of the warehouse. (Tr. 97-100, 248-9). Cooper asked AWG lead Bordelon if the auditors could get better gear for the cold temperature and Bordelon said the auditors would have to speak with Capstone. (Tr. 248-9). Henson also asked Wilson, in the presence of Cooper and Marcel, if the employees could get appropriate gear to work in the cold temperatures to which Wilson responded the gear was only for AWG employees. (Tr. 97-8). *Lou's Transport, Inc.*, *supra*.

Additionally, at the end of the week spent in auditing training, on about October 17, Henson and Cooper raised their safety, equipment, and pay concerns in a meeting with AWG Director of Distribution Chris Griffin. In this meeting, attended by Capstone supervisor Wilson, Henson, Cooper, Marcel, and new Capstone auditor Mikeka Garcia, Henson told Griffin about the auditors' safety concerns during equipment and auditing training and asked for the auditors' work area to be moved to "safety corrals." (Tr. 103-5). Henson also said the auditors were requesting to be provided with freezer suits or gear for the cold temperatures on the refrigerated side of the warehouse. (Tr. 103). Finally, Henson discussed concerns the auditors had about shifting to a production pay system and said they did not believe they would be able to make money under a production pay system because of problems with the auditing process. (Tr. 107-8, 245-6). *Parkview Lounge, LLC d/b/a Ascent Lounge*, 366 NLRB No. 71 (2018) (protected concerted activity found where employee discussed pay with coworkers and brought concern to management); See *Allied Aviation Service Co.*, 248 NLRB 229 (1980) (where the Board held an employee's letters to the employer's customers seeking assistance with ongoing labor disputes to be protected).

Henson engaged in additional protected concerted activities on October 22, the day before her discharge, in a meeting with Vice-President of Operations Casey, Director of Operations Ruder

and auditors Cooper, Marcel, and Garcia. In this meeting, Henson, along with Cooper, discussed the auditors' safety concerns with the area where equipment training had been conducted and the problems the auditors had with how Wilson conducted the training. (Tr. 114-116). Henson also said the auditors wanted to get freezer suits or gear to work in cold temperatures. (Tr. 114-5). Finally, Henson said the auditors had concerns about the production pay system and that, because of problems with the auditing system and reductions to the rate of pay per case, the auditors would have trouble making money. (Tr. 115). *Parkview Lounge, LLC d/b/a Ascent Lounge*, *supra*; *Talsol Corp.*, 317 NLRB 290, 317 (1995) (employee engaged in protected concerted activity when he raised workplace concerns at staff meeting).

Henson engaged in further protected concerted activities in her communications by text message to AWG customer Donnie Rouse on the afternoon of October 22. In her text message, Henson wrote, "Today at 12:00 pm we had a meeting with Capstone management. They told my auditors that they was misinformed and they will only make $0.09 per case not $0.16. I have not been given a amount that I will make. As of right now I'm making 10.00 hr and This is week 3." (ALJD 6:33-42; RX 55). Henson further asked Rouse to contact AWG managers Griffin or Ryan Carroll to attempt to resolve these issues. (ALJD 6:33-42; RX 55). While ALJ Amchan is correct that Henson's prior text communication with Rouse on October 16, related to AWG managers Griffin and Carrol in their meeting on October 17, concerned Henson's hourly rate as lead auditor, the Judge incorrectly asserts that Henson's October 22 text message to Rouse also only related to Henson's own hourly pay rate. (ALJD 10:15-17). This is a plain misreading of the text message Henson sent to Rouse on October 22 as the text message asks Rouse for assistance with her hourly pay rate AND the reduction in the per case rate all the auditors would receive under the production pay system, which had only been communicated to the auditors in a group meeting that day. (ALJD

6:33-42; RX 55).   Contrary to the Judge's finding, Henson, by specifically raising the 44% reduction in the per case rate announced to the auditors that day, was specifically asking Rouse to intervene and assist the auditors with resolving an issue of common concern and thus engaged in protected concerted activity.  See *Allied Aviation Service Co.*, *supra*; See also *Cordura Publications*, 280 NLRB 230 (1986) (where the Board held an employee's communications with the employer's parent company about a labor related matter were protected).

       B.      The Judge Incorrectly Found There Was No Evidence of Animus Toward Henson's Protected Activities. (Exceptions 5, 6, 11, 12, 13, 14, 16, 17, 18)

Concerning the issue of animus, ALJ Amchan makes several findings which are contrary to the credible facts as establishes in the record and contrary to a common-sense reading of the record.  First, the Judge, while acknowledging some of Henson's protected activities, states, "The record … does not establish any animus towards Henson's protected activities prior to October 22." (ALJD 10:10-11, 26-27).  In support of this finding, the Judge writes that, because Capstone continued to designate Henson as the lead auditor for the 1-2 weeks prior to her discharge (which provided her a slightly higher hourly rate than the other auditors), this fact demonstrates a lack of animus toward Henson's protected activities.  It appears ALJ Amchan finds no evidence of animus because Capstone did not unlawfully retaliate against Henson or otherwise express animus toward Henson because of her protected activities prior to the day of her discharge.  A better explanation for the apparent lack of statements of animus prior to October 22 is that, for the two week period prior to Henson's discharge, Capstone did not have any manager or supervisor overseeing the day shift at the AWG facility.[9] (ALJD 3:fn.5).  In fact, October 22 was the first day Capstone managers Casey and Ruder were present at the AWG facility during Henson's employment. (Tr. 435-6).  It

---

[9] While trainer Prince Wilson was at the AWG site from October 5-18, Casey testified Wilson had no supervisory authority while working at the AWG facility. (Tr. 417-8).

is thus no coincidence that the first statements of animus directed to Henson because of her activities occurred on the first, and only day, managers Casey and Ruder were present at the facility during Henson's employment.

Hence, ALJ Amchan does acknowledge the record establishes both Capstone and AWG, on October 22 and 23, demonstrated animus toward Henson's activities without specifying the specific statements or conduct which led to this finding. (ALJD 10:11-12). The record establishes, on the morning of October 22, Griffin, in a conversation with Casey, expressed annoyance that Henson and the other auditors were coming to him instead of Capstone supervisors about pay and other issues, and because Henson was texting with AWG customer Donnie Rouse about employment issues. (Tr. 438-9; 509-10). Subsequently, following a meeting with the auditors at the start of the shift, Casey, based on his earlier conversation with Griffin, directed Henson to only discuss work issues or complaints with Capstone managers and not to raise them with any AWG personnel. (ALJD 6:26-8; Tr. 443-5, 557). Thus, the record firmly establishes both Capstone and AWG bore animus toward Henson because of her repeated protected activities in the three weeks she had worked for Capstone and specifically directed Henson to not discuss concerted complaints with non-Capstone managers.

