# United States Court of Appeals

*for the*

# Fifth Circuit

---

Case No. 23-60513

CAPSTONE LOGISTICS, L.L.C.,

*Petitioner/Cross-Respondent,*

v.

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner.*

---

ON APPEAL FROM THE NATIONAL LABOR RELATIONS BOARD
IN CASE NOS. 15-CA-257443, 15-CA-259712

## PETITION FOR PANEL REHEARING

REYBURN W. LOMINACK, III, ESQ.
FISHER & PHILLIPS, LLP
1320 Main Street, Suite 750
Columbia, South Carolina 29201
(803) 255-0000
rlominack@fisherphillips.com

EDWARD F. HAROLD, ESQ.
FISHER & PHILLIPS, LLP
201 St. Charles Avenue, Suite 3710
New Orleans, Louisiana 70170
(504) 522-3303
eharold@fisherphillips.com

*Attorneys for Petitioner/Cross-Respondent*

# CERTIFICATE OF INTERESTED PERSONS

## Capstone Logistics LLC v. National Labor Relations Board

The undersigned counsel of record certifies that the following persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. Petitioner Capstone Logistics LLC is a private company and no publicly held corporation owns 10% or more of its stock.

2. Fisher & Phillips LLP is Counsel for Petitioner.

3. Edward F. Harold is Counsel for Petitioner.

4. Respondent the National Labor Relations Board is a federal agency.

5. Ruth E. Burdick is the Acting Deputy Associate General Counsel, Appellate and Supreme Court Litigation Branch, for Respondent the National Labor Relations Board.

6. Joyce Henson is an individual Charging Party in the Board matter appealed from.

7. Peggy Cooper is an individual Charging Party in the Board matter appealed from.

8. Casey Denson is Counsel for Charging Parties Henson and Cooper.

9. Casey Denson Law LLC is Counsel for Charging Parties Henson and Cooper.

10. Associated Wholesale Grocers, Inc. was a respondent / Charged Party in the Board matter appealed from. Petitioner lacks information sufficient to identify Associated Wholesale Grocers, Inc.'s corporate structure or whether any publicly held entities own 10% or more of its stock.

11. Martin J. Regimbal, Esq. is Counsel for Associated Wholesale Grocers, Inc.

12. Bart Sisk, Esq. is Counsel for Associated Wholesale Grocers, Inc.

13. The Kullman Firm is Counsel for Associated Wholesale Grocers, Inc.

January 9, 2025

*s/ Edward F. Harold*
Edward F. Harold

*Counsel for Petitioner*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................iv

INTRODUCTION ...............................................................................1

GROUNDS FOR REHEARING ...........................................................1

LEGAL ARGUMENT..........................................................................2

I.    THE PANEL MAJORITY ERRED TO THE EXTENT IT
DEFERRED TO THE BOARD'S LEGAL CONCLUSIONS .............2

II.    THE PANEL MAJORITY ERRONEOUSLY FOUND
THAT SUBSTANTIAL EVIDENCE SUPPORTED THE
BOARD'S FINDING THAT CASEY BELIEVED HENSON
RAISED GROUP EMPLOYMENT COMPLAINTS TO
GRIFFIN .......................................................................................4

A.    Casey's Statements About Henson's Discharge.........................5

B.    Casey's Alleged Knowledge of Henson and Other
Auditors Raising Group Concerns to Griffin.............................8

III.    THE PANEL MAJORITY ERRED BY ASSUMING THAT
THE GROUP EMPLOYMENT COMPLAINTS CASEY
PURPORTEDLY BELIEVED HENSON MADE TO
GRIFFIN WOULD HAVE BEEN PROTECTED IF SHE
HAD ACTUALLY MADE THEM ...................................................11

IV.    THE PANEL MAJORITY SHOULD NOT HAVE
DISREGARDED THE ADDITIONAL *WRIGHT LINE*
FACTORS .....................................................................................13

CONCLUSION ...................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Berry Sch. v. NLRB*,
    627 F.2d 692 (5th Cir. 1980) ......................................................15

*Brown & Root, Inc. v. NLRB*,
    333 F.3d 628 (5th Cir. 2003) ......................................................15

*C.R. Pittman Const. Co., Inc. v. Nat'l Fire Ins. Co. of Hartford*,
    453 Fed. Appx. 439 (5th Cir. 2011) ............................................10

*Capstone Logistics, LLC*,
    372 N.L.R.B. No. 124 (Aug. 22, 2023) .........................................1

*Chevron U.S.A., Inc. v. Natural Resources Defense Council*,
    467 U.S. 837 (1984)........................................................................3

*Cordua Restaurants, Inc. v. NLRB*,
    985 F.3d 415 (5th Cir. 2021) ............................................... 13, 15

*Dallas & Mavis Specialized Carrier Co.*,
    346 N.L.R.B. 253 (2006) ..............................................................14

*Eastex, Inc. v. NLRB*,
    437 U.S. 556 (1978)......................................................................11

*E-Z Recycling*,
    331 N.L.R.B. 950 (2000) ..............................................................12

*Henning & Cheadle, Inc v. NLRB*,
    522 F.2d 1050 (7th Cir. 1975) ....................................................11

*Hospital Menonita Guayama, Inc. v. NLRB*,
    94 F.4th 1 (D.C. Cir. 2024), *cert. granted, judgment vacated*,
    __ S. Ct. __, 2024 WL 5112286 (Dec. 16, 2024).........................3

*J. Vallery Elec., Inc. v. NLRB*,
    337 F.3d 446 (5th Cir. 2003) ........................................................2

*Loper Bright Enterprises v. Raimondo*,
    603 U.S. 369 (2024).............................................................. 1, 3, 4

*NLRB v. Colvert Dairy Products Co.*,
    317 F.2d 44 (10th Cir. 1963) ......................................................14

*NLRB v. Esco Elevators, Inc.*,
   736 F.2d 295 (5th Cir. 1984) ........................................................7

*NLRB v. Howard Quarries, Inc.*,
   362 F.2d 236 (8th Cir. 1966) ......................................................14

*Pacemaker Yacht Co. v. NLRB*,
   663 F.2d 455 (3d Cir. 1981) .......................................................11

*PAE Applied Technologies, LLC*,
   367 N.L.R.B. No. 105 (Mar. 8, 2019) ........................................11

*Reef Industries, Inc. v. NLRB*,
   952 F.2d 830 (5th Cir. 1991) ......................................................11

*Rieth-Riley Construction Co., Inc. v. NLRB*,
   114 F.4th 519 (6th Cir. 2024) ......................................................3

*TWR, Inc. v. NLRB*,
   654 F.2d 307 (5th Cir. 1981) ........................................................8

*United Nat. Foods, Inc. v. NLRB*,
   66 F.4th 536 (5th Cir. 2023), *cert. granted, judgment vacated*,
   144 S. Ct. 2708 (2024)..................................................................3

*Universal Camera Corp. v. NLRB*,
   340 U.S. 474 (1951)......................................................................8

*Wright Line*,
   251 N.L.R.B. 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir. 1981),
   *cert. denied*, 455 U.S. 989 (1982)...................................... 2, 13, 15


**Statutes & Other Authorities:**

5 U.S.C. § 706................................................................................3

29 U.S.C. § 160(e) ........................................................................8

Federal Rule of Appellate Procedure 40.......................................1

National Labor Relations Act § 8(a)(1) ........................................1

## INTRODUCTION

Pursuant to Federal Rule of Appellate Procedure 40, Petitioner/Cross-Respondent Capstone Logistics, LLC ("Capstone") hereby petitions for panel rehearing of the Court's November 25, 2024 decision denying Capstone's petition for review, and granting Respondent/Cross-Petitioner National Labor Relations Board's ("the Board") cross-application for enforcement, of the Board's decision and order in *Capstone Logistics, LLC*, 372 N.L.R.B. No. 124 (Aug. 22, 2023). This petition is limited to the panel majority's decision to affirm the Board's finding that Capstone violated Section 8(a)(1) of the National Labor Relations Act ("NLRA" or "the Act") by discharging Joyce Henson because it believed she engaged in protected concerted activity.