Despite the warning not to discuss concerted complaints with non-Capstone managers, about 2 ½ hours later, Henson sent a text message to AWG customer Rouse in which she discussed complaints about the reduction in the pay per case which all the auditors would receive and concerns about her hourly pay rate as lead auditor, and asked Rouse to contact AWG managers Griffin and Carroll in attempt to get AWG to intervene with Capstone about these issues. (ALJD 6:33-42; RX 55). Based on this timing, ALJ Amchan infers Griffin received a call from Rouse about Henson's text message and approached Henson to discuss the matter with her. (ALJD 7:1-

2).  As noted previously, Griffin did not testify at the hearing and Henson's undisputed testimony that nothing unusual or inappropriate occurred during this interaction was unrebutted. (ALJD 7:2-5).[10]  In fact, the ALJ should have taken an adverse inference based on the Employer's failure to call Griffin as a witness to contradict Henson's testimony that nothing unusual or inappropriate occurred during the interaction.   Nonetheless, ALJ Amchan mistakenly concluded that what occurred in the conversation between Griffin and Henson led directly to Griffin's call to Casey at 3:01 p.m., which then led to Casey's decision to discharge Henson. (ALJD 7:7-10, 10:19-21).  The record, however, supports a different conclusion.  Based on the timing of Henson's text message to AWG customer Rouse and the timing of the phone call from Griffin to Casey, the appropriate inference to draw would be that Griffin, who had expressed annoyance earlier in the day about receiving complaints from Capstone employees, received a call from Rouse where Rouse told Griffin that Henson had asked him to call to see what could be done about the reduction in the per case production pay rate for the auditors and about Henson's hourly pay rate.  In response to this call from Rouse, Griffin called Casey where he informed Casey about his call from Rouse about Henson's text message, where she complained about the reduction in the per case production pay rate and her hourly rate, and informed Casey that he did not want Henson returning to the AWG warehouse.  Based on Griffin's demand that Henson not be permitted on AWG property and Casey's earlier directive to Henson that she not discuss any protected concerted complaints or issues with non-Capstone managers, Casey decided to discharge Henson.

This conclusion is supported by Casey's decision to not perform any investigation before deciding to discharge Henson. Casey admitted he allowed Henson to work the remainder of her

---

[10] While Casey testified about what he claimed Griffin said to him in 3:01 p.m. phone conversation, ALJ Amchan fully discredited this testimony noting Casey's testimony about what Griffin told him had occurred between Griffin and Henson was hearsay and Casey's testimony about what Griffin said to hm in the call was too self-serving in the context of the record to be credible. (ALJD 7:13-17).

shift on October 22, thus she was available to answer any questions about her text message to Rouse or any alleged interaction with Griffin. (Tr. 118-9, 519). Casey however chose not provide Henson with an opportunity to respond. (Tr. 118-9, 519). Casey also admitted he did not prepare any notes or document his call with Griffin and did not ask Griffin to prepare any written statement concerning the events which led to Griffin's demand that Henson be barred from AWG property. (Tr. 522). Casey further admitted he did not attempt to contact anyone in Human Resources to consult with them prior to making the decision to discharge Henson and did not prepare any paperwork documenting his decision to discharge Henson despite Capstone policies requiring completion of paperwork within one week after an employee is discharged. (Tr. 520-1, 544).

C. ALJ Amchan Incorrectly Found Capstone Lawfully Discharged Henson (Exceptions 19, 20)

ALJ Amchan writes Henson's discharge by Capstone was lawful as General Counsel had not established a causal connection between Henson's protected activities and her discharge. (ALJD 10:34-5). Specifically, ALJ Amchan writes Henson's discharge was related to her October 22 interaction with Griffin but the evidence was insufficient to establish Henson's communications with Griffin related to her protected activities as opposed to her complaints about her own pay rate. (ALJD 10:35-11:2). As explained in the prior section, ALJ Amchan's conclusion is flawed based on his incorrect finding that Henson's text message to Rouse on October 22 concerned only her own pay rate issues, while the text message itself establishes Henson raised concerted complaints about the reduction in the per case production pay rate, which affected all the auditors equally. Also as explained in the prior section, the record further establishes both Capstone and AWG harbored animus toward Henson because of her protected activities and supports a finding that Henson was unlawfully discharged because of her protected activities.

Capstone's unlawful motivation can also be shown by the close timing between Henson's discharge and her protected concerted activities. (ALJD 11:3-4). Henson's concerted complaints to Capstone and AWG supervisors all took place within a 2 ½ week period which culminated in her discharge. Additionally, according to Casey, he made the decision to discharge Henson on the same day AWG manager Griffin complained about Henson's protected activities and he inappropriately directed Henson to not discuss protected concerted complaints or issues with non-Capstone personnel. (ALJD 6:26-8; Tr. 443-5, 438-9; 509-10, 557) The timing of Henson's discharge, along with Capstone's admitted motive in deciding to discharge her, further supports a finding Henson was discharged because of Capstone's animus toward her protected activities. *La Gloria Oil & Gas Co.*, 337 NLRB 1120 (2002) (timing of discipline imposed four months after activity found suspect); *Medic One, Inc.*, 331 NLRB 464, 475 (2000) (close proximity of time between protected activity and discharge supports finding employer's discriminatory motive).

Capstone's unlawful motivation for discharging Henson can also be shown by Casey's failure to perform any investigation of Henson's alleged misconduct before discharging her. As discussed in the prior section, Casey chose not to interview Henson about Griffin's allegation and thus denied her an opportunity to respond. (Tr. 118-9, 519). Casey admitted he did not prepare any notes or document his call with Griffin and did not ask Griffin to prepare any written statement concerning the events which led to Griffin's demand that Henson be barred from AWG property. (Tr. 522). Casey further admitted he did not attempt to contact anyone in Human Resources to consult with them prior to making the decision to discharge Henson and did not prepare any paperwork documenting his decision to discharge Henson despite Capstone policies requiring completion of paperwork within one week after an employee is discharged. (Tr. 520-1, 544). Casey's failure to perform any investigation whatsoever prior to deciding to discharge Henson

further supports a finding Capstone had an unlawful motive for discharging Henson. See *New Orleans Cold Storage & Warehouse Co.*, 326 NLRB 1471 (1998).

Capstone's unlawful motivation is further established by evidence showing Henson was treated differently by Capstone when it deviated from its progressive discipline policy and discharged her for her first disciplinary incident. While Casey testified Capstone's progressive discipline policy does not require employees receive warnings prior to termination (Tr. 469-70), Capstone's disciplinary records from both the AWG Gulf Coast facility and other Capstone facilities show employees consistently receive lesser forms of discipline before discharge for conduct similar to that attributed to Henson. (GCX 13; RX 36, 42). Between March and December 2020, four Capstone employees at the AWG Gulf Coast facility, Bodrick Scott, Brittany Guillotte, Ronnie Moss, and Roxanne Randle, engaged in serious insubordinate behavior by refusing to perform an unloading assignment given to them by a lead. (GCX 13, p.1, 4-6). Guillotte, Moss and Randle received 2 day suspensions while Scott was only issued a written warning. (GCX 13, p. 1, 4-6). In August 2020, Capstone employee Matthew Rawls not only engaged in insubordination by refusing to perform a work assignment but also engaged in unprofessional conduct by creating a disturbance when directed to perform his work assignment. (GCX 13, p.2). For this conduct, Rawls only received a 2 day suspension. Also, in June 2020, Capstone employee Dijon Magee violated safety rules by wearing earbuds while operating equipment despite prior warnings not to do so. (GCX 13, p.3). Capstone Site Manager Andrew Powell admitted Magee was only issued a written warning even though Magee had previously received several prior verbal directives to follow safety rules. (Tr. 622).