## GROUNDS FOR REHEARING

The panel majority's decision is flawed in four principal respects. First, in light of *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), the panel majority erred to the extent it deferred to the Board's legal conclusions, including the Board's application of the law to the facts. Second, the panel majority erroneously found that substantial evidence supported the Board's inference that Capstone Vice President Tim Casey believed Henson raised "group employment complaints" during her interaction with Associated Wholesale Grocers ("AWG") Director Chris Griffin on October 22, 2019. Third, the panel majority (like the

Board) erroneously assumed that the "group employment complaints" Casey purportedly believed Henson raised would have been protected under the NLRA, had she actually raised them.[1] Finally, the panel majority erred by disregarding Capstone's additional arguments, under *Wright Line*, 251 N.L.R.B. 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir. 1981), *cert. denied*, 455 U.S. 989 (1982), that Casey did not have the requisite animus toward Henson's perceived activity necessary to establish a violation, and that Henson would have been discharged notwithstanding Casey's purported beliefs. Accordingly, Capstone's petition for panel rehearing should be granted.

## LEGAL ARGUMENT

## I. THE PANEL MAJORITY ERRED TO THE EXTENT IT DEFERRED TO THE BOARD'S LEGAL CONCLUSIONS.

The panel majority cited *J. Vallery Elec., Inc. v. NLRB*, 337 F.3d 446, 450 (5th Cir. 2003), for the proposition that the Court's "deference" extends to the Board's application of the law to the facts. Opinion at 10. This proposition is

---

[1] Recall, there is no record evidence that Henson raised *any* complaints or engaged in protected concerted activity during her interaction with Griffin on October 22. The administrative law judge ("ALJ") explicitly found "no reliable evidence . . . as to what transpired between Griffin and Henson on the afternoon of October 22," ROA.1105, and the Board adopted the ALJ's credibility findings, ROA.1093 n.1.

untenable in light of *Loper*, which overruled *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984).[2]

In *Loper*, the Supreme Court made clear that, consistent with the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, "courts, not agencies, will decide '*all* relevant questions of law' arising on review of agency action—even those involving ambiguous laws—and set aside any such action inconsistent with the law as they interpret it." 603 U.S. at 392 (internal citation omitted) (emphasis in original). This includes "so-called mixed questions of law and fact," as Justice Gorsuch observed in his concurring opinion. *Id.* at 431; *see also id.* at 469 (Kagan, J., dissenting) (suspecting that the majority's "intent" is to preclude judicial deference even when "law and facts are entwined" because, otherwise, a "substantial part" of *Chevron* would be preserved).[3]

---

[2] *Chevron* invited courts to defer to "permissible" agency interpretations of the statutes they administer, even when the court may read the statute differently. *Loper*, 603 U.S. at 378.

[3] Notably, the Supreme Court has already remanded two cases involving judicial review of NLRB decisions for reconsideration in light of *Loper*, including one case from this Court. *See United Nat. Foods, Inc. v. NLRB*, 66 F.4th 536 (5th Cir. 2023), *cert. granted, judgment vacated*, 144 S.Ct. 2708 (2024) (mem.); *Hospital Menonita Guayama, Inc. v. NLRB*, 94 F.4th 1, 16 (D.C. Cir. 2024) ("The Board's legal findings are supported by substantial evidence . . . ."), *cert. granted, judgment vacated*, __ S.Ct. __, 2024 WL 5112286 (Dec. 16, 2024) (mem.). Additionally, one circuit court has already expressly held that *Loper* prohibits courts from deferring to the Board's legal determinations. *See Rieth-Riley Construction Co., Inc. v. NLRB*, 114 F.4th 519, 528-29 (6th Cir. 2024) ("We do not defer to the NLRB's

3

The Board's finding that Capstone violated Section 8(a)(1) of the NLRA by discharging Henson because it believed she engaged in protected concerted activity is a question of law, notwithstanding that it rests, in part, on factual findings. Thus, the panel majority should have declined to cite or rely on *J. Vallery* as sanctioning a deferential standard of review of the Board's legal conclusions.

## II. THE PANEL MAJORITY ERRONEOUSLY FOUND THAT SUBSTANTIAL EVIDENCE SUPPORTED THE BOARD'S FINDING THAT CASEY BELIEVED HENSON RAISED GROUP EMPLOYMENT COMPLAINTS TO GRIFFIN.

According to the panel majority, the Board based its finding that Casey believed Henson raised "group employment complaints" to Griffin on two things: Casey's statements about Henson's discharge, and Henson raising group complaints during a meeting with Casey and other auditors earlier that day. Opinion at 16.[4] The

---

interpretation of the NLRA, but exercise independent judgment in deciding whether an agency acted within its statutory authority.") (citing *Loper*).

[4] It is not entirely clear that the Board relied on Casey's statements to infer that he believed Henson raised *group* complaints to Griffin, as opposed to complaints in general. To be sure, the Board explained, "Indeed, if Casey did not believe that Henson had brought *complaints* to [Griffin] on October 22, there would have been no reason for Casey to claim—when explaining the reason for her discharge—that Henson had violated his directive not to bring Capstone-related issues or concerns to AWG." ROA.1099 (emphasis added). If the Board intended to mean "group complaints" instead of "complaints," presumably it would have stated so, as it did with respect to its finding concerning Henson raising group complaints during the auditor meeting. *See* ROA.1099 ("Casey had good reason to believe that Henson had raised *group complaints* to Griffin, because Henson had raised group complaints earlier that day during the meeting the auditors had with Casey [and other Capstone officials].") (emphasis added).

panel majority found that Casey's statements and his participation in the Capstone auditor meeting, "coupled with Casey's knowledge that Henson and the other auditors had previously raised group concerns to Griffin," was "sufficient circumstantial evidence" to support the Board's inference regarding Casey's belief. Opinion at 16-17.[5] The panel should reconsider and reverse its findings.

## A.    Casey's Statements About Henson's Discharge

Casey's statements about Henson's discharge do not support an inference that he believed she raised *group* (*i.e.*, concerted) complaints or concerns to Griffin. Casey and Capstone Manager Mike Ruder talked about Henson the morning after meeting with her privately. ROA.562. Ruder testified that the topic of the conversation was that Henson "had gone to the partner with *some* concerns" after being told that "she would voice *her* concerns to Capstone Logistics and not the partner." ROA.562-63. Ruder recalled Casey saying that he decided to discharge Henson because she "had violated proper communication" and "had gone to the partner *with concerns* after being told not to do so." ROA.563, 574. Ruder did not recall Casey specifying what those "concerns" were. ROA.575.[6] Ruder was also in

<hr />

[5] Presumably, then, the panel majority would not have found any of this evidence, standing alone, sufficient to support the Board's inference concerning Casey's belief.