Noting that Capstone's policies apply the same at all its facilities, Respondent presented evidence through Powell showing employees at other Capstone facilities received lesser discipline

for serious misconduct prior to their termination. In September 2018, Jackson Oberkiser, who worked for Capstone at its operations in Ashley, Indiana, was issued a verbal warning for inappropriate and unprofessional behavior and for cursing at a supervisor because he was upset about work assignments. (RX 36, p.2). Then, in November 2018, Oberkiser was terminated after he engaged in unprofessional conduct by throwing a pen and walking off the job because he was upset about work assignments. (RX 36, p.1). Notably, the Statement of Last Incident and Reason for Termination prepared for Oberkiser noted Oberkiser had a history of outbursts and had been previously warned to keep his attitude under control. (RX 36, p.1). In July 2018, Capstone employee Michael Smith, who worked at the AWG warehouse in Kansas City, Kansas, was terminated for his unprofessional conduct in a disciplinary meeting. (RX 42). In the Statement of Last Incident and Reason for Termination prepared by Andrew Powell (who was Site Manager for Capstone at the AWG Kansas City facility at that time), Powell wrote he called Smith in to issue only a written warning for insubordination for refusing a work assignment after Smith had previously been warned not to engage in this conduct. (Tr. 624-5; RX 42). In the meeting to issue Smith the written warning, Smith began swearing and speaking disrespectfully to Powell and a Dock Lead, threw his badge at them, said they would hear from his lawyer and had to be escorted from the warehouse. (Tr. 624-5; RX 42). Thus, the evidence reflects that Henson was subjected to disparate treatment in that she was discharged for conduct for which other employees had uniformly, both prior to and following Henson's discharge, received lesser discipline. *Ozburn-Hessey Logistics, LLC*, 362 NLRB 1532, 1549 (2015), *enfd.* 689 Fed. Appx. 639 (D.C. Cir. 2016) (disparate treatment found where other employees violated same rule but not disciplined as harshly as the discriminatee who engaged in protected activity); *Yellow Enterprise Systems, Inc.*, 342 NLRB 804, 806 (2004).

The evidence thus shows Henson was engaged in protected concerted activities during her employment with Capstone, Capstone supervisors and agents were aware of Henson's protected concerted activities and harbored animus toward Henson because of her protected concerted activities. The evidence clearly establishes, contrary to ALJ Amchan's findings, that Capstone expressed direct animus toward Henson's protected activities, discharged Henson close in time to her protected concerted activities, failed to investigate the alleged offense, treated Henson disparately from other employees who engaged in similar or more serious conduct, and informed Henson on October 23, via Manager Casey, that she was terminated because she engaged in protected concerted activities.

III. THE JUDGE INCORRECTLY DETERMINED CASEY DID NOT UNLAWFULLY INFORM EMPLOYEES THEY WERE TERMINATED BECAUSE OF THEIR PROTECTED CONCERTED ACTIVITIES (Exception 28)

In finding Capstone Manager Casey did not unlawfully inform employees they were terminated because they engaged in protected concerted activities, ALJ Amchan bases his finding largely on his prior determination that Henson was not discharged because of her protected activities. ALJ Amchan writes, "On October 23, Casey told Henson that she was being terminated due to what transpired the day before and for disrupting Capstone's relationship with its business partner AWG." (ALJD 11:28-30). ALJ Amchan further writes Casey, in his November 6 voicemail for Henson, he again stated Henson was discharged for the events on October 22 and disrupting Capstone's relationship with AWG. (ALJD 11:40-1).

However, as established in Section II, the record evidence supports a finding Capstone violated the Act by discharging Henson in retaliation for her protected activities. Contrary to the Judge's finding, Henson's communications with Griffin and AWG customer Rouse were concerted complaints as they related to the decision by Capstone to reduce the per case production pay rate for all the auditors, a matter of mutual concern. (ALJD 6:33-42; RX 55). Casey

28

subsequently discharged Henson because she discussed her concerted complaints with third parties and AWG personnel, contrary to his directive to not discuss concerted complaints or issues with non-Capstone supervisors. (ALJD 6:26-8; Tr. 443-5, 557).

The "mutual aid or protection" clause of Section 7 covers employee efforts to "improve their lot as employees through channels outside the immediate employee-employer relationship…" *Eastex, Inc. v. NLRB*, 437 U.S. 556, 559-60, 565 (1978).  The Board has found the right to communicate with individuals or entities outside the immediate employer-employee relationship includes communications with an employer's customer and an employer's parent company.  See *Cordura Publications*, *supra*; *Allied Aviation Service Co.*, *supra*.  Henson's communications with AWG supervisors, such as AWG Director of Distribution Griffin, about issues of common concern for the Capstone auditors would thus be protected under the Act and may not be lawfully curtailed. Thus, when Casey informed Henson, in the phone call on October 23 and the voice mail on November 6, that she was discharged for her conduct on October 22 and disrupting Capstone's relationship with AWG, Casey was telling Henson she was discharged because her protected concerted activities in violation of Section 8(a)(1) of the Act.

IV.     THE JUDGE IMPLIEDLY FAILED TO SPECIFICALLY FIND THAT RESPONDENTS CAPSTONE AND AWG WERE JOINT EMPLOYERS WITHIN THE MEANING OF THE ACT CONCERNING THE AUDITORS (Exception 21)

The initial question to be answered concerning whether Respondents Capstone and AWG are joint employers under the Act is what joint employer standard applies to this case.  Respondent Capstone and AWG, in their Motions to Dismiss made on the record at the hearing, argued the appropriate joint employer standard is the test as outlined in the Board's recent rulemaking concerning joint employers. See *Joint Employer Status Under the National Labor Relations Act*, 85 FR 11184 (April 28, 2020).  However, in the rule, the Board determined the new joint employer rule would only be applied prospectively, i.e., only to those cases or matters filed after the

implementation date of the rule. *Joint Employer Status Under the National Labor Relations Act*, 85 FR 11184, 11188 (April 28, 2020); *Browning-Ferris Industries of California, Inc. d/b/a BFI Newby Island Recyclery*, 369 NLRB No. 139, fn. 2 (July 29, 2020) (*Browning-Ferris II*) ("The final rule … applies only prospectively from its effective date of April 28, 2020…"). Because the original charges in these cases were filed on March 3, 2020 and April 27, 2020, these cases were matters pending before the Board prior to the implementation date of the Board's joint employer rule and thus the new joint employer rule would not apply to any joint employer analysis in this case.

The question which follows is, if the Board's new joint employer rule does not apply, what is the joint employer test to be applied to the facts of this case. In *Browning-Ferris Industries of California, Inc. d/b/a BFI Newby Island Recyclery*, 362 NLRB 1599 (2015) (*Browning-Ferris I*), the Board overturned the prior joint employer standard, as articulated in *TLI, Inc.*, 271 NLRB 798 (1984), *enfd. mem.* 772 F.2d 894 (3d Cir. 1985), and *Laerco Transportation*, 269 NLRB 324 (1984). In *Browning-Ferris I*, The Board held that "two or more entities are joint employers of a single work force if they are both employers within the meaning of the common law, and if they share or codetermine those matters governing the essential terms and conditions of employment." *Id.* at 1610-11. When applying this standard, the Board "consider[s] the various ways in which joint employers may 'share' control over terms and conditions of employment or 'codetermine' them . . . ." *Id.* The Board no longer requires that a joint employer exercise the authority to control employees' terms and conditions of employment "and do so, directly, immediately, and not in a 'limited and routine' manner." *Id.* Rather, it is sufficient that the joint employer possess the authority. *Id.* Furthermore, the Board continues to adhere to its inclusive approach in defining essential terms and conditions of employment. *Id.* Thus, a joint employer relationship may be

established by showing that the putative joint employer has authority over essential terms such as "hiring, firing, discipline, supervision, [or] direction," as well as "wages and hours." *Id.* "Other examples of control over mandatory terms and conditions of employment found probative by the Board include dictating the number of workers to be supplied; controlling scheduling, seniority, and overtime; and assigning work and determining the manner and method of work performance." *Id.*