[6] This is consistent with Casey's testimony that Griffin did not tell him what Henson said when she reportedly interrupted him. ROA.465, 520. It is also consistent with Henson's testimony that she did not raise *any* concerns to Griffin

the room when Casey called Henson to tell her she was being discharged. Ruder recalled Casey telling her she "had violated the communication process and expectation." ROA.563.

Casey did not testify about what he may have said to Ruder concerning Henson's discharge. Casey only recalled telling Henson during their phone call, which Ruder witnessed, that she was being discharged because of "[t]he engagement between her and Chris Griffin the day before" and that "it was a disruption of business with our partner." ROA.478. At best, then, Casey's statements to Ruder only support an inference that Casey believed Henson raised *some type of* "concerns" to Griffin, but not necessarily *group* concerns.

Casey next told Capstone's HR department in an email that he discharged Henson because AWG asked that she not be allowed back "due to disruption of business." ROA.860. He further stated in the email that he was "[p]repared to let her go anyway" because she did not "[f]ollow [his] instructions"—which he gave during their earlier private meeting—to contact Ruder or himself with "any issues." ROA.860.[7] Thus, Casey's statements to HR do not support an inference that he believed Henson raised *group* complaints or concerns to Griffin.

_____

during their conversation. ROA.119-20.

[7] The panel majority overgeneralized the email as Casey "reiterat[ing] that he decided to terminate Henson's employment because she disobeyed his instruction not to go to the partner with Capstone-related concerns." Opinion at 16. That is not

6

Finally, Casey told Henson in a voicemail two weeks after her discharge that she had been discharged because she "disrupted business" by "questioning the partner" after he had told her the day before "that if [she] had any questions or issues, to come to [him] . . . ." ROA.44-45, 802. Casey said nothing about Henson having raised any complaints or concerns to Griffin, let alone *group* complaints or concerns. Thus, as with his other statements about Henson's discharge, Casey's voicemail to Henson does not support an inference that he believed she raised *group* complaints or concerns to Griffin.

Because none of Casey's statements concerning Henson's discharge support an inference that he believed she raised *group* complaints or concerns to Griffin—as opposed to individual complaints or concerns—the panel majority erred by approving the Board's reliance on those statements.

---

what Casey wrote in the email. He wrote that Henson was discharged because AWG asked that she not be allowed back. ROA.860. Regardless, even if Casey had written that he discharged Henson "because she disobeyed his instruction not to go to the partner with Capstone-related concerns," that does not support an inference that Casey believed she had raised *group* concerns. Indeed, Henson's concerns about her own pay as a lead auditor were also "Capstone-related concerns," which does not necessarily make them protected concerted activity. *See NLRB v. Esco Elevators, Inc.*, 736 F.2d 295, 300 (5th Cir. 1984) (employee's safety-related complaints not protected concerted activity where no evidence complaints were made to enlist support of other employees, related to group action in the interest of employees, were authorized by other employees, or were a group concern).

## B. Casey's Alleged Knowledge of Henson and Other Auditors Raising Group Concerns to Griffin.

The panel majority's finding that Casey knew that "Henson and the other auditors had previously raised group concerns to Griffin," Opinion at 16, is not supported by "substantial evidence on the record considered as a whole." *TWR, Inc. v. NLRB*, 654 F.2d 307, 310 (5th Cir. 1981) (citing, *inter alia*, 29 U.S.C. § 160(e)); *see also ibid.* ("In assessing the substantiality of the evidence . . . [the court] must consider not only those facts that support the Board's decision, but also those facts and inferences that militate against it") (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487-88 (1951)).

Casey knew that Griffin met with the Capstone auditors, but Griffin never told him what, if any, concerns they had raised to him. ROA.442-43, 512-13. At most, Griffin wrote the following in an email on which Casey was copied: "The auditors are not aware of who their lead is supposed to be." ROA.816. Griffin's email did not indicate how he learned the auditors were not aware of who their lead was supposed to be (*e.g.*, whether someone brought it to his attention or whether it was something he merely observed). Moreover, the record as a whole demonstrates that Casey understood that this was only a concern of *Henson's*, not the other auditors.

To be sure, Griffin specifically told Casey that Henson "went to his office asking . . . who to report to at Capstone" and also "mention[ed] something about her relationship with Donnie Rouse." ROA.441. Griffin was referring to the private

meeting he had with Henson *after* the group meeting with other auditors on October 17, as evidenced by Griffin giving Henson (and no one else) a piece of paper with Casey's and other Capstone officials' names and phone numbers on it. ROA.111, 944.

Casey thought it was "odd" that Henson did not know who to report to, given that it is part of the orientation documents and is posted on Capstone's office door at the facility. ROA.443. Indeed, no other auditors raised questions or concerns about the reporting structure, and that topic was not discussed in any of the group meetings. *See* ROA.103-04, 108-09, 115-16, 185, 256-57, 275, 277-78, 448-49, 454-55. Nevertheless, Casey assured Griffin he personally would make sure Henson knew who she was supposed to report to. ROA.443. And he did, during their private meeting on October 22.

During that private meeting, Henson explained to Casey how *she* had been told during orientation that *she*, as the lead auditor, would make $200.00 per day. ROA.117-18. She further told him that there was "nobody to talk to, no supervisors, no nothing." ROA.118. Henson and Casey then talked about "who *she* needs to go to, who *her* managers are, where *she* can find the contact information, and that if *she* had any issues, that that's who *she* needs to go to." ROA.447. Casey even pointed to a sign on Capstone's office door that included contact information for Capstone's managers. ROA.447. He then instructed Henson "to not go to our partner [AWG] with any Capstone related . . . issues or concerns." ROA.448.

Later that day, *something* happened between Griffin and Henson that prompted Griffin to call Casey, and Casey to discharge Henson. It seems that the best evidence concerning what Casey *believed* happened would come from Casey himself; however, the ALJ did not credit Casey's testimony about what Griffin told him, and Griffin did not testify. ROA.1105.[8] Even rejecting Casey's direct and uncontradicted testimony regarding what Griffin told him concerning Henson, the only reasonable conclusion that can be drawn based on the remaining record evidence is that Casey had no idea what Henson said to Griffin, or at most believed she had again questioned Griffin about the reporting structure. Neither scenario, however, supports the inference that Casey believed Henson raised "group employment complaints" to Griffin. Moreover, the *content* of Henson's communication with Griffin was not the problem; it was the *manner* of it, as discussed further below.

---

[8] Casey testified that Griffin told him Henson "walked up to him" and "disrupted him" while he was talking to AWG employees and was "[v]ery unprofessional [and] rude." ROA.465. The ALJ—who was not the trial judge and, therefore, could not base his credibility findings on demeanor—cast this testimony aside on the specious grounds that it was "too self-serving." ROA.1105. *But see C.R. Pittman Const. Co., Inc. v. Nat'l Fire Ins. Co. of Hartford*, 453 Fed. Appx. 439, 443 (5th Cir. 2011) ("A party's own testimony is often 'self-serving,' but we do not exclude it as incompetent for that reason alone.") (citation omitted). Of course, accepting Casey's testimony—which was consistent with his statements to Ruder, his email to HR, and his voicemail to Henson—would have put this entire case to rest.

**III. THE PANEL MAJORITY ERRED BY ASSUMING THAT THE GROUP EMPLOYMENT COMPLAINTS CASEY PURPORTEDLY BELIEVED HENSON MADE TO GRIFFIN WOULD HAVE BEEN PROTECTED IF SHE HAD ACTUALLY MADE THEM.**

Even if Casey believed Henson raised "group employment complaints" to Griffin, her discharge would only be unlawful if that conduct, as perceived by Casey, would have been protected under the Act. *See Henning & Cheadle, Inc v. NLRB*, 522 F.2d 1050, 1053 (7th Cir. 1975) (where record establishes decisionmaker believed concerted activity occurred, "[t]he question . . . becomes whether the admittedly concerted activity, had it actually occurred as [the decisionmaker] perceived, would have been protected under the Act"). Henson's supposed conduct, as allegedly perceived by Casey, would not have been protected.