The Board's decision in *Browning-Ferris I* was reviewed on appeal to the United States Court of Appeals for the D.C. Circuit which affirmed "the Board's articulation of the joint-employer test as including consideration of both an employer's reserved right to control and its indirect control over employees' terms and conditions of employment." *Browning-Ferris Industries of California, Inc. v. National Labor Relations Board*, 911 F.3d 1195, 1200 (D.C. Cir 2018). However, because the Board failed "to confine its consideration of indirect control consistently with common-law limitations," the Court granted the petition for review, denied the Board's cross-application for enforcement, and remanded the case to the Board for proceedings consistent with [the Court's] opinion. *Id.* at 1200.

On remand, however, the Board, in *Browning-Ferris II*, did not further articulate the joint-employer test to address the concerns of the Court of Appeals. Instead, the Board dismissed the Complaint finding it was inappropriate to apply the new joint employer standard retroactively to the employer in that case. *Browning-Ferris II*, 369 NLRB slip op. at 3-4. The Board however recognized the decision of the Court of Appeals as, "the law of the case," for purposes of its decision on remand. *Id.*, slip op. at 3.

There have been a limited number of decisions interpreting and applying the Board's joint employer standard as set forth in *Browning-Ferris I*. One such decision is *Retro Environmental*

*Inc./Green Jobworks, LLC*, 364 NLRB 922 (2016), where the Board found the two employers were joint employers under the *Browning-Ferris I* standard. In that case, Retro Environmental contracted with Green Jobworks for Green Jobworks to provide employees to perform services on construction and demolition job sites operated by Retro Environmental. *Id.* at 922. The Board's finding was based, in part, on evidence Retro Environmental had retained the right to exclude Green Jobworks employees from job sites, even though Retro Environmental had not recently exercised that right. *Id.* at 924; See *Browning-Ferris I*, 362 NLRB at 1612 (finding user employer's unqualified right to "discontinue the use of any personnel" that the supplier employer has assigned supports a finding of joint employer status). In that case, Retro Environmental was also partially responsible for determining the work hours of and supervising Green Jobworks employees. *Id.* at 924.

In the present case, ALJ Amchan found AWG and Capstone were joint employers during the period of time the Capstone auditors were being supervised and trained by AWG personnel. (ALJD 3:23-8; 10:fn.17; GCX 16). ALJ Amchan further writes, "If the record established that Henson went to Griffin about protected matters, that Griffin excluded her from the property and that Capstone fired her as a result, I may well have found that both AWG and Capstone violated the Act and that they were joint employers. Concerted complaints to third parties about working conditions are protected. *Eastex v. NLRB*, 437 U.S. 556 (1978)." (ALJD 10:fn.17). As established in Section II of this brief, Henson discussed concerted complaints with AWG Director of Distribution Griffin prior to October 22 which led Griffin to complain to Casey about Henson's protected activities. (ALJD 6:4-17; Tr. 438-9; 509-10). In response, Casey directed Henson to not discuss protected concerted complaints or issues with non-Capstone managers. ALJD 6:26-8; Tr. 443-5, 557). Finally, after Griffin was informed by AWG Rouse that Henson had texted him to

seek his assistance with concerted complaints about pay issues, Griffin contacted Casey and told Casey that he would not permit Henson to reenter AWG property, effectively ending Henson's employment with Capstone. (Tr. 519; RX 17 at p. 3).[11]  Based on this evidence, General Counsel submits Capstone and AWG sufficiently share or codetermine matters governing the Capstone auditors' essential terms and conditions of employment and would be joint employers pursuant to the joint employer standard articulated in *Browning-Ferris I*.

V.     THE JUDGE INCORRECTLY FOUND PEGGY COOPER WAS NOT TERMINATED IN RETALIATION FOR HER PROTECTED CONCERTED ACTIVITIES (Exceptions 1, 8, 9,10, 22, 23, 24, 25, 26, 27)

A.     ALJ Amchan Incorrectly Found Cooper Did Not Engage in Protected Concerted Activities Following Henson's Discharge (Exceptions 1, 8, 9, 10)

ALJ Amchan correctly finds Cooper engaged in protected concerted activities during her employment with Capstone and Capstone was aware of this protected activity. (ALJD 10:9-11). As noted previously, during her first full week of work, Cooper discussed her safety concerns about training in the equipment room with Henson and Marcel and informed trainer Wilson about her safety concerns, along with Henson. (ALJD 8:13-7; Tr. 74-7, 234-6).  Cooper also spoke with Henson and Marcel about safety concerns about the area where auditing training was being conducted and the lack of appropriate equipment for the auditors to work on the cold side of the warehouse, and requested AWG lead provide the auditors with freezer suits. (ALJD 8:22-5; Tr. 97-100, 103-6, 248-9).  Finally, on October 22, during the meeting with Casey, Ruder, Henson and Marcel, Cooper, along with Henson, discussed the auditors' safety concerns about the area where the auditing training was being conducted and concerns with how Wilson conducted equipment training. (Tr. 114-6).

---

[11] The Master Service Agreement in effect between Capstone and AWG contains a provision where AWG reserves the right to request Capstone to take action against Capstone employees and to exclude specified Capstone employees from working at AWG facilities. (RX 1 at 6).

However, while ALJ Amchan asserts that Cooper did not engage in protected concerted activities after Henson's discharge, the record establishes otherwise. Following Henson's discharge, Cooper continued her concerted activities when she raised concerns about changes to the auditing process implemented by Capstone trainer Shyane Mora. The record shows Cooper, in the presence of the other auditors, raised complaints to Mora concerning work procedures, implementation of the production pay system, reduction of the per case pay rate, and the refusal to provide freezer suits or cold temperature gear to the auditors. (Tr. 264-5, 275-6, 268-70). These complaints led Mora to discuss her concerns about Cooper with Casey, who decided to meet directly with Cooper. (Tr. 662-3). Then, during the meeting with Casey on October 31, Cooper specifically raised complaints about how the changes Mora was making to the auditing process was affecting the auditors ability to do their job and the shared concern among the auditors about their ability to make money because of the reduction in the per case pay rate. (ALJD 8:36-41; Tr. 268-70). Thus, contrary to ALJ Amchan's finding, when Cooper raised these concerns with Mora and Casey, Cooper was engaged in further protected concerted activity. *Parkview Lounge, LLC d/b/a Ascent Lounge*, *supra.*

B.     ALJ Amchan Incorrectly Found Capstone Lawfully Discharged Cooper
         (Exceptions 22, 23, 24, 25, 26, 27)

In finding Capstone lawfully discharged Cooper, ALJ Amchan first writes that the record does not establish Capstone bore animus toward Cooper as a result of her protected activities. (ALJD 10:12-13). This finding is flawed in part as ALJ Amchan incorrectly found Cooper did not engage in concerted activities after Henson's discharge which, as shown in the prior section, is not correct. While the record does not reflect any direct statements of animus toward Cooper, Capstone's animus toward protected concerted activities by its employees is established by its conduct toward and unlawful discharge of Henson just one week prior to Cooper's discharge.