The Act generally protects an employee's right to complain to her employer's customers about her terms and conditions of employment. *Eastex, Inc. v. NLRB*, 437 U.S. 556, 575 (1978). But that right is not absolute. *See Reef Industries, Inc. v. NLRB*, 952 F.2d 830, 837 (5th Cir. 1991) ("[E]mployees' rights [to engage in protected concerted activity] are not absolute; they must be balanced against the employer's long-recognized right to maintain order and respect."); *Pacemaker Yacht Co. v. NLRB*, 663 F.2d 455, 461 (3d Cir. 1981) (Garth, J., concurring) ("[E]mployee activities aimed at improving terms and conditions of employment can lose their [S]ection 7 protection if carried out in a disruptive or otherwise inappropriate manner."); *PAE Applied Technologies, LLC*, 367 N.L.R.B. No. 105, at 5 (Mar. 8,

2019) ("When an employee acts irresponsibly towards a customer . . . it is within the purview of the employer to discipline the employee for his or her inappropriate behavior."); *E-Z Recycling*, 331 N.L.R.B. 950, 950 (2000) (employers have the right to discipline employees for rude and discourteous behavior towards customers).

Regardless of what Casey believed Henson said to Griffin, the overwhelming record evidence demonstrates that he also believed she said it in a disruptive, unprofessional, and/or rude manner. *See, e.g.*, ROA.44-45, 802 (Casey telling Henson in a voicemail that she had been discharged because she "disrupted business" by "questioning the partner"); ROA.860 (Casey telling HR in an email that Henson "went directly to the partner and was *unprofessional and refused to listen to him*" and that AWG asked that she not be allowed back "due to disruption of business").[9]

Accordingly, even if Casey believed Henson raised group employment complaints to Griffin, he also believed she did so in an unprotected way, as Judge Haynes determined. *See* Opinion at 18 (Haynes, J., dissenting) ("[T]he specific discussion with Griffin was a problem. . . . [I]t wasn't Henson discussing group

---

[9] Notably, the panel majority relied on the "context" of Casey's email to HR to find that the "inciting event involving a Capstone partner was Henson's October 22 interaction with Griffin, during which Henson was alleged to be 'unprofessional' and 'rude,' not the LinkedIn message she sent to Rouse." Opinion at 15. The panel majority also should have relied on the context of the email to support the conclusion that Casey believed Henson was unprofessional and rude to Griffin.

issues, it was her complaining, indeed, having an unpleasant discussion, about her own issues with Griffin, as least as far as the Capstone group understood.").

## IV. THE PANEL MAJORITY SHOULD NOT HAVE DISREGARDED THE ADDITIONAL *WRIGHT LINE* FACTORS.

Because the panel majority found insufficient evidence that Henson was discharged for sending the LinkedIn message to AWG's customer, it expressly declined to consider Capstone's argument that the Board misapplied *Wright Line*. Opinion at 11 n.7. The panel majority should have considered Capstone's argument, however, after finding that substantial evidence supported the Board's alternative finding that Capstone discharged Henson because it believed she engaged in protected concerted activity.

Specifically, the panel majority should have considered Capstone's argument that Casey had no animus toward Henson allegedly raising group complaints or concerns to Griffin. *See Cordua Restaurants, Inc. v. NLRB*, 985 F.3d 415, 424 (5th Cir. 2021) ("In order to round out the *Wright Line* framework . . . we must find substantial evidence to support that [the employer] harbored animus toward [the employee's] protected activities.") (citation omitted). Again, Casey thought it was "odd" that Henson did not know who to report to, but he felt it was important that she get answers from someone. ROA.443. Additionally, when Casey and Ruder met privately with Henson to discuss the reporting structure, they had a "professional" discussion, and he walked away from the conversation feeling "very confident that

we were all on the same page." ROA.448. Ruder confirmed the discussion was "[l]ight, professional, [and] supportive." ROA.562. Casey was not upset with Henson and did not consider the conversation to be disciplinary in any way. ROA.450. Even Henson felt no animosity from Casey following the meeting. ROA.119.

Where, then, is Casey's animosity toward Henson supposedly raising "group employment complaints" to Griffin? It cannot be based on his instruction that she not go to AWG with Capstone-related issues or concerns, as that instruction was not alleged nor found to be unlawful. *See NLRB v. Howard Quarries, Inc.*, 362 F.2d 236, 239-40 (8th Cir. 1966) ("It is well established that otherwise legal acts cannot be the basis for an inference of antiunion animus.") (citing *NLRB v. Colvert Dairy Products Co.*, 317 F.2d 44 (10th Cir. 1963)).[10] It also cannot be based on mere timing. *See Dallas & Mavis Specialized Carrier Co.*, 346 N.L.R.B. 253, 255-56 (2006) (timing not indicative of animus when there is evidence the decision was motivated by an intervening event that would justify disciplinary action). And it cannot be based on Casey's statements regarding Henson's discharge, as none of those statements referred to Henson raising *group* concerns. *See supra* at II.A.

_____

[10] Ironically, Henson denied that Casey ever provided such an instruction. ROA.118-19.

What remains is pure speculation, which is manifestly insufficient. *See Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 639 (5th Cir. 2003) (evidence supporting Board's finding of a violation must be "substantial, not speculative, nor derived from inferences upon inferences") (citation omitted); *Berry Sch. v. NLRB*, 627 F.2d 692, 704 (5th Cir. 1980) (determining that "inferences about events which might have happened" were "speculations unsupported by the evidence").

Finally, the panel majority should have considered Capstone's argument that it would have discharged Henson even if Casey did not purportedly believe she engaged in protected concerted activity. *See Cordua*, 985 F.3d at 427 (employer may negate finding of unlawful motivation by establishing, as an affirmative defense under *Wright Line*, that it would have discharged employee even if she had not engaged in protected conduct).

Most telling is AWG's instruction to Capstone that Henson not be allowed back, ROA.521, and her subsequent disruption of the workplace when she returned the day after her discharge and made "inflammatory statements" to AWG and Capstone associates, ROA.863. As Judge Haynes aptly recognized in his dissent, "Griffin clearly did not want to hear more complaints from [Henson]. In a situation where a customer complains, it makes little sense to me to have the employee continue to bother that customer." Opinion at 18. Yet, by enforcing the Board's order, that is precisely what the panel majority has compelled Capstone to do.

## <u>CONCLUSION</u>

For the foregoing reasons, as well as those previously set forth in Capstone's briefings and oral argument, Capstone's petition for panel rehearing should be granted.

Dated: January 9, 2025

Respectfully submitted,

/s/ Edward F. Harold
EDWARD F. HAROLD, ESQ.
FISHER & PHILLIPS, LLP
201 St. Charles Avenue, Suite 3710
New Orleans, Louisiana 70170
(504) 522-3303
eharold@fisherphillips.com

– and –

REYBURN W. LOMINACK, III, ESQ.
FISHER & PHILLIPS, LLP
1320 Main Street, Suite 750
Columbia, South Carolina 29201
(803) 255-0000
rlominack@fisherphillips.com

*Attorneys for Petitioner/Cross-Respondent*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 9, 2025, a true and correct copy of the foregoing Petition for Panel Rehearing was served via electronic filing with the Clerk of Court and all registered ECF users.