Capstone's decision to discharge Cooper just one week after Henson's unlawful discharge and during a period when Cooper was continuing to engage in protected concerted activities reflects Capstone's continued animus toward employee protected activities and establishes a nexus between Cooper's protected activities and her discharge. *Medic One, Inc.*, 331 NLRB at 475 (close proximity of time between protected activity and discharge supports finding employer's discriminatory motive); See *National Dance Institute—New Mexico, Inc.,* 364 NLRB 342, 350 (2016).

The nexus between Cooper's protected activities and her discharge is further supported by the pretextual nature of Capstone's claimed reason for discharging Cooper and its attempt to mask the unlawful discharge by claiming it sought to place Cooper in a different position. See *National Dance Institute—New Mexico, Inc.,* 364 NLRB at 350. While ALJ Amchan found Cooper admitted she was having difficulty keeping up with the demands of the auditor position, Cooper credibly testified she informed Casey on October 31 that her difficulty in keeping up with the work was a result of the changes Mora was making to the auditing process and that she could physically perform the auditing work. (ALJD 11:16-17; Tr. 268-70).[12]   Additionally, in the meeting with Casey on October 31, Cooper specifically requested to return to performing her auditing duties at the end of the meeting. (Tr. 269-71).   Instead, Casey refused to allow Cooper to return to her auditing duties and directed Cooper to go home for the rest of the day while he attempted to place her in a different position. (Tr. 269-71).   When Cooper returned to work on November 1, the following morning, Casey sent her away claiming there was no available position for her at the warehouse. (Tr. 271).   While ALJ Amchan faulted Cooper for not asking to return to the auditor

---

[12] While Capstone Director of Operations Powell and trainer Mora testified Cooper admitting having some difficulties performing physical portions of the auditor duties, both witnesses admitted they did not document any of these alleged admissions by Cooper. (Tr. 529, 630).

position when she spoke with Casey on November 1, this fails to recognize it would have been futile for Cooper to make this request. Specifically, the record establishes Cooper had already made a futile request of Casey the previous day to return to the auditor position at the end of their meeting and Casey refused and sent her home. (Tr. 269-71).

Finally, while Capstone's witnesses claimed they attempted to place Cooper in an available position with Capstone or AWG, the evidence reflects this was not a genuine effort. As noted previously in Section I.G, Casey refused to place Cooper in any available Capstone position, including a position in sanitation which Cooper had requested. (Tr. Tr. 493, 528). Casey and Powell further testified they each spoke separately with AWG Director of Distribution Griffin about whether AWG had an available position for Cooper and both claimed Griffin said AWG did not have positions available. (Tr. 493, 594). However, as noted previously, Powell testified he specifically told Griffin that Cooper was an auditor concerned about the pace of the work and asked Griffin if AWG had any lighter duty positions available, thus depicting Cooper in an unfavorable light and severely limiting Cooper's chance of being placed in a position with AWG. (Tr. 594-5). *National Steel & Ship-building Co.*, 324 NLRB 1114, 1119 fn. 11 (1997) (discharge unlawful where employer's reasons are false or pretextual). See *Pro-Spec Painting, Inc.*, 339 NLRB 946, 949 (2003) (employer's explanation for termination found to be pretextual).

The evidence thus shows Cooper was engaged in protected concerted activities during her employment with Capstone, Capstone supervisors and agents were aware of Cooper's protected concerted activities and harbored animus toward Cooper because of her protected concerted activities. The evidence also establishes Capstone cannot show it would not have discharged Cooper in the absence of her protected concerted activities as Capstone discharged Cooper close

in time to both her protected concerted activities and the unlawful discharge of Henson and offered pretextual reasons for her discharge.

VI.     CONCLUSION

For the reasons discussed above, General Counsel requests the Board reverse the findings of the administrative law judge and find 1) that the discharges of Joyce Henson and Peggy Cooper violated the Act, 2) that Respondent Capstone unlawfully informed employees they were discharged because of their protected concerted activities, and 3) that Respondents Capstone and AWG are joint employers who violated Section 8(a)(1) of the Act by informing Joyce Henson she was discharged because of her protected concerted activities and discharging Henson and Peggy Cooper in retaliation for their protected concerted activities. General Counsel seeks an order requiring Respondents to: (1) cease and desist from engaging in such conduct; (2) reinstate Henson and Cooper and make them whole for their loss of employment with Respondent Capstone; (3) expunge the discharge notices from their personnel and disciplinary files; and (4) all other relief to which General Counsel and discriminatees are entitled.


Dated:  July 8, 2021

Respectfully submitted,

*/s/ William T. Hearne*

William T. Hearne
Counsel for the Acting General Counsel
National Labor Relations Board
Subregion 26
80 Monroe Avenue, Suite 350
Memphis, TN 38103

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of Brief of Counsel for the General Counsel in Support of Exceptions to the Decision of the Administrative Law Judge to be filed electronically with the Division of Judges on July 8, 2022.

I further certify that on July 8, 2022, I caused a true and correct copy of Brief of Counsel for the General Counsel in Support of Exceptions to the Decision of the Administrative Law Judge to be served via electronic mail upon the following persons:

David Klass, Esq.
227 West Trade St. Suite 2020
Charlotte, NC 28202
Email: dklass@fisherphillips.com

Bart N. Sisk
The Kullman Firm
6263 Poplar Avenue, Suite 945
Memphis, TN 38119
Email: bns@kullmanlaw.com

Martin J. Regimbal Esq.
The Kullman Firm
PO Box 827
Columbus, MS 39703-0827
Email: mjr@kullmanlaw.com

Casey Denson Esq.
Justine Daniel Esq.
Casey Denson Law LLC
3436 Magazine Street, Unit 7005
New Orleans, LA 70112
Email: cdenson@caseydensonlaw.com
Email: jdaniel@caseydensonlaw.com

Dated: July 8, 2021

_/s/ William T. Hearne_
William T. Hearne
Counsel for the General Counsel

# UNITED STATES OF AMERICA
## BEFORE THE NATIONAL LABOR RELATIONS BOARD

CAPSTONE LOGISTICS, LLC, and
ASSOCIATED WHOLESALE GROCERS, INC.,
As Joint Employers,

      and

Cases   15-CA-257443
             15-CA-259712

JOYCE HENSON, an Individual,

      and

PEGGY COOPER, an Individual.

**RESPONDENT CAPSTONE LOGISTICS, LLC'S BRIEF IN SUPPORT OF CROSS-EXCEPTIONS TO ADMINISTRATIVE LAW JUDGE'S DECISION**

David I. Klass, Esq.
**FISHER & PHILLIPS LLP**
227 West Trade Street, Suite 2020
Charlotte, NC 28202
Telephone: (704) 334-4565
Facsimile: (704) 334-9774
E-mail: dklass@fisherphillips.com

*Counsel for Capstone Logistics, LLC*

# I. **INTRODUCTION**

Pursuant to Section 102.46(c) of the Board's Rules and Regulations, Respondent Capstone Logistics, LLC (Capstone) hereby submits this brief in support of its cross-exceptions to Administrative Law Judge Arthur J. Amchan's May 10, 2022 decision dismissing the complaint against Capstone and Respondent Associated Wholesale Grocers, Inc. (AWG). While Capstone agrees with most of the judge's findings and ultimate conclusions, the Board should not adopt certain findings and conclusions for the reasons set forth below.