Dated: January 9, 2025

<div style="margin-left: 50%;">

Respectfully submitted,

/s/ Edward F. Harold
EDWARD F. HAROLD, ESQ.
FISHER & PHILLIPS, LLP
201 St. Charles Avenue, Suite 3710
New Orleans, Louisiana 70170
(504) 522-3303
eharold@fisherphillips.com

   – and –

REYBURN W. LOMINACK, III, ESQ.
FISHER & PHILLIPS, LLP
1320 Main Street, Suite 750
Columbia, South Carolina 29201
(803) 255-0000
rlominack@fisherphillips.com

*Attorneys for Petitioner/Cross-Respondent*

</div>

## CERTIFICATE OF COMPLIANCE

This petition has been prepared using 14-point, proportionately spaced, serif typeface, in Microsoft Word. Excluding the parts of the petition exempted by Fed. R. App. P. 32(f), this petition contains 3806 words.

Respectfully submitted,

/s/ Edward F. Harold
EDWARD F. HAROLD, ESQ.
FISHER & PHILLIPS, LLP
201 St. Charles Avenue, Suite 3710
New Orleans, Louisiana 70170
(504) 522-3303
eharold@fisherphillips.com

— and —

REYBURN W. LOMINACK, III, ESQ.
FISHER & PHILLIPS, LLP
1320 Main Street, Suite 750
Columbia, South Carolina 29201
(803) 255-0000
rlominack@fisherphillips.com

*Attorneys for Petitioner/Cross-Respondent*

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 25, 2024

Lyle W. Cayce
Clerk

No. 23-60513

Capstone Logistics, L.L.C.,

*Petitioner/Cross-Respondent*,

*versus*

National Labor Relations Board,

*Respondent/Cross-Petitioner*.

Petition for Review of an Order of the National Labor Relations Board
Agency Nos. 15-CA-257443,
15-CA-259712

Before Southwick, Haynes, and Douglas, *Circuit Judges*.

Dana M. Douglas, *Circuit Judge*:

Capstone Logistics, LLC ("Capstone") petitions for review of a National Labor Relations Board ("NLRB" or "the Board") decision and order determining that Capstone violated the National Labor Relations Act ("NLRA") by firing an employee for engaging in protected concerted activity or, alternatively, because it believed she had engaged in protected concerted activity. The Board opposes Capstone's petition and cross-petitions for summary enforcement of its order. Because we determine that the decision of the NLRB was, in part, supported by substantial evidence, we DENY Capstone's petition for review and ENFORCE the order.

No. 23-60513

## I.

Capstone is a nationwide company that provides labor to other businesses, including Associated Wholesale Grocers at its facilities. In the fall of 2019, Capstone began supplying personnel to work as auditors at Associated Wholesale Grocers' food distribution warehouse in Pearl River, Louisiana. Using scan guns, the auditors checked groceries that had been loaded onto pallets on various docks, including the cold dock for perishables, to ensure that Associated Wholesale Grocers accurately fulfilled its customers' orders. The auditors' job also required them to spend some time inside of freezers at the facility. Associated Wholesale Grocers provided its employees with freezer suits to withstand the cold temperatures, but Capstone did not supply its auditors with such suits. After verifying the customers' orders were correctly filled, the auditors then rewrapped the orders and rebuilt the pallets.

Capstone initially told the Pearl River auditors that they would be paid hourly during their training and would receive production pay—at sixteen cents per case scanned—after their training. But in the nine months or so that Capstone provided auditors to Associated Wholesale Grocers at its Pearl River facility, its auditors were only ever paid an hourly wage.

## A.

In September 2019, Capstone hired Joyce Henson to serve as lead auditor at the Pearl River facility. During her one-month tenure, Henson spoke to the other Capstone auditors, as well as Capstone and Associated Wholesale Grocers personnel, about a variety of work-related matters. The auditors expressed concerns related to safety and training, the need for warm clothing to withstand cold temperatures, and the rate of pay. Henson also spoke separately with Associated Wholesale Grocers and Capstone officials about her own pay as lead auditor.

On either October 17 or 18, Prince Wilson, a Capstone manager who trained the auditors at the Pearl River facility, brought Henson and the other

No. 23-60513

auditors to a meeting with Associated Wholesale Grocers' Director of Distribution Chris Griffin and Senior Manager Ryan Carroll. At the meeting, Henson raised the auditors' concerns about the safety of the location in which they would be working, their need for freezer suits, and their pay. As Henson spoke on their behalf, the other auditors nodded their heads in agreement. Griffin told Henson that he would discuss these matters with Capstone.

At the end of the meeting, after the other auditors had left, Henson spoke privately with Griffin and Carroll to raise concerns about her own pay. Henson also mentioned that she had contacted Donny Rouse, the owner of a grocery chain that was a major Associated Wholesale Grocers customer, and who happened to be a friend of Henson's stepfather.[1] Griffin expressed surprise that Henson knew Rouse and told her to contact Capstone's Vice President of Operations Tim Casey and Director of Operations Mike Ruder.

Griffin told Casey about his meeting with Henson and the other Capstone auditors. He expressed annoyance that the auditors came to him directly instead of their own managers about Capstone-related matters. Griffin also complained that Henson did not know who to report to, and he told Casey about Henson's relationship with Donny Rouse. Casey assured Griffin that he would take care of it.

Several days later, at about noon on October 22, Henson and the other auditors met with Capstone officials Casey and Ruder, along with Andrew Powell, who at the time of the meeting was Capstone's site manager in Kansas City and would later succeed Ruder as Capstone's Director of

---

[1] In a LinkedIn message sent from Henson to Rouse on October 16, Henson asked Rouse for his "help" with her pay. Henson informed Rouse that she was initially told by Capstone told that she would make $175 to $200 per day at sixteen cents per case, but she was recently informed by Capstone's floor supervisor that she would only make $11.75 per hour instead. After telling Rouse that she "can't continue this [job] for [$]11.75/hr," Henson asked Rouse to "put in a call for [her]." The following day, Rouse responded to Henson's message, stating, "no problem, I will look into it."

No. 23-60513

Operations for Pearl River. During the meeting, Henson raised the concerns about the safety of the area in which the auditors were being trained. Powell indicated that this was a problem at another Associated Wholesale Grocers' location and that he had been able to rectify the issue. Henson also claimed that Prince Wilson, the individual who trained the auditors, was unqualified to do so, but Casey disagreed. Other auditors also raised concerns during the meeting about their training and safety. When Henson asked about freezer suits for the auditors, Casey responded that Capstone was only required to provide its employees with gloves and vests. Henson also raised the issue of compensation, stating that the auditors had been told they would make sixteen cents per case scanned and arguing that the production pay system was flawed. Casey remarked that the auditors would be paid only eight or nine cents per case.

After the meeting with the other auditors, Henson spoke separately with Casey, Ruder, and Powell. She specifically raised concerns about her own pay to the Capstone officials, complaining that she had been told that she would make $200 per day as lead auditor.[2] Casey indicated that Capstone would investigate it and that she would get what was due. Casey also told Henson that if she had any concerns, she should bring them only to him or Ruder, and specifically asked her not to go to Associated Wholesale Grocers with any Capstone-related issues or concerns.