# II. **ARGUMENTS**

## A. AWG EMPLOYEES DID NOT MANAGE CAPSTONE AUDITORS (CROSS-EXCEPTION 1).

The judge found that, prior to Capstone trainer Shayne Mora's arrival at the AWG Gulf Coast facility on about October 25, 2019,[1] "the Capstone auditors were managed by AWG personnel" (ALJD 3). The sole evidence the judge cites to support this assertion is General Counsel's Exhibit 16, which is an October 17 email AWG Warehouse Manager Chris Griffin sent Capstone Director of Operations for the Gulf Coast facility Mike Ruder. The email reads: "The auditors are not aware of who their lead is supposed to be. One is not here. I thought we had a Capstone trainer here? *Our associates are managing them currently*. Please advise[.]" (GC Exh. 16 (emphasis added).)

Although Griffin told Ruder that AWG employees were "managing" Capstone employees at one point, the record evidence as a whole demonstrates that Capstone auditors only shadowed AWG employees for a few days before Mora arrived and that AWG employees neither had nor exercised any managerial or supervisory authority over the Capstone auditors. Capstone trainer

---

[1] All dates referenced herein are in 2019, unless otherwise indicated.

Prince Wilson initially trained the new auditors on the equipment (Tr. 160).[2] The following week, the new auditors shadowed the AWG auditors who were still performing the auditing tasks at that time (Tr. 89, 93-94, 651-652, 678, 682).[3]

AWG lead auditor Brady Bordelon credibly testified that having the Capstone auditors shadow the AWG auditors was really the only way to effectively train them on the auditing process (Tr. 677-678).[4] Bordelon also confirmed that at no time during the brief period of shadowing did anyone at AWG have or exercise managerial or supervisory authority over the Capstone auditors (Tr. 678-679). Moreover, Wilson was present throughout the shadowing (Tr. 94). After a few days of shadowing the AWG auditors, the Capstone auditors transitioned to train with Mora (Tr. 661, 678).

In light of the above evidence, the judge incorrectly relied on General Counsel's Exhibit 16 to support his assertion that Capstone auditors were "managed by" AWG personnel prior to Mora's arrival.

---

[2] Capstone and other employers are required to train affected employees regarding the operation of powered industrial trucks, including pallet jacks, pursuant to 29 C.F.R. § 1910.178(l), a regulation adopted pursuant to the Federal Occupational Safety and Health Act of 1970. Capstone's extensive, week-long training of its auditors, including Henson and Cooper, on the use of pallet jacks demonstrates its commitment to the safety of its employees and undermines the General Counsel's (and Charging Parties') claims that their employment was terminated based on alleged safety complaints regarding that training.

[3] Capstone was taking over the auditing function for AWG, and the AWG employees who had been performing the auditing function were to be moved to different departments once the Capstone auditors had been trained (Tr. 677).

[4] Henson testified that Wilson was supposed to train the Capstone auditors on the auditor functions but did not know how to do it (Tr. 160). Bordelon did not know why Wilson did not train the Capstone auditors (Tr. 677).

**B. THE JUDGE SHOULD HAVE CREDITED CASEY'S TESTIMONY CONCERNING THE REPORTED INTERACTION BETWEEN GRIFFIN AND HENSON (CROSS-EXCEPTIONS 2 AND 3).**

The judge found there was no reliable evidence as to what Griffin and Casey said to each other after the incident between Griffin and Henson (ALJD 7). Griffin did not testify, but Casey testified that Griffin told him Henson "walked up to him" and "disrupted him" while he was talking to AWG employees, which "upset and embarrassed" him (Griffin) (Tr. 462). Casey further testified that Griffin told him Henson's tone was "[v]ery unprofessional [and] rude" and that he "had trouble getting control of her" (Tr. 462). The judge improperly categorized Casey's testimony about the underlying incident between Griffin and Henson, as reported to Casey by Griffin, as hearsay.

First, Casey did not testify about any reported "statements" by Henson, which is a prerequisite to a hearsay finding. See Fed. R. Evid. 801(a) ("'Statement'" means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion."). Specifically, Casey did not testify that Griffin told him Henson made any oral or written assertions, as contemplated by Rule 801(a). Rather, he testified only that Griffin told him Henson "walked up to him" and "disrupted him" (Tr. 462). Henson's reported non-verbal conduct of walking up to Griffin and disrupting him was not an "assertion" under Rule 801(a). Cf. Advisory Committee Note to Rule 801(a) (example of nonverbal conduct intended as an assertion includes pointing to someone in a criminal lineup).

Second, even if Henson's reported conduct towards Griffin were a "statement" under Rule 801(a), it was not offered into evidence to prove the truth of the matter (i.e., that Henson actually did walk up to Griffin and disrupt him) but rather to show the effect the conduct had on the listener, Griffin (i.e., it "upset and embarrassed him"). See *Kitchen v. BASF*, 952 F.3d 247, 255 (5th Cir. 2020) (manager's testimony in terminated employee's discrimination action that the company's

4

in-house physician told him the employee's positive alcohol test indicated he was likely under the influence of alcohol at work was not hearsay because it was not offered to show the employee was intoxicated but rather for the effect the physician's opinion had on the manager, namely the manager's honest belief that the employee had been intoxicated while at work).

Third, Henson's reported conduct—even if a "statement" and even if offered to prove the truth of the matter asserted therein—is not hearsay because Henson is a charging party and, consequently, a party-opponent under Rule 801(d)(2). Cf. *Vencor Hospital-Los Angeles*, 324 NLRB 234, 235 fn. 5 (1997) (declining to find an alleged discriminatee *who is not a charging party* a party-opponent under Rule 801(d)(2)).

 Fourth, even if Casey's testimony about Henson's conduct, as reported by Griffin, was technically hearsay, the judge should not have excluded it because it was corroborated by other evidence—namely, Casey's non-hearsay testimony that he decided to terminate Henson's employment based on Griffin's report of the incident he had with Henson. See *Rome Electrical Systems*, 356 NLRB 170, 170 fn. 4 (2010) (Board "may consider probative hearsay testimony that is corroborated by other evidence or otherwise inherently reliable"); *Dauman Pallet, Inc.*, 314 NLRB 185, 186 (1994) (overturning judge's exclusion of corroborated hearsay and according it weight).

Finally, the judge should not have refused to consider Casey's testimony about the underlying incident reported to him by Griffin on hearsay grounds because neither the General Counsel nor the Charging Parties raised a timely objection at the hearing. See *Vista Del Sol Health Services, Inc.*, 363 NLRB 1193, 1193 fn. 1 (2016) (judge properly considered evidence because respondent "failed to raise a timely hearsay objection at the hearing").

As to Casey's testimony about Griffin's reported *account* of the underlying event (distinct from his testimony about the underlying event), the judge properly found it was not hearsay because it was clearly not offered for the truth of the matter asserted therein but rather for its effect on the listener, Casey. Nevertheless, the judge improperly failed to credit Casey's testimony about Griffin's account on the sole, conclusory basis that it was "too self-serving" (ALJD 7). The judge did not have an opportunity to evaluate witness demeanor because he was assigned the case after the trial. Regardless, it was incumbent upon the judge to evaluate Casey's credibility about Griffin's report by examining the record evidence as a whole, which he failed to do. See *Pacific Green Trucking Inc.*, 368 NLRB No. 14, slip op. at 5 (2019) (observing that "a witness's interest in the case is only one of many relevant factors to consider in evaluating credibility"); *Mercy Hospital of Buffalo*, 336 NLRB 1282, 1285 (2001) (Board independently evaluating credibility where judge based findings on factors other than demeanor and finding, contrary to the judge, that "nothing in the documentary evidence" was inconsistent with the witness's testimony).