Following these meetings, Henson sent a LinkedIn message to Donny Rouse. The message, which Henson sent to Rouse at 2:43 p.m. on October 22, concerned her pay and the pay of her fellow auditors, and it implicitly asked Rouse to intervene with Associated Wholesale Grocers officials Griffin and Carroll on the auditors' behalf. It read:

---

[2] Henson's pay stubs reflect that prior to the October 22 meeting, she had been paid on an hourly basis at a rate of $10 per hour.

This is by far the worst company I have ever worked for. Do you ever come to slidell? Would you like to have lunch with me and we talk about everything and I'll treat you!!! I really need your opinion and feed back. I'm really trying to stick it out. Today at 12:00 pm we had a meeting with capstone management. They told my auditors that they was misinformed and they will only make $0.09 per case not $0.16. I have not been given a amount that I will make. As of right now I'm only making 10.00 hr and This is week 3.

I would love to talk anytime . . . and answer any questions you might have. The guy that runs things for [Associated Wholesale Grocers] is Chris griffin and Ryan Carroll their number is [###-###-####].

Later that same day, Griffin and Henson briefly interacted on the loading dock of the Pearl River facility. Afterwards, Griffin had a one-minute conversation with Casey over the phone, purportedly about Henson. Casey testified that he decided to terminate Henson's employment after speaking with Griffin.

The next morning, Casey told Ruder that he intended to fire Henson because she "had gone to the partner with some concerns" after being told to "voice her concerns to Capstone [ ] and not the partner,"[3] thereby "violat[ing] proper communication." Casey then telephoned Henson and informed her of her termination because of what had transpired the day before and for disrupting Capstone's relationship with Associated Wholesale Grocers. Casey did not ask Henson what had transpired during her conversation with Griffin on October 22.

Henson subsequently contacted Capstone's Human Resources Department several times about her discharge. On November 6, Casey left a

---

[3] Capstone refers to its customers, including Associated Wholesale Grocers, as its partners. In testimony, Casey has referred to Associated Wholesale Grocers' Chris Griffin as "the partner."

No. 23-60513

voicemail for Henson in which he stated that the reason for her termination was the "disruption of business" caused by Henson "questioning the partner" despite his directive from the day before that Henson should come directly to him if she had any questions or issues.

Casey testified that Associated Wholesale Grocers personnel never asked or instructed Capstone to terminate Henson and had no input in the decision to fire her, and that he alone made the decision to fire Henson. Capstone did not provide Henson with any documentation regarding her termination nor any other explanation than the voicemail message above.

**B.**

Acting on charges filed by Henson, the Board's General Counsel issued a complaint against Capstone, alleging violations of Section 8(a)(1) of the NLRA by discharging Henson because she engaged in protected concerted activity and by informing Henson that she had been fired for that protected concerted activity. After a hearing, the administrative law judge ("ALJ") dismissed both allegations.

Specifically, the ALJ found that Henson engaged in protected concerted activity by "concertedly complain[ing] about the safety of the area in which new auditors were trained." It also credited Henson's testimony "that she raised concerted concerns regarding the production or piecework rate at which the new auditors were to be paid after completing their training." Moreover, the ALJ determined that Capstone was aware, through Prince Wilson, of Henson's safety and compensation complaints. But the ALJ concluded that there was "no evidence of animus towards Henson's protected activities prior to October 22 and 23." And although the ALJ found that there was evidence of animus towards Henson by Capstone and Associated Wholesale Grocers on October 22 and 23, it determined that the General Counsel had failed to "establish[] that this animus was due to her

No. 23-60513

protected activities." Instead, the ALJ concluded that "[t]he record [was] equally consistent with animus confined to her unprotected activities"— namely, her efforts to secure better compensation for herself, not other employees. The ALJ reasoned that Henson's testimony and her October 22 message to Donny Rouse both indicated that she was primarily concerned with her own pay and not that of her fellow auditors.

The ALJ further determined that it was "clear that something transpired between Henson and [Associated Wholesale Grocers'] Chris Griffin on October 22, that led Griffin to call Tim Casey to tell him Henson should not be allowed back in the Pearl River facility." The ALJ inferred that Griffin had learned of Henson's LinkedIn message to Donny Rouse, after which Griffin approached Henson on the loading dock at the Pearl River facility. While Henson testified that Griffin had asked her how her meeting with Casey, Ruder, and Powell went, and that she made no complaints about wages or working conditions to Griffin, the ALJ determined that there was "no reliable evidence in [the] record as to what transpired between Griffin and Henson."[4] However, the ALJ concluded that whatever transpired between the two ultimately led to Henson's termination the following day.

The ALJ noted that Griffin had sent a text message to Casey at 2:58 p.m. asking Casey to call him,[5] which the ALJ inferred was sent almost immediately after Griffin spoke to Henson on the loading dock. Minutes later, Casey called Griffin and the two men spoke for about one minute at 3:01 p.m. Although Casey testified about what he and Griffin discussed during

---

[4] The ALJ concluded that the testimony regarding what transpired between Griffin and Henson was hearsay and declined to credit it.

[5] The time stamp shown on Griffin's text message is 3:58 p.m.; however, Casey testified that because he is based in Atlanta, Georgia, the timestamp is in Eastern Standard Time, meaning that the message was sent at 2:58 p.m. Central Time.

the phone call,[6] the ALJ found that there was "no reliable evidence as to what was said by either one" because Casey's testimony—the only testimony on the conversation—was "too self-serving in the context of this record to be credible." But the ALJ inferred that "Griffin may have been reacting to a communication from [Donny] Rouse," and concluded that Casey "decided to terminate Henson after talking to Griffin."

Next, the ALJ determined that the General Counsel failed to establish a sufficient causal connection between Henson's protected concerted activities and her termination. The ALJ reasoned that while Henson's discharge was "clearly connected to her interaction with Chris Griffin on October 22," the General Counsel did not show that this communication "concerned her protected activities as opposed to her desire to put pressure on [Capstone and Associated Wholesale Grocers] to increase her own compensation." The ALJ also found that although the timing between Henson's meeting with Capstone and her subsequent discharge might otherwise suggest a discriminatory motive, such was not the case here given the lack of evidence connecting Capstone's "animus towards Henson's protected activity, and the intervening event, i.e., Henson's interaction with Griffin."

Finally, the ALJ rejected the allegation that Capstone violated Section 8(a)(1) when Casey told Henson that she was terminated for engaging in protected activities. The ALJ reasoned that Casey's statements regarding the reason for Henson's termination—that she had disrupted business by "questioning the partner"—"clearly relate[d] to Henson's

---

[6] Casey testified that Griffin was "upset and excited," and his voice was raised during the call, and that Griffin had told him that Henson had interrupted him while he was speaking with his associates. Casey further testified that Griffin described Henson as "unprofessional" and "rude" during the encounter.

encounter with Griffin on October 22." Because the ALJ found no evidence that Henson engaged in protected activity during her encounter with Griffin, it concluded that Casey's statements did "not mean that he was terminating [Henson] for protected activity."

Both the General Counsel and Henson filed exceptions before the Board, and Capstone filed cross-exceptions. The Board reversed the ALJ's conclusion that Capstone did not violate Section 8(a)(1) of the NLRA by discharging Henson. It found two rationales for finding that Henson's discharge violated the Act: (1) that she was discharged for engaging in protected concerted activity when she sent the LinkedIn message to Rouse to enlist his support for an employee compensation matter, and (2) that she was discharged because Capstone believed she engaged in protected concerted activity during her conversation with Griffin on October 22. The Board further reversed the ALJ's finding that Capstone did not violate Section 8(a)(1) by informing Henson of the reason for her discharge.