Notwithstanding the judge's improper failure to find reliable evidence as to what Griffin communicated to Casey after the incident between Griffin and Henson, the judge's decision to credit Casey insofar as he testified that he decided to terminate Henson's employment after talking to Griffin (ALJD 7)—and his ultimate conclusion that the General Counsel failed to prove that Henson's interaction with Griffin concerned protected concerted activity as opposed to individual concerns (ALJD 10-11)—is appropriate and supported by the record as a whole.

## C. AWG AND CAPSTONE ARE NOT JOINT EMPLOYERS (CROSS-EXCEPTION 4).

The judge incorrectly found that "AWG was clearly a joint employer while its employees

trained and supervised the Capstone auditors . . ." (ALJD 10 fn. 17).[5] Cooper summarized her

employment situation correctly, testifying that she "wasn't working for AWG" (Tr. 287). She and

Henson were employees of Capstone and only Capstone, both as a practical matter and under the

applicable rules governing joint employer status under the Act. See 29 C.F.R. § 103.40 et al.[6]

Under 29 C.F.R. § 103.40(a), an employer "may be considered a joint employer of a

separate employer's employees only if the two employers share or codetermine the employees'

essential terms and conditions of employment." The party arguing for joint employer status—the

General Counsel in this case—must show that the putative joint employer "possess[es] and

exercise[s] such substantial direct and immediate control over one or more essential terms or

conditions of their employment as would warrant finding that the entity meaningfully affects

matters relating to the employment relationship with those employees." Ibid. "Joint-employer

status must be determined on the totality of the relevant facts in each particular employment

setting." Ibid.

Essential terms and conditions of employment means "wages, benefits, hours of work,

hiring, discharge, discipline, supervision, and direction." 29 C.F.R. § 103.40(b). Each of the listed

---

[5] The judge further found that AWG and Capstone were "not necessarily" joint employers *after* the Capstone auditors shadowed the AWG auditors (ALJD 10 fn. 17). The judge should have gone further and definitively found they were not, given the complete lack of evidence to support that conclusion.

[6] The General Counsel argued in support of her exceptions that the applicable standard is set forth in *Browning-Ferris Industries of California, Inc. d/b/a BFI Newby Island Recyclery*, 362 NLRB 1599 (2015) (*Browning-Ferris I*), rather than the new joint employer rule because the effective date of the new rule was April 28, 2020, and the underlying charges were filed before that date. As Capstone explained in its answering brief to the General Counsel's exceptions, however, the effective date of the new rule was April 27, 2020, *not* April 28, 2020. See Joint Employer Status Under the National Labor Relations Act, 85 Fed. Reg. 11184, 11184 ("The effective date is April 27, 2020.") (Feb. 26, 2020). Ironically, one of the charging parties filed her charge on April 27, 2020 (GC Exh. 1(e)). Moreover, the complaint was not issued until Oct. 5, 2020 (GC Exh. 1(g)), well after the new rule went into effect. In any event, Capstone and AWG are not joint employers under any standard.

terms and conditions of employment has its own definition focused on "Direct and Immediate Control." 29 C.F.R. § 103.40(c)(1)-(8). "'Substantial direct and immediate control' means direct and immediate control that has a regular or continuous consequential effect on an essential term or condition of employment of another employer's employees. Such control is not 'substantial' if only exercised on a sporadic, isolated, or de minimis basis." 29 C.F.R. § 103.40(d). "'Indirect control' means indirect control over essential terms and conditions of employment of another employer's employees but not control or influence over setting the objectives, basic ground rules, or expectations for another entity's performance under a contract.'" 29 C.F.R. § 103.40(e).

The judge's opinion that AWG and Capstone were joint employers "while [AWG's] employees trained and supervised the Capstone auditors" (ALJD 10 fn. 17) is not supported by the law or facts. Under the joint employer rule, a putative joint employer exercises "direct and immediate control over supervision by actually instructing another employer's employees how to perform their work or by actually issuing employee performance appraisals" 29 C.F.R. § 103.40(c)(7), and "over direction by assigning particular employees their individual work schedules, positions, and tasks" 29 C.F.R. § 103.40(c)(8). For "direct and immediate control" over supervision and direction to be "substantial," as required to find joint employment status, the control must have "a regular or continuous consequential effect on an essential term or condition of employment of another employer's employees[,]" and "[s]uch control is not 'substantial' if only exercised on a sporadic, isolated, or de minimis basis." 29 C.F.R. § 103.40(d).[7]

The contract defining the business relationship of Capstone and AWG make clear that Capstone "is an independent contractor engaged in the business of supervising, managing and

---

[7] See also *AM Property Holding Corp.*, 350 NLRB 998, 1001 (2007) ("The Board has held that evidence of supervision which is 'limited and routine' in nature does not support a joint employer finding.") (citing *G. Wes Limited Co.*, 309 NLRB 225, 226 (1992)).

employing or contracting for workers . . . to provide various services . . . to warehouse operators and their vendors" (R. Exh. 1, p. 1). The contract elaborates as follows regarding AWG and LMS's (Capstone's predecessor in interest) relationship:

> LMS is solely responsible for all LMS Personnel, including its employees, independent contractors or agents who work for LMS or on its behalf. Selection, hiring, training, supervision, termination, and grievance determination of LMS Personnel is the sole responsibility of LMS. LMS shall be solely responsible for the means, methods, techniques and procedures in connection with the performance of the Services, with the Services being performed by LMS Personnel under the supervision and direction of LMS management using LMS' best skills and supervision. . . . Further, LMS is solely responsible for all compensation, benefits, payroll taxes and withholding for all LMS Personnel and AWG will have no responsibility whatsoever with respect to LMS Personnel.

Id. at 6.

Casey testified, consistently with the contract, that AWG had no role in "supervising" or "training" Capstone's auditors (Tr. 401). Other record evidence also bore this out. Specifically, Capstone manager Shadi Krishan led the auditors' initial orientation, during which the new auditors "watched films and filled out . . . paperwork" (Tr. 220). Capstone then brought in Prince Wilson, a Capstone employee, to train the auditors (Tr. 160). He was on site for two weeks (Tr. 645). During the first week, he trained the auditors on operating pallet jacks (Tr. 160). During the second week, he was present when Capstone auditors shadowed AWG's auditors for a few days, as discussed above, pp. 2-3.

The few days during which Capstone auditors job shadowed AWG auditors is insufficient to meet the joint employer rule's requirement of "substantial direct and immediate control" over the supervision or direction of Capstone auditors. Again, the rule plainly states that "sporadic, isolated, or de minimis" control is not sufficient. 29 C.F.R. § 103.40(d).