Capstone then filed the instant petition with this court. The Board cross-appealed for enforcement of its order.

## II.

We review the Board's findings of fact under a substantial-evidence standard. *Sara Lee Bakery Grp., Inc. v. NLRB*, 514 F.3d 422, 428 (5th Cir. 2008). Under 29 U.S.C. § 160(e), the Board's findings of fact are "conclusive" if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); *accord Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *Cordua Rest., Inc. v. NLRB*, 985 F.3d 415, 422 (5th Cir. 2021). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera*, 340 U.S. at 477; *Flex Frac Logistics, LLC v. NLRB*, 746 F.3d 205, 207 (5th Cir. 2014). "It is more than a mere scintilla, and less than

a preponderance." *IBEW, AFLCIO, CLC, Loc. Unions 605 & 985 v. NLRB*, 973 F.3d 451, 457 (5th Cir. 2020) (quoting *Creative Vision Res., LLC v. NLRB*, 882 F.3d 510, 515 (5th Cir. 2018) (internal quotation marks omitted)).  Under this standard, a reviewing court may not "displace the Board's choice between two fairly conflicting views, even though the court [may] justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera*, 340 U.S. at 488; *accord El Paso Elec. Co. v. NLRB*, 681 F.3d 651, 656–57 (5th Cir. 2012).  Our deference "extends to [our] review of both the Board's findings of fact and its application of law." *J. Vallery Elec., Inc. v. NLRB*, 337 F.3d 446, 450 (5th Cir. 2003).

## III.

Section 7 of the NLRA guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."  National Labor Relations Act § 7, 29 U.S.C. § 157.  Section 8(a)(1) safeguards those rights by making it an "unfair labor practice" for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7]."  *Id.* § 158(a)(1). Relevant here, an employer violates Section 8(a)(1) by discharging an employee for engaging in protected concerted activities within the meaning of Section 7, or because it believes the employee engaged in such activity.  *See Remington Lodging & Hosp., LLC v. NLRB*, 847 F.3d 180, 185–86 (5th Cir. 2017) (noting that Sections 7 and 8(a)(1) of the NLRA protect both actual and "alleged" [protected] activities, such that it is "sufficient if the employer was motivated by suspected [protected] activity in discharging the employee" (quoting *Holyoke Visiting Nurses Ass'n v. NLRB*, 11 F.3d 302, 307 (1st Cir. 1993) (internal quotation marks omitted))); *see also JCR Hotel, Inc. v. NLRB*, 342 F.3d 837, 839 (8th Cir. 2003) (holding that § 8(a)(1) prohibits

No. 23-60513

an employer from discharging an employee for conduct the employer believes to be protected concerted activity); *Saffels v. Rice*, 40 F.3d 1546, 1549 (8th Cir. 1994) (collecting cases in which courts have held that the NLRA protects employees who "did not actually engage in" protected activity when the employer mistakenly believes that they engaged in such protected activity); *Henning & Cheadle, Inc. v. NLRB*, 522 F.2d 1050, 1052 (7th Cir. 1975) (holding that the NLRA is violated if an employer acts against his employees in the belief that they have engaged in protected activities, whether or not they actually did so).

We find insufficient evidence in the record to support the Board's finding that Capstone unlawfully discharged Henson for engaging in protected concerted activity when she sent the October 22 LinkedIn message to Donny Rouse.[7]  Nevertheless, we affirm the Board on its alternative determination that Capstone violated Section 8(a)(1) of the NLRA by discharging Henson because it believed she had engaged in protected concerted activity.[8]

## A.

The Board first determined that Capstone violated the NLRA when it discharged Henson because of her protected concerted activity. Specifically, it found that Henson engaged in protected concerted activity by sending the LinkedIn message to Donny Rouse on October 22 "in an effort

---

[7] We therefore decline to consider Capstone's argument that the Board erred in concluding that the *Wright Line* analysis was unnecessary or, alternatively, that the Board misapplied *Wright Line*.

[8] Because we find that Capstone unlawfully discharged Henson, we need not reach Capstone's argument that the Board erred in finding that Capstone told Henson she was fired for an unlawful reason.  As Capstone acknowledges in its brief, its argument rests upon a finding that Henson's discharge was not unlawful.

to enlist Rouse's support in asking [Associated Wholesale Grocers] to intervene with Capstone on the employees' behalf concerning their pay." The Board then concluded that although there was "no direct evidence" that Capstone Vice President Casey knew about Henson's LinkedIn message to Rouse when he decided to fire her, the record warranted an inference of such knowledge. In reaching this conclusion, the Board relied on the assertion that "knowledge of an employee's protected activity may be proven by circumstantial evidence from which a reasonable inference may be drawn." For circumstantial evidence, the Board pointed to: (1) the ALJ's unexcepted finding that Henson engaged in protected concerned activity during the October 22 group meeting with Casey; (2) Griffin's prior complaint to Casey that Henson and the other auditors had approached him about Capstone-related issues, and Casey's subsequent assurance to Griffin that he would take care of this problem; (3) Casey's knowledge of Henson's relationship with Rouse; (4) the ALJ's unexcepted inference that Griffin knew about the LinkedIn message when he approached Henson on the loading dock; and (5) Casey's decision to fire Henson immediately after speaking to Griffin. Based upon these findings and inferences, coupled with the sequence of events following Henson's LinkedIn message, the Board determined that there was "compelling circumstantial evidence that Griffin told Casey about Henson's October 22 LinkedIn message prior to Casey's decision to discharge Henson," and that Casey's knowledge of the LinkedIn message was the basis for Henson's termination.

Substantial evidence does not support the Board's illative conclusion. Even assuming Henson engaged in protected concerted activity when she sent the LinkedIn message to Rouse, we find insufficient evidence in the record to support the Board's inference that Casey knew of the message when he terminated Henson's employment. In reaching this inference, the Board speculated that Griffin learned about Henson's LinkedIn message and

relayed this information to Casey during their one-minute phone call. But only fifteen minutes separates the time that Henson sent Rouse the message at 2:43 p.m. from the time that Griffin asked Casey to call him at 2:58 p.m. And nothing in the record substantiates whether Rouse ever read Henson's message or contacted Griffin about it. Thus, the Board's conclusion required it to make a series of inferential leaps: (1) that after Henson sent Rouse the LinkedIn message, Rouse almost immediately read the message and contacted Griffin about it; (2) that Griffin then approached Henson on the loading dock about her message; and (3) that Griffin subsequently relayed to Casey the information about Henson's LinkedIn message when they spoke on the phone—all of which must have transpired in less than twenty minutes. Such a speculative chain of events does not offer substantial circumstantial evidence that Casey knew about the LinkedIn message before terminating Henson, nor does it give rise to a reasonable inference of such knowledge. *See Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 639 (5th Cir. 2003) (noting that although a finding of a violation "may be supported through circumstantial, rather than direct evidence, . . . [t]hat evidence . . . must be substantial, not speculative, nor derived from inferences upon inferences"); *cf. Berry Sch. v. NLRB*, 627 F.2d 692, 704 (5th Cir. 1980) (determining that "inferences about events which might have happened" were "speculations unsupported by the evidence").