Two Board cases issued prior to the joint employer rule being adopted, but also prior to *Browning-Ferris I* changing the long-standing "direct and immediate control" standard to an

"indirect control" standard, are further instructive. In *TLI, Inc.*, 271 NLRB 798 (1984), and *Laerco Transp.*, 269 NLRB 324 (1984), the Board found that, although the contracting companies exercised some control over the supplier's labor force, the control was minimal and routine in nature and did not meaningfully affect the terms and conditions of employment. See *TLI*, above at 799 ("[T]he supervision and direction exercised by Crown on a day-to-day basis is both limited and routine, and considered with its lack of hiring, firing, and disciplinary authority, does not constitute sufficient control to support a joint employer finding."); *Laerco*, above at 326 ("[W]hile there is some minimal day-to-day supervision of the petitioned-for employees by Laerco and/or Laerco clients, such supervision is of an extremely routine nature . . . . [W]e find the degree and nature of Laerco's supervision over CTL employees to be insufficient to render Laerco a joint employer with CTL.").

As in *TLI* and *Laerco*, and as clearly contemplated by the joint employer rules, AWG did not exercise sufficient control to be a joint employer over Capstone auditors merely because Capstone auditors shadowed AWG auditors for a few days before they took over the AWG auditors' role.[8] Thus, the judge erred by finding that AWG was "clearly a joint employer while its employees trained and supervised the Capstone auditors . . ." (ALJD 10 fn. 17).

### D. THERE IS NO EVIDENCE OF PRETEXT (CROSS-EXCEPTION 5).

The judge incorrectly found that "the record contains evidence that would otherwise support a finding of pretext (lack of investigation, departure from normal practices, disparate

---

[8] Even under *Browning-Ferris I*, an ad hoc period of shadowing by a staffing agency's employees of a customer's employees—especially when the staffing agency's employees are taking over the jobs of the customer's employees—is not sufficient to establish a joint employer relationship. See *Browning-Ferris I*, above at 1614 ("[I]t is certainly possible that in a particular case, a putative joint employer's control might extend only to terms and conditions of employment too limited in scope or significance to permit meaningful bargaining.").

treatment, etc.)" (ALJD 12 fn. 18). Casey conducted an investigation. He personally spoke with

Griffin, an eyewitness (and indeed the target) of Henson's outburst. He had known Griffin for "at

least six years," and given their "work history" and his knowledge of Griffin's "credibility," "[i]t

was clear to [Casey] what had happened, and . . . was . . . a very easy decision to make" (Tr. 461,

541). In other words, no further "investigation" was needed, including obtaining a statement from

Griffin. Casey credibly testified that he did not think it was appropriate to get a written statement

from a customer following a report like that and that he has "never done that and never would"

(Tr. 535, 540-541).

Casey also testified he "would only call human resources to consult on something that [he]

felt would be questionable" (Tr. 520), which this situation was not. Casey also afforded "an

opportunity for Ms. Henson to talk about the incident that she didn't take" (Tr. 541). He called her

on the phone, discussed the reason for terminating her employment, and gave her "the opportunity

to talk about what had happened" (Tr. 541). Henson chose not to do so; she hung up on Casey

instead (Tr. 475). As for paperwork, it was not Casey's responsibility to fill it out; it was the site

manager's responsibility (Tr. 543-544). And then-Site Manager Powell filled out the paperwork

(Tr. 600-601; GC Exh. 14). Thus, normal practices were followed.

Regarding comparators, Capstone presented evidence that other employees have been

terminated for insubordination. See R. Exhs. 36, 42. Casey testified, however, that Henson's

conduct was even "[m]ore serious" than these examples because Henson directed her outburst at

Capstone's customer rather than her own supervisor, thereby threatening Capstone's business

relationship (Tr. 471). Fortunately, Capstone has never received a report from a customer like the

one Griffin made about Henson, so there is no comparator evidence directly on point. Nevertheless,

an employee is not immune from discipline—nor can the General Counsel establish unlawful

motivation—merely because no one else has engaged in the exact same misconduct. Compare *Merillat Industries*, 307 NLRB 1301, 1303 (1992) ("[I]t is rare to find cases of previous discipline that are 'on all fours' with the case in question, and the Respondent should not be faulted for being unable to show that it had discharged an employee who [engaged in the same misconduct as the alleged discriminatee].")). There was, therefore, no disparate treatment.

Accordingly, the judge erred in finding evidence that would otherwise support a finding of pretext.

### III.  <u>CONCLUSION</u>

For the foregoing reasons, the Board should grant Capstone's cross-exceptions.


Respectfully submitted,

*/s/ David I. Klass*
David I. Klass, Esq.
**FISHER & PHILLIPS LLP**
227 West Trade Street, Suite 2020
Charlotte, NC 28202
Telephone: (704) 334-4565
Facsimile: (704) 334-9774
E-mail: dklass@fisherphillips.com

*Counsel for Capstone Logistics, LLC*

September 2, 2022

**STATEMENT OF SERVICE**

The undersigned hereby states that **Respondent Capstone Logistics, LLC's Brief in Support of Cross-Exceptions to the Administrative Law Judge's Decision** in the above-captioned cases has been E-Filed on the National Labor Relations Board's website, and a copy served on the following by email on the date indicated below:

William T. Hearne, Esq.
National Labor Relations Board
Subregion 26
80 Monroe Ave., Ste. 350
Memphis, TN  38103
William.Hearne@nlrb.gov
*Counsel for the General Counsel*

Martin J. Regimbal, Esq.
The Kullman Firm
PO Box 827
Columbus, MS  39703
mjr@kullmanlaw.com
*Counsel for Associated Warehouse Grocers, Inc.*

Bart N. Sisk, Esq.
The Kullman Firm
6263 Poplar Avenue, Suite 945
Memphis, TN  38119
bns@kullmanlaw.com
*Counsel for Associated Warehouse Grocers, Inc.*

Casey Rose Denson, Esq.
Justine Daniel, Esq.
3436 Magazine Street, Unit 7005
New Orleans, LA  70115
cdenson@caseydensonlaw.com
jdaniel@caseydensonlaw.com
*Counsel for Joyce Henson and Peggy Cooper*

*/s/ David I. Klass*
David I. Klass
*Counsel for Respondent Capstone Logistics, LLC*

September 2, 2022

13

# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

| | | |
|---|---|---|
| CAPSTONE LOGISTICS, L.L.C. | ) | |
| | ) | |
| Petitioner/Cross-Respondent | ) | No. 23-60513 |
| | ) | |
| v. | ) | Board Case Nos. |
| | ) | 15-CA-257443 |
| NATIONAL LABOR RELATIONS BOARD | ) | 15-CA-259712 |
| | ) | |
| Respondent/Cross-Petitioner | ) | |

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the Board

certifies that its motions to lodge contains 374 words of proportionally-spaced, 14-

point type, and the word processing system used was Microsoft Word 2016.

Respectfully submitted,


/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
National Labor Relations Board
1015 Half Street, SE
Washington, DC 20570
(202) 273-2960


Dated at Washington, DC
this 7th day of March 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

CAPSTONE LOGISTICS, L.L.C.       )
                                   )

    Petitioner/Cross-Respondent   )    No. 23-60513
                                   )

    v.                           )    Board Case Nos.
                                   )    15-CA-257443

NATIONAL LABOR RELATIONS BOARD   )    15-CA-259712
                                   **)**

    Respondent/Cross-Petitioner     )

## CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2024, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that the foregoing document will be served via the CM/ECF system on all parties or their counsel of record.

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
National Labor Relations Board
1015 Half Street, SE
Washington, DC 20570
(202) 273-2960

Dated at Washington, DC
this 7th day of March 2024