The court notes that because neither party excepted to the ALJ's inference that Griffin knew about Henson's LinkedIn message before approaching her, the Board accepted this finding as true, and we must do the same.[9] *See Detroit Edison Co. v. NLRB*, 440 U.S. 301, 311–12 n.10 (1979). But

---

[9] Capstone asserts that it "did not except to the ALJ's conclusion on this point because it was irrelevant to the ALJ's decision." Although Capstone concedes that it is

this inference, by itself,[10] is not sufficient to infer Casey's knowledge. Even assuming that Griffin learned of the LinkedIn message within the short fifteen-minute window after Henson sent it, there is no evidence—direct or circumstantial—that Griffin mentioned the message either to Henson during their October 22 interaction or to Casey when he talked with him on the phone shortly thereafter. Indeed, neither Henson nor Casey testified to having any discussion of the LinkedIn message with Griffin. And none of the other circumstantial evidence identified by the Board lends support to the inference that Griffin specifically told Casey about the LinkedIn message during their one-minute phone call. Thus, the ALJ's unexcepted inferential finding as to Griffin's knowledge formed the exclusive basis upon which the Board inferred that Casey likewise knew of the message when he discharged Henson. This finding is no more than unsupported speculation "derived from inferences upon inferences," not substantial evidence. *Brown & Root, Inc.*, 333 F.3d at 639.

The Board also found that "Capstone essentially admitted that it discharged Henson because of the conduct found to be protected concerted activity." The Board pointed to the conversation between Casey and Capstone's Director Mike Ruder just before Casey fired Henson on October

---

not asking this court to overturn this finding, it urges the court to find that there is a lack of substantial evidence to support the inference that Casey knew about the message.

[10] The Board inferred that "Griffin learned about Henson's LinkedIn message" shortly after she sent it to Rouse. The Board's only basis for reaching this conclusion was that neither party excepted to the ALJ's "inference that Griffin learned of Henson's LinkedIn message before he approached Henson." After the ALJ reached this inference in its decision, the ALJ cited only to a portion of the transcript from Joyce Henson's testimony during which she testified that "a couple of hours after [the] meeting" with Capstone officials, "[Associated Wholesale Grocers'] manager Chris Griffin approached [her] while [she] was walking across the warehouse from the dry side to the cold side." But the ALJ offered no evidentiary support for its inference that Griffin got a call from Rouse or otherwise learned about Henson's LinkedIn message.

23, during which Casey said that he had decided to fire Henson because she "had gone to the partner with some concerns" after being told not to do so. The Board also noted that Casey told Henson that she was fired for what had transpired on October 22 and for disrupting Capstone's relationship with its business partner.     According to the Board, Casey's statements "link [Henson's] discharge to her protected concerted activity in sending the LinkedIn message."     Again, such an inferential conclusion is not supported by substantial evidence.

The record reflects that the "partner" Casey referred to was Associated Wholesale Grocers' Chris Griffin, not Donny Rouse.  Casey and other Capstone personnel routinely refer to Capstone's customers, including Associated Wholesale Grocers, as its partners.  And Rouse was not a customer or partner of Capstone, but of Associated Wholesale Grocers.  This interpretation is further supported by an email that Casey sent to Capstone's Human Resources Department following Henson's termination in which he stated that Henson "went directly to the partner and was unprofessional and refused to listen to him."  From the context of this email, it is clear that the inciting event involving a Capstone partner was Henson's October 22 interaction with Griffin, during which Henson was alleged to be "unprofessional" and "rude," not the LinkedIn message she sent to Rouse.

That Casey admittedly fired Henson for speaking with an Associated Wholesale Grocers' official, in direct contravention of Casey's earlier instructions not to bring concerns to the partner, does not lend any evidentiary support to the Board's conclusion that Henson was terminated for sending the LinkedIn message.  As Casey himself acknowledged, he decided to let Henson go because "she did not follow [his] instructions" by going to Griffin, not because she contacted Rouse.  For these reasons, we find that there is not substantial evidence to support the Board's conclusion that Henson was terminated for her protected LinkedIn message.

**B.**

As an alternative basis upon which to find that Capstone violated Section 8(a)(1) of the NLRA, the Board concluded that Henson's discharge was motived by Capstone's belief that Henson had raised group employment complaints to Griffin during their October 22 interaction. There is sufficient evidence to support this finding by the Board.

In reaching its conclusion, the Board determined that if Capstone did not believe that Henson had brought group employment complaints to Griffin on October 22, "there would have been no reason for Casey to claim—when explaining the reason for her discharge—that Henson had violated his directive not to bring Capstone-related issues or concerns to [Associated Wholesale Grocers]." This finding was based, in part, on the voicemail Casey left on Henson's phone following her termination, in which Casey explained that Henson was discharged for disrupting business by "questioning the partner" after she was told to only take concerns to Capstone. Likewise, in the email to Capstone's Human Resources Department, Casey reiterated that he decided to terminate Henson's employment because she disobeyed his instruction not to go to the partner with Capstone-related concerns. And Capstone's Mike Ruder also testified that Casey told him he was discharging Henson because she "had gone to the partner with some concerns" and "[s]he had violated proper communication."

The Board further noted that Casey had good reason to believe that Henson raised group complaints to Griffin because Henson had raised group complaints to Capstone officials, including Casey, earlier that same day. That Casey himself had engaged in discussions of this nature with Henson and the other auditors, coupled with Casey's knowledge that Henson and the other auditors had previously raised group concerns to Griffin, is sufficient

circumstantial evidence to support the Board's inference that he at least suspected protected concerted activity. *See Remington*, 847 F.3d at 185 ("[I]t is sufficient if the employer was motivated by suspected [protected concerted] activity in discharging the employee.").

Accordingly, we find that there is sufficient evidence in the record to support the Board's finding that a motivating factor for Capstone's discharge of Henson was its belief that she had raised group employment complaints to Griffin on October 22. We therefore affirm the Board's conclusion that Capstone violated Section 8(a)(1) of the NLRA on this basis.[11]

## IV.

For the foregoing reasons, we DENY Capstone's petition for review and GRANT the Board's cross-application to enforce.

---

[11] While we find that there was not sufficient evidence for the Board to conclude that Henson was terminated for actually engaging in protected concerted activity, we affirm the Board on its alternative finding that Capstone terminated Henson because it believed Henson engaged in protected concerted activity. There is a sufficient indication that the Board would have reached the same outcome in finding that Capstone violated Section 8(a)(1) of the NLRA based solely on this alternative finding. The Board itself acknowledged that "even assuming Capstone did not actually know that Henson had sent that protected message, it unlawfully discharged her based on its belief that she engaged in other protected concerted activity."

No. 23-60513

Haynes, *Circuit Judge*, dissenting:

I agree with the conclusion set out in Section III.A. of the majority opinion. However, I respectfully dissent from the conclusion in Section III.B. that results in an affirmance. I would reverse the Board and affirm the ALJ's judgment.

While it is true that employees can discuss group employment complaints with people outside of their company, in this case, the specific discussion with Griffin was a problem. Griffin worked for a customer of Capstone and complained earlier about Henson's comments. Griffin clearly did not want to hear more complaints from her. In a situation where a customer complains, it makes little sense to me to have the employee continue to bother that customer. In this case, it wasn't Henson discussing group issues, it was her complaining, indeed, having an unpleasant discussion, about her own issues with Griffin, at least as far as the Capstone group understood. The ALJ concluded that the NLRB General Counsel had not established that Henson's October 22 interaction with Griffin and subsequent discharge "concerned her protected activities as opposed to her desire . . . to increase her own compensation." That is what the ALJ relied upon in determining that her protected activity was not the reason for her firing.[1] Accordingly, I would affirm the ALJ's judgment, not that of the Board. Thus, I respectfully dissent.

---

[1] It is a bit unclear why she continually complained about her salary but wanted to continue to work for a company she thought pays too little